

CV16861410                  93578553

# IN THE COURT OF COMMON PLEAS
## CUYAHOGA COUNTY, OHIO

RevoLaze, LLC
29307 Clemens Road
Westlake, Ohio 44145,

       Plaintiff,

vs.

Dentons US LLP
c/o RL&F Service Corp.
920 N. King Street, 2nd Floor
Wilmington, Delaware 19801,

       and

Mark L. Hogge
c/o Dentons US LLP
1301 K Street, NW
Suite 600, East Tower
Washington, DC 20005,

       and

Steven J. Stein
c/o Dentons US LLP
1221 Avenue of the Americas
New York, NY 10020,

       Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Civil Action No.

Judge: DAVID T MATIA

CV 16 861410

**COMPLAINT AND JURY
DEMAND**

FILED
2016 APR -4  P 3: 14
CLERK OF COURTS
CUYAHOGA COUNTY

Plaintiff, RevoLaze, LLC ("RevoLaze"), by and through undersigned counsel, for its Complaint against Defendants, Dentons US LLP ("Dentons US"), Mark L. Hogge ("Atty. Hogge"), and Steven J. Stein ("Atty. Stein") (collectively, "Defendants"), hereby states as follows:

**The Parties**

1.     RevoLaze is a Delaware limited liability company with its principal place of business at 29307 Clemens Road, Westlake, Ohio 44145.

2.     Dentons US is law firm operating as a Delaware-based limited liability partnership. Dentons US is a member of Dacheng Salans FMR SNR Denton Group ("Dentons"), a Swiss verein structure with more than 125 locations across 50-plus countries and more than 6,000 lawyers worldwide, making Dentons the world's largest law firm by number of lawyers. Under the Swiss verein structure, Dentons operates as an incorporated membership association, holds itself out as one law firm, and boasts about its seamless delivery of services across the globe.

3.     Atty. Hogge is licensed to practice law in the District of Columbia and the State of Virginia and, at all times material to this Complaint, has been an attorney and/or agent of Dentons US.

4.     Atty. Stein is licensed to practice law in the State of New York and, at all times material to this Complaint, has been an attorney and/or agent of Dentons US.

## Statement of Facts

### A.  The Engagement Letter

5.      On or about November 4, 2013, authorized representatives of RevoLaze and Dentons US met regarding the potential of Dentons US providing legal services in connection with the enforcement of RevoLaze's patent portfolio covering laser abrasion of denim products and laser patterns etched on denim products.

6.      Prior to that time, RevoLaze had interviewed several firms and had participated in an initial consultation with Dentons US. After not originally reaching an agreement, Dentons US reinitiated communications with RevoLaze, promoting the fact that Dentons was the world's largest law firm by number of lawyers and highlighting its "enviable track record representing individual inventors, artists and entrepreneurs, public institutions, emerging companies, venture capital groups and global corporations." See true and accurate copy of www.dentons.com/en/find-your-dentons-team/practices/intellectual-property-and-technology.aspx, attached hereto and incorporated herein as Exhibit 1.

7.      RevoLaze was impressed by and trusted the credentials of Atty. Hogge, who is the chair of Dentons US' legacy patent litigation practice. Atty. Hogge held himself out to the public and to RevoLaze as "one of the most experienced patent litigators in the country, having litigated many patents in all areas of technology for all sizes of

3

companies." See true and accurate copy of www.dentons.com/en/mark-hogge, attached hereto and incorporated herein as Exhibit 2.

8.      RevoLaze also engaged Dentons US as a result of Dentons' international presence and influence. This was important because RevoLaze sought to enforce its patents around the globe, including in Mexico, Turkey, and China.

9.      In order to secure RevoLaze as a client and in connection with the international work required by RevoLaze, Dentons US introduced RevoLaze to Dentons' "China specialist," Peter Su, and represented that Dentons US had partners around the globe.

10.      Subsequent to the meeting referenced above, Dentons US began a conflicts check relative to potential litigation defendants and respondents, including, but not limited to, The Gap, Inc. ("Gap") and Ralph Lauren Corporation ("Ralph Lauren"). See true and accurate copy of November 4, 2013, email from Atty. Stein to (among others) Darryl J. Costin, Sr. ("Costin," Chief Executive Officer of RevoLaze), attached hereto and incorporated herein as Exhibit 3.

11.      On January 8, 2014, Dentons US (by and through Atty. Stein) informed RevoLaze that it was unlikely that conflicts would be found to exist as to (among others) Gap. See true and accurate copy of January 8, 2014, email from Atty. Stein to Jim Schnorf ("Schnorf") and Costin, attached hereto and incorporated herein as Exhibit 4. However, it was determined that Dentons US was precluded from acting in any potential

4

litigation relative to Ralph Lauren because it was "a present client of the Canadian region" (*i.e.*, a present client of Dentons Canada LLP). Id.

12.     Further, Dentons US made a last-minute determination to exclude Calvin Klein as a defendant and respondent due to representation of Calvin Klein by Dentons Hong Kong (*i.e.* Dentons HK LLP). See true and accurate copy of August 15, 2014, email from Atty. Hogge to Costin, attached hereto and incorporated herein as Exhibit 5. Dentons US specifically contemplated the potential consequences of including Calvin Klein as a defendant and respondent, stating, "We don't want to draw a motion to disqualify." Id.

13.     Nonetheless, Dentons US was willing to proceed against (among others) Gap, claiming that all conflicts had been cleared. These determinations and the information provided by Dentons US (by and through Attys. Stein and Hogge) as set forth in paragraphs 11 and 12 above directly contradict (without limitation) the March 30, 2015, sworn statement of Dentons US partner and general counsel Edward J. Reich, which was filed in the ITC Litigation.

14.     By Engagement Letter dated February 7, 2014 ("Engagement Letter"), Dentons US agreed to provide legal services in connection with the enforcement of RevoLaze's patent portfolio covering laser abrasion of denim products and laser patterns etched on denim products ("the Litigation"), as well as incidental matters, such as responding to audit

5

letter requests. See true and accurate copy of Engagement Letter dated February 7, 2014, attached hereto and incorporated herein as Exhibit 6.

15.     More specifically, pursuant to the Funding Agreement dated February 7, 2014, between (among others) RevoLaze and Longford Capital Fund I, LP ("Longford") ("the Funding Agreement"), the Litigation contemplated and included all pre-trial, trial, appeal, and collections of any settlements, judgments, and awards in connection with (i) proceedings at the United States International Trade Commission pursuant to Section 337 of the Tariff Act of 1930 and related United States District Court actions per the Funding Agreement ("Phase 1"); (ii) conventional patent litigation under United States patent law in United States Districts Courts per the Funding Agreement ("Phase 2"); (iii) international enforcement actions per the Funding Agreement ("Phase 3"); and (iv) defending any counterclaims against RevoLaze in connection with the Litigation. See Ex. 6, p. 1. The Funding Agreement was incorporated into the Engagement Letter by reference. Id.

16.     Further, Dentons US agreed to (among other things) discount its rates for all timekeepers by twenty-five percent (25%) with respect to the Litigation and unconditionally cap its fees and expenses as follows: $3,715,000 for Phase 1; $2,134,000 for Phase 2; and $1,746,000 for Phase 3. See Ex. 6, p. 2. Dentons US was also entitled to a portion of the proceeds obtained through litigation of RevoLaze's claims on a contingent-fee basis. Id.

6

17.     Dentons US agreed that, in the event a conflict arose and Dentons US declined to pursue a component of the Litigation, alternate counsel would be engaged and the costs of any such alternate counsel would serve to reduce the amounts available to Dentons US pursuant to its unconditional fee cap. See Ex. 6, p. 2. Accordingly, Dentons US expressly identified all "existing conflicts" that it had with potential Litigation defendants and respondents, including, but not limited to, Gap and Ralph Lauren. See Ex. 6 at Exhibit B.

18.     Despite having identified Gap as an "existing conflict" on Exhibit B to the Engagement Letter (Ex. 6), Dentons US (by and through Atty. Hogge) expressly and repeatedly represented to RevoLaze that General Counsel for Dentons US had "cleared conflicts" for Gap, and, therefore, Dentons US was not precluded from acting against Gap in the Litigation. In reliance upon said express and repeated representations, RevoLaze authorized Dentons US to assert and pursue claims against Gap in the Litigation.

19.     In addition, Dentons US acknowledged that (among other things), in the event of any conflict in language and terms between the Engagement Letter and the Funding Agreement, the terms of the Funding Agreement shall prevail. See Ex. 6, p. 3.

**B.  The Phase 1 District Court Litigation**

20.     On August 15, 2014, pursuant to the Engagement Letter, Dentons US (by and through Atty. Hogge, Shailendra K. Maheshwari

("Atty. Maheshwari"), Nicholas H. Jackson ("Atty. Jackson"), and Atty. Stein) filed 17 separate lawsuits in the United States District Court for the Northern District of Ohio, Eastern Division, as attorneys for RevoLaze against denim jean brands, including, but not limited to, Gap (*i.e.*, Case No. 1:14-cv-01821-PAG (Judge Patricia A. Gaughan)) alleging infringement of six separate patents owned by RevoLaze ("the Phase 1 District Court Litigation") seeking (among other things) damages and prejudgment interest on the damages. See true and accurate copy of Complaint and Jury Demand, filed August 15, 2014, against Gap in the Phase 1 District Court Litigation attached hereto and incorporated herein as Exhibit 7, pp. 3-6.

### C. The ITC Litigation

21.     On August 18, 2014, pursuant to the Engagement Letter, Dentons US (by and through Attys. Hogge, Maheshwari, Jackson, and Stein) filed a Verified Complaint Under Section 337 of the Tariff Action of 1930 in the United States International Trade Commission against 17 respondents, including, but not limited to, Gap (*i.e.*, Investigation No. 337-TA-930) ("the ITC Litigation") seeking (among other things) a permanent general exclusion order pursuant to 19 U.S.C § 1337(d)(2)(B). See true and accurate copy of Verified Complaint Under Section 337 of the Tariff Action of 1930 (without referenced exhibits) filed August 18, 2014, in the United States International Trade Commission against

(among others) Gap, attached hereto and incorporated herein as Exhibit 8, p. 36.

### D. Unauthorized Disclosure and Production of the Funding Agreement

22.     On or about September 24, 2014, the respondents in the ITC Litigation jointly served upon RevoLaze a first set of requests for production of documents.

23.     On October 20, 2014, in breach and violation of the Engagement Letter and Funding Agreement, Dentons US (by and through Atty. Jackson) disclosed the existence and produced a copy of the Funding Agreement (for which the Engagement Letter is attached via Schedule I thereto) to the respondents in the ITC Litigation without notifying and obtaining the express written consent of Longford and RevoLaze prior to said disclosure and production. Dentons US also negligently produced other privileged documents, including, but not limited to, draft claim charts that Costin had composed for counsel.

24.     On October 22, 2014, without notifying either Longford or RevoLaze of its October 20, 2014, disclosure and production of the Funding Agreement to the respondents in the ITC Litigation, Dentons US (by and through Atty. Jackson) served the respondents with a "clawback" request relating to (among other documents) the Funding Agreement.

25.     On November 6, 2014, still without having notified either Longford or RevoLaze of its October 20, 2014, disclosure and production

of the Funding Agreement to the respondents in the ITC Litigation, Dentons US (by and through Atty. Jackson) served the respondents with a second "clawback" request relating to (among other documents) the Funding Agreement.

26.     On November 10, 2014, once again without having notified either Longford or RevoLaze of its October 20, 2014, disclosure and production of the Funding Agreement to the respondents in the ITC Litigation, Dentons US (by and through Atty. Jackson) served the respondents with a third "clawback" request relating to (among other documents) the Funding Agreement.

### E.  The Respondents' Motion to Compel

27.     On December 11, 2014, unable to resolve (among other things) the "clawback" requests made by Dentons US, referenced in paragraphs 24 through 26 above, Respondents' Motion to Compel Complainants to Withdraw Claims of Privilege and Work Product Protection Over Documents Previously Produced By Complainants and to Produce Certain Documents Referenced Therein ("Respondents' Motion to Compel") was filed in the ITC Litigation.

28.     Five days later, early in the afternoon on December 16, 2014, Costin spoke to Atty. Hogge relative to Atty. Stein's expressed concern regarding "something bad in the case." Atty. Hogge represented to Costin that Atty. Hogge had no knowledge of what Atty. Stein was concerned about and emphasized that if he knew that "something was bad in the

10

case" that RevoLaze would know as well. See true and accurate copy of December 16, 2014, email from Costin to William P. Farrell, Jr., and Michael A. Nicolas ("Farrell" and "Nicolas," respectively, Managing Directors of Longford), attached hereto and incorporated herein as Exhibit 9.

29. Late in the evening on December 16, 2014, Longford (among other things) requested a copy of Respondents' Motion to Compel from Dentons US (via Attys. Hogge and Maheshwari). See true and accurate copy of December 16, 2014, email from Nicolas to Attys. Hogge and Maheshwari, attached hereto and incorporated herein as Exhibit 10.

30. On December 17, 2014, Dentons US (per the request of Atty. Hogge) provided Longford and RevoLaze with a copy of Respondents' Motion to Compel. See true and accurate copy of December 17, 2014, email (with referenced attachment) from Sharon M. Norwood to Nicolas, attached hereto and incorporated herein as Exhibit 11.

31. Thereafter, on December 17, 2014, Dentons US (by and through Atty. Hogge) informed Longford and RevoLaze that the opposition to Respondents' Motion to Compel was due December 22, 2014. See true and accurate copy of December 17, 2014, email from Atty. Hogge to Nicolas, attached hereto and incorporated herein as Exhibit 12.

32. On March 23, 2015, by Order No. 36: Granting In Part Motion to Compel Re-Production of Documents, Respondents' Motion to Compel was granted regarding (among other things) the Funding Agreement (for

11

which the Engagement Letter is attached via Schedule I thereto). See true and accurate copy of the "Public Version" of Order No. 36: Granting In Part Motion to Compel Re-Production of Documents issued March 23, 2015, in the ITC Litigation, attached hereto and incorporated herein as Exhibit 13. Dentons US never provided RevoLaze with a copy thereof.

### F. Gap's Motion to Disqualify Dentons US

33.      On February 4, 2015, counsel for Gap confirmed his February 2, 2015, conversation with Atty. Hogge regarding Gap's demand that Dentons US immediately withdraw from the Phase 1 District Court Litigation and the ITC Litigation (at least as it pertains to Gap) given the conflict issue for Dentons US relative to Gap. See true and accurate copy of February 4, 2015, email from Christopher T. Holland to Atty. Hogge, attached hereto and incorporated herein as Exhibit 14.

34.      The next day, on February 5, 2015, Dentons US (by and through Atty. Hogge), consistent with its prior oral representations, once again expressly represented to RevoLaze that Gap had "cleared conflicts," and, therefore, Dentons US was not precluded from acting against Gap in the Litigation. See true and accurate copy of February 5, 2015, email from Atty. Hogge to Costin, attached hereto and incorporated herein as Exhibit 15.

35.      On February 20, 2015, Dentons US (by and through Atty. Hogge) informed RevoLaze for the first time that it expected Gap to file a motion to disqualify Dentons US and yet again expressly represented to

RevoLaze that Gap had "cleared conflicts," and, therefore, Dentons US was not precluded from acting against Gap in the Litigation. See true and accurate copy of February 20, 2015, email from Atty. Hogge to Costin, attached hereto and incorporated herein as Exhibit 16.

36.    On March 11, 2015, Respondent The Gap, Inc.'s, Motion to Disqualify Dentons US LLP as Counsel for Complainants RevoLaze, LLC, and TechnoLines, LLC, ("Motion to Disqualify Dentons US") was filed in the ITC Litigation. Dentons US never provided RevoLaze with a copy thereof.

37.    On March 13, 2015, Defendant Gap Inc.'s, Motion to Disqualify Dentons US LLP was filed in the Phase 1 District Court Litigation. Dentons US never provided RevoLaze with a copy thereof.

38.    On April 13, 2015, Dentons US (by and through Atty. Stein) forwarded a link to (among others) RevoLaze of an April 12, 2015, article in The Wall Street Journal entitled "At Dentons, Strategy Is to Go Big – Law firm says it won't get hemmed in by conflicts as it bulks up to become a one-stop shop." See true and accurate copy of April 13, 2015, email from Atty. Stein with corresponding April 12, 2015, article, attached hereto and incorporated herein as Exhibit 17.

39.    The followed excerpt is contained within The Wall Street Journal article:

> Dentons's global chairman, Joseph Andrew, says the firm hopes to disprove a widespread belief that once a law firm gets past a certain size, conflicts of interest are inevitable, requiring it to forgo an assignment for one client that

13

could cut against the interest of another. "What we're trying to do is take these myths that have gathered up in the legal profession and simply say [they're] not true," he said. Id.

40.     On May 7, 2015, by Order No. 43: Granting Motion to Disqualify Counsel, Gap's Motion to Disqualify Dentons US was granted. See true and accurate copy of the "Public Version" of Order No. 43: Granting Motion to Disqualify Counsel issued May 7, 2015, in the ITC Litigation, attached hereto and incorporated herein as Exhibit 18. Notably, Chief Administrative Law Judge Charles E. Bullock specifically found that Dentons US had committed an ethical violation in the form of concurrent conflict of interest and that forcing RevoLaze to retain new counsel at that point in the ITC Litigation would severally prejudice RevoLaze; however, the disqualification of Dentons US was necessary inasmuch as he could not "condone the continued violation of an ethical rule" by Dentons US. Id., p. 13.

41.     With regard to Defendants, in his Order, Chief Administrative Law Judge Bullock stated the following:

> The undersigned cannot fully credit Mr. Hogge's representations that he only intended to identify Gap "as a potential business conflict" for two reasons. (Reply Opp., Hogge Decl.) First, Dentons US specifically identified the conflict with Gap in its retainer agreement with Complainant Revolaze as an "existing conflict." (See Holland Decl., Ex. F at Schedule 1.) It is textbook contract law that the words in the final written agreement trump Mr. Hogge's subjective intent. The identification of Gap as an existing conflict serves as an admission that Dentons US did not, at the time when it took on representation of Complainants and entered into the Funding Agreement, believe that it was sufficiently separate from the other

14

> Legal Practices to be able to represent Complainants against Gap. (*See id.*, Schedule I at 2 (discussing terms for handling conflicts).) Second, Complainants' opposition papers show a lack of understanding of the nuances of the ABA Model Rules between current and former clients and when ethical screens may be implemented. This unfamiliarity with the rules undermines the persuasiveness of Mr. Hogge's later determination that Dentons US could proceed without conflict. Id., p. 9.

The above-referenced admission that Dentons US did not believe that it was sufficiently separate to represent RevoLaze against Gap is further reinforced by Atty. Stein's January 8, 2014, email (See Ex. 4) and Atty. Hogge's August 15, 2014, email (See Ex. 5), in which Dentons US stated that it was unable to represent RevoLaze against Ralph Lauren and Calvin Klein, respectively, for the same reasons that ultimately resulted in Dentons US' disqualification.

42. On May 8, 2015, Dentons US (by and through Atty. Hogge) informed RevoLaze that it had been disqualified from the ITC Litigation. See true and accurate copy of May 8, 2015, email from Atty. Hogge to Costin, attached hereto and incorporated herein as Exhibit 19.

43. Due to the disqualification of Dentons US referenced in paragraph 40 above, RevoLaze had to quickly retain alternate counsel who had no conflicts with any of the respondents in the ITC Litigation in order to (without limitation) immediately:

    a. Prepare for and defend at least 12 depositions;

    b. Prepare for the respondents' visit to RevoLaze;

    c.  Prepare answers and responses to numerous discovery requests served upon RevoLaze by the respondents;

    d.  Prepare argument and brief for "claim construction;"

    e.  Prepare for and take numerous depositions of (among others) the respondents;

    f.  Research new evidence on the issue of RevoLaze's domestic industry;

    g.  Prepare a brief on the domestic industry issue; and

    h.  Attempt to negotiate possible settlements with the respondents.

44.    In order to quickly retain alternate counsel and to accomplish the work referenced in paragraph 43 above, RevoLaze was forced to secure additional capital and was left with no other alternative than to amend the terms and conditions of the Funding Agreement ("the Amended Funding Agreement") to its economic detriment.

45.    Further, in order to begin to address the necessary work referenced in paragraph 43 above, RevoLaze requested that Dentons US meet with RevoLaze's alternate counsel as soon as possible and provide the alternate counsel with all documents in the ITC Litigation. See true and accurate copy of May 11, 2015, email from Costin to Attys. Hogge, Jackson, and Maheshwari, attached hereto and incorporated herein as Exhibit 20.

46. In response to RevoLaze's request referenced in paragraph 45 above, Dentons US (by and through Atty. Stein) demanded payment of nearly $1,000,000.00 for fees and expenses allegedly owed before Dentons US would release the requested documents to alternate counsel. See true and accurate copy of May 11, 2015, email from Atty. Stein to Costin, attached hereto and incorporated herein as Exhibit 21.

47. Accordingly, in order to protect and pursue the interests of RevoLaze in (among other things) the ITC Litigation, Global IP Law Group, LLC, contacted Dentons US to request that all the documents in the ITC Litigation be immediately forwarded to them as per the professional obligation of Dentons US. See true and accurate copy of May 11, 2015, email from C. Graham Gerst ("Atty. Gerst") to Atty. Hogge, attached hereto and incorporated herein as Exhibit 22.

48. On May 12, 2015, Dentons US (by and through Atty. Hogge) finally acceded to the requests of RevoLaze and its new counsel referenced in paragraphs 45 and 47 above. See true and accurate copy of May 12, 2015, email from Atty. Hogge to Atty. Gerst, attached hereto and incorporated herein as Exhibit 23.

**G. Phase 1 Budget**

49. As noted in paragraph 15 above, Dentons US agreed that the scope of representation for Phase 1 of the Litigation included all pre-trial, trial, appeal, and collections of any settlements, judgments, and awards

17

in connection with the Phase 1 District Court Litigation and the ITC Litigation. See Ex. 6, p. 2.

50.     As further noted in paragraph 16 above, Dentons US agreed to (among other things) unconditionally cap its fees and expenses at $3,715,000 for Phase 1 of the Litigation. See Ex. 6, p. 2.

51.     As of the date of its disqualification (*i.e.*, May 7, 2015), Dentons US had been paid $2,486,664.38 for Phase 1 of the Litigation.

52.     Since the date of its disqualification (*i.e.*, May 7, 2015), Dentons US has invoiced RevoLaze for an additional $392,387.40 for fees and $136,008.75 in expenses.

## H. Failures Regarding the Respondents' Infringing Products

53.     The February 7, 2014, budget for the ITC Litigation provided by Dentons US accounted for "pre-suit investigation" (including, but not limited to, "identifying importation evidence"). See Estimated ITC Budget, attached hereto and incorporated herein as Exhibit 24. Dentons US, however, unilaterally and improperly elected to limit the pre-suit investigation in the ITC Litigation, in particular as it pertained to engaging experts, investigating the unauthorized use of RevoLaze's patents, and the respondents' importation of infringing products.

54.     On September 4, 2014, Dentons US (by and through Atty. Hogge) estimated that Dentons US would take approximately 18 depositions on behalf of RevoLaze in the ITC Litigation. See true and accurate copy of September 4, 2014, email from Atty. Hogge to Farrell

18

and Costin, attached hereto and incorporated herein as Exhibit 25. The number included only the Rule 30(b)(6) depositions for the originally named respondents and did not account for the six subsequently named respondent-manufacturers or any of the other prospective deponents. Costin subsequently identified in writing for Dentons US specific individuals to subpoena for depositions. See true and accurate copy of November 6, 2014, email from Costin to Attys. Hogge, Jackson, and Maheshwari, attached hereto and incorporated herein as Exhibit 26.

55.     Contrary to Atty. Hogge's March 30, 2015, sworn statement, which was filed in the ITC Litigation and addressed the allegedly active progress of both written and oral discovery, only one deposition had been taken by Dentons US by that time, and no inspections of premises had been conducted by either the respondents or the complainants.

56.     Despite being provided with the names of prospective deponents and despite the fact that there were 17 respondents and six additional manufacturers added in the ITC Litigation, by the time Dentons US had been disqualified (*i.e.*, May 7, 2015), which occurred more than eight months after Atty. Hogge's September 4, 2014, email regarding projected depositions and almost nine months after the complaint had been filed, Dentons US (by and through Atty. Hogge), to the best knowledge and belief of RevoLaze, had only taken one deposition—that of H&M Hennes & Mauritz L.P. and H&M Hennes & Mauritz AB (collectively, "H&M")—and it was taken in Sweden.

19

57.     The respondents, in contrast, facing only RevoLaze and TechnoLines as complainants, took at least 14 depositions.

58.     Further, Dentons US negligently failed to address both the respondents' inadequate responses to RevoLaze's complaint and the respondents' subsequent refusal to respond to discovery requests relative to each of the respondent's respective infringing products.

59.     For a response to a complaint, the ITC requires (without limitation) that, in addition to providing facts constituting each ground of any defenses that is pleaded, each respondent also include statistical data on the quantity and value of imports of the involved units, the Harmonized Tariff Schedule item number for importations of each of the accused imports, a statement concerning the company's capacity to produce the subject unit, the relative significance of the U.S. market to the company's operations, and the name and address of the supplier of imports if the company does not manufacture the accused imports.

60.     At least three of the respondents in the ITC Litigation stated (1) that they would not provide data until the week of trial when responding either to the complaint or to discovery requests, (2) that they were unwilling to incur the expense of determining the number of units imported, or (3) that they would only address specific items in the complaint. Atty. Hogge identified these failures with specificity as to Gap in his March 30, 2015, sworn statement, which was filed in the ITC

Litigation. Nonetheless, Dentons US failed to address these inadequate responses within the ITC Litigation.

61.     Rather than addressing the respondents' inadequate responses, and despite Costin's repeated (and ultimately unsuccessful) requests to Dentons US (through Atty. Hogge) to file motions to compel against the respondents, Dentons US sought and obtained the ITC's Office of Unfair Import Investigation ("OUII") recommendation that Dentons US bring into the ITC Litigation the respondents' denim jean manufacturers. However, Dentons US incorrectly advised RevoLaze that they could only bring in the denim jean manufacturers identified by the respondents during discovery. Consequently, only a limited number of denim jean manufacturers were brought into the ITC Litigation despite the numerous other denim jean manufacturers in (among other countries) Mexico, Columbia, China, Bangladesh, and Vietnam, all of which RevoLaze had verified were producing and exporting infringing product into the U.S.

62.     On April 13, 2015, after the Gap had filed its Motion to Disqualify in the ITC Litigation, Dentons US (by and through Atty. Hogge), with knowledge of its conflicted posture and contrary to the best interests of RevoLaze, encouraged "accelerating" settlement discussions with the Gap. The stated purpose was to "try and stop the expensive high stakes desperate motion practice of Gap * * * [i]t is a drag on OUII and the other respondents." See true and accurate copy of April 13, 2015,

21

email from Atty. Hogge to Costin, attached hereto and incorporated herein as Exhibit 27.

63.     On May 8, 2015, after having been disqualified and leaving RevoLaze irreparably damaged as a result of the failures in (without limitation) addressing both the respondents' inadequate responses to RevoLaze's complaint and the respondents' subsequent refusal to respond to discovery requests relative to each of the respondent's respective infringing products, Dentons US (by and through Atty. Hogge) claimed that "[t]he situation is simple from Judge Bullock's point of view * * * Gap has to be out of the case for [Dentons US] to continue with the ITC matter * * * [t]he message is to Gap as well * * * * [t]his is the one time that Gap has to capitalize on its strategy * * * Gap does not have big numbers with Crystal out of the picture." See true and accurate copy of May 8, 2015, email from Atty. Hogge to Farrell and Costin, attached hereto and incorporated herein as Exhibit 28.

**I.   Failure Regarding Domestic Industry**

64.     On February 3, 2015, Dentons US (by and through Atty. Jackson), without consulting with or obtaining the approval of RevoLaze, stipulated that RevoLaze would "not rely on the Levi settlement license to establish domestic industry in" the ITC Litigation.

65.     The relevant date on which a domestic industry must be shown to exist before the ITC is the date on which a complaint is filed. Therefore, the existence of a domestic industry in the ITC Litigation

should have been established as of August 18, 2014. Dentons US negligently failed to develop evidence of the facts needed to support the existence of a domestic industry prior to filing the complaint in the ITC Litigation. Further, as a result of Dentons US' unauthorized stipulation regarding the Levi settlement license, RevoLaze had to pay considerably more in legal fees in order to establish its domestic industry argument.

66.     Had Dentons US not agreed to the above-referenced stipulation, the Levi settlement would have clearly established that RevoLaze was not simply a patent troll by demonstrating that Levi had also wanted to explore ways of working with RevoLaze in order to license the laser technology, which would have saved RevoLaze substantial costs and fees.

**J. Failure to Secure Reasonable Settlements**

67.     Although its February 7, 2014, Budget for the ITC Litigation accounted for a "pre-suit investigation" (including, but not limited to, "identifying importation evidence"), Dentons US limited the investigation conducted relative to the respondents' importation of infringing products by refusing to engage experts or to investigate the unauthorized use of RevoLaze's patents. See Ex. 24. These decisions, along with Dentons US' failures set forth in paragraphs 53 through 63 above, substantially limited the scope of all settlement discussions by creating a glass ceiling for any alleged damages.

68.     The litigation strategy, as proposed by Dentons US, had initially been to seek (among other things) a permanent general exclusion order pursuant to 19 U.S.C. § 1337(d)(2)(B) through the ITC Litigation, then to seek monetary damages through the Phase 1 District Court Litigation, including, but not limited to, punitive and treble damages for willful infringement by (among others) the Gap.

69.     Pursuant to the Engagement Letter, Dentons US established a budget and agreed to cap its fees and expenses at $3,715,000 for both the ITC Litigation and the Phase 1 District Court Litigation. By the time the complaints in the ITC Litigation and the Phase 1 District Court Litigation had been filed in August of 2014, Dentons US had billed RevoLaze $1,316,874.76 (*i.e.*, approximately 35% of Dentons US' total budget for both the ITC Litigation and the Phase 1 District Court Litigation and approximately $980,000 over-budget at the pre-suit investigation and post filing stage of its budget).

70.     In November of 2014, a Past Damages/Future Royalty Analysis ("the Analysis") was prepared by Costin, approved by Dentons US, and presented to the respondents during settlement negotiation meetings conducted in the ITC Litigation. See the Analysis, attached hereto and incorporated herein as Exhibit 29. The Analysis assumed the following: (i) 6 years of past damages; (ii) 7 years of future royalties; and (iii) a royalty rate of 3% of the average price of $37.41 for jeans sold in the U.S. (Dentons US' royalty expert, Donald E. Stout from the

24

intellectual property law firm Fitch, Even, Tabin & Flannery LLP, had agreed that the 3% royalty rate was reasonable during a phone discussion with Atty. Hogge and Costin).

71.     The Analysis also provided a settlement range based upon a respondent's market share (*e.g.*, $8,676,000 for a respondent with a 1% share of the laser-abraded market; $43,381,000 for a respondent with a 5% share of the laser-abraded market; and $104,115,000 for a respondent with a 12% share of the laser-abraded market). The one material issue that the respondents expressed regarding the Analysis was the 3% royalty rate. Settlement discussions would have proceeded naturally from these meetings but for the negligence of Dentons US.

72.     In addition, and as stated above in paragraphs 58 through 61, Dentons US had negligently failed to address both the respondents' inadequate responses to RevoLaze's complaint and the respondents' subsequent refusal to respond to discovery requests relative to each of the respondent's respective infringing products. Despite Costin's repeated (and ultimately unsuccessful) requests to Dentons US (through Atty. Hogge) to file motions to compel against the respondents, Dentons US merely sought and obtained the ITC's OUII recommendation that Dentons US bring into the ITC Litigation the respondents' denim jean manufacturers. However, Dentons US incorrectly advised RevoLaze that they could only bring in the denim jean manufacturers identified by the respondents during discovery. Consequently, only a limited number of

denim jean manufacturers were brought into the ITC Litigation despite the substantial number of other denim jean manufacturers in (among other countries) Mexico, Columbia, China, Bangladesh, and Vietnam, all of which RevoLaze had verified were producing and exporting infringing product into the U.S. This failure necessarily limited the extent of recovery available through settlement.

73.     As set forth above in paragraph 62, on April 13, 2015, after the Gap had filed its Motion to Disqualify Dentons US in the ITC Litigation, Dentons US (by and through Atty. Hogge), with knowledge of its conflicted posture and contrary to the best interests of RevoLaze, encouraged "accelerating" settlement discussions with the Gap. The stated purpose was to "try and stop the expensive high stakes desperate motion practice of Gap * * * [i]t is a drag on OUII and the other respondents." See Ex. 27.

74.     Because Dentons US was entitled to a portion of the proceeds on a contingent-fee basis (See Ex. 6, p. 2), Dentons US had a clear conflict of interest with regard to accelerating settlement discussion following the Gap's filing of its Motion to Disqualify. Additionally, had Dentons US not been compromised as a result of the conflicted representation, the settlement process would not have been artificially accelerated. This artificial and conflicted acceleration negatively impacted RevoLaze's leverage in the settlement negotiations and, consequently, its business viability.

26

75.     By the time Dentons US had been disqualified in the ITC Litigation on May 7, 2015 (*i.e.*, 9 months after filing the complaints in the ITC Litigation and the Phase 1 District Court Litigation), it had billed RevoLaze $3,010,148.46 (*i.e.*, approximately 81% of Dentons US' total budget for both the ITC Litigation and the District Court Litigation and approximately $643,000 over-budget at that stage). Nonetheless, Dentons US still needed to, without limitation, (1) complete no fewer than 17 additional depositions (and, more realistically, at least 23), including those in China, Turkey, and Mexico, (2) prepare for domestic industry arguments, (3) prepare for claim construction arguments, (4) prepare for expert reports, (5) prepare for and present at the Markman hearing, (6) prepare for and participate in the ITC Litigation trial, (7) prepare for and participate in the District Court Litigation trial, and (8) handle all appeals and collections. All of these tasks needed to be completed with the 19% of the budget that remained (*i.e.*, $704,851.54). Further, in addition to the clear budgetary impediments, the deadlines to complete these tasks were either quickly approaching or had already passed, turning the successful prosecution of RevoLaze's claims into a seemingly impossible task.

76.     Just before the disqualification in the ITC Litigation, Dentons US (by and through Atty. Hogge) surprisingly confessed to Farrell at a meeting in Dentons US' offices in Washington, D.C., that it had no intention of going to trial in either the ITC Litigation or the Phase 1

27

District Court Litigation. This confession aligns with the complete failure of Dentons US to prosecute RevoLaze's claims or to conduct discovery to any reasonable degree.

77.     As a direct and proximate result of Dentons US' collective negligent conduct, settlement royalties were far less than the amount RevoLaze was entitled to. Because of Dentons US' failure to fully prepare to try either case, RevoLaze was unable to obtain (without limitation) any exclusion order in the ITC Litigation or punitive or treble damages in the Phase 1 District Court Litigation.

**K.  General Misconduct**

78.     On September 3, 2014 (*i.e.*, approximately two weeks after complaints were filed in the Phase 1 District Court Litigation and the ITC Litigation), Dentons US (by and through Atty. Hogge) represented to Longford that "[t]he major reasons for exceeding the budget have to do with the original infringer list changing as things developed, the number of claims determined to be infringed, and the actual mapping of infringement." See true and accurate copy of September 3, 2014, email from Atty. Hogge to Farrell, Costin, and Nicolas, attached hereto and incorporated herein as Exhibit 30. The vast majority of the tasks listed by Dentons US (by and through Atty. Hogge) to justify exceeding its budget were performed by RevoLaze itself and should have had no more than a nominal impact on fees and expenses incurred.

79.     Having RevoLaze perform the majority of these tasks has proven to be demonstrative of Dentons US' lack of familiarity practicing before the ITC. Claim construction in the ITC Litigation, for example, needed to be performed by an expert because RevoLaze would not have been granted access to the respondents' confidential business information. Dentons US was improperly delegating tasks to RevoLaze and then pointing to the completion of those tasks to justify exceeding its budget.

80.     On October 20, 2014, in breach and violation of the Engagement Letter and the Funding Agreement, Dentons US (by and through Atty. Jackson) disclosed the existence of and produced a copy of the Funding Agreement to the respondents in the ITC Litigation without notifying or obtaining the prior express written consent of Longford and RevoLaze. Having knowledge of the Funding Agreement and the arrangement capping fees was highly advantageous to the respondents. This knowledge also substantially and irreparably harmed RevoLaze and would not have come into the respondents' possession but for the negligence of Dentons US.

81.     On October 22, 2014, without notifying either Longford or RevoLaze of its October 20, 2014, disclosure and production of the Funding Agreement to the respondents in the ITC Litigation, Dentons US (by and through Atty. Jackson) served the respondents with a "clawback" request relating to (among other documents) the Funding Agreement.

29

82.     On October 23, 2014, unaware of Dentons US' disclosure and production of the Funding Agreement to the respondents in the ITC Litigation, Longford raised the issue of Dentons US' budget overage by more than $1 million (*i.e.*, 300% over budget). See true and accurate copy of October 23, 2014, email from Farrell to Atty. Stein, attached hereto and incorporated herein as Exhibit 31. Dentons US remained silent on the disclosure and production of the Funding Agreement.

83.     On November 6, 2014, still without having notified either Longford or RevoLaze of its October 20, 2014, disclosure and production of the Funding Agreement to the respondents in the ITC Litigation, Dentons US (by and through Atty. Jackson) served the respondents with a second "clawback" request relating to (among other documents) the Funding Agreement.

84.     On November 10, 2014, again without having notified either Longford or RevoLaze of its October 20, 2014, disclosure and production of the Funding Agreement to the respondents in the ITC Litigation, Dentons US (by and through Atty. Jackson) served the respondents with a third "clawback" request relating to (among other documents) the Funding Agreement.

85.     That same day (*i.e.*, November 10, 2014), while still remaining silent on its disclosure and production of the Funding Agreement to the respondents in violation of the Funding Agreement and Engagement Letter, Dentons US (by and through Atty. Stein) began pressuring

30

Longford for payment of its over-budget bills. See true and accurate copy of November 10, 2014, email from Atty. Stein to Farrell and Nicolas, attached hereto and incorporated herein as Exhibit 32. Specifically, Atty. Stein told Costin that Dentons US was considering a lawsuit against Longford for breach of contract.

86.     Accordingly, on November 21, 2014, Schnorf, acting as a mediator at Costin's request, notified Atty. Stein that under no circumstances should Dentons US take action toward stopping its work in the Litigation or filing a complaint against Longford. See true and accurate copy of November 21, 2014, email from Schnorf to Atty. Stein, attached hereto and incorporated herein as Exhibit 33.

87.     On December 11, 2014, unable to resolve (among other things) the "clawback" requests made by Dentons US, the respondents filed a Motion to Compel in the ITC Litigation relative to (among other things) the Funding Agreement and Engagement Letter. Dentons US did not notify RevoLaze of the filing of Respondents' Motion to Compel.

88.     Five days later, early in the afternoon on December 16, 2014, Costin spoke to Atty. Hogge relative to Atty. Stein's expressed concern regarding "something bad in the case." Atty. Hogge represented to Costin that he had no knowledge of what Atty. Stein was concerned about and emphasized that, if he knew that "something was bad in the case," RevoLaze would know as well.

89.     Eventually, and as previously set forth in paragraph 29, Longford came to discover that the respondents had filed a Motion to Compel, and, late in the evening on December 16, 2014, after Costin had previously spoken with Atty. Hogge, Longford requested a copy of Respondents' Motion to Compel from Dentons US (via Attys. Hogge and Maheshwari). See Ex. 10. It is unclear when, if ever, the negligent disclosure and production of the Funding Agreement would have been disclosed to RevoLaze had Longford not enquired about Respondents' Motion to Compel.

90.     Similarly, on March 11, 2015, the Gap's Motion to Disqualify Dentons US was filed in the ITC Litigation. Dentons US never provided RevoLaze with a copy thereof.

91.     As set forth in paragraph 32, on March 23, 2015, by Order No. 36: Granting In Part Motion to Compel Re-Production of Documents, Respondents' Motion to Compel was granted regarding (among other things) the Funding Agreement. See Ex. 13. Dentons US never provided RevoLaze with a copy thereof.

92.     On April 9, 2015, without the knowledge or approval of RevoLaze, Dentons US (via an email from Atty. Hogge) submitted a $150,000 settlement demand to H&M through its counsel in the ITC Litigation.

32

93.     As set forth in paragraph 40, on May 7, 2015, by Order No. 43: Granting Motion to Disqualify Counsel, the Gap's Motion to Disqualify Dentons US was granted in the ITC Litigation. See Ex. 18.

94.     On May 8, 2015, Dentons US (by and through Atty. Hogge) informed RevoLaze that it had been disqualified from the ITC Litigation. See paragraph 42 above. This information was both surprising and devastating to RevoLaze. See Ex. 19.

95.     On May 11, 2015, as a result of Dentons US' disqualification in the ITC Litigation, and as previously set forth in paragraph 45, RevoLaze requested that Dentons US meet with RevoLaze's alternate counsel as soon as possible and provide the alternate counsel with all documents in the ITC Litigation. See Ex. 20.

96.     Later that same day (*i.e.*, May 11, 2015), in response to RevoLaze's request that Dentons US meet with RevoLaze's alternate counsel as soon as possible and to provide them with all documents in the ITC Litigation, Dentons US (by and through Atty. Stein) demanded payment of nearly $1,000,000.00 for fees and expenses allegedly owed before it would release the requested documents to RevoLaze's alternate counsel. See Ex. 21.

**Count One – Legal Malpractice as to all Defendants**

97.     RevoLaze incorporates by reference the allegations of paragraphs 1 through 96, as though fully set forth herein.

33

98.　No later than February 7, 2014, RevoLaze and Defendants had entered into an attorney-client relationship through which Defendants would provide legal services to RevoLaze in the form of, among other things, prosecution of patent infringement claims on patents owned by RevoLaze.

99.　Through this attorney-client relationship, Defendants owed to RevoLaze the duty to act with the degree of skill, knowledge, care, and diligence normally applied by members of their profession under like or similar circumstances.

100.　Defendants deviated from this standard of care in a variety of ways, including, but not limited to, the following:

a. Engaging in conflicted representation of RevoLaze, in direct violation of Rule 1.7 of the Ohio Rules of Professional Conduct;

b. Failing to properly prepare to prosecute RevoLaze's claims in the ITC Litigation prior to filing a complaint;

c. Failing to engage experts where necessary in the ITC Litigation;

d. Negligently and improperly delegating litigation tasks to RevoLaze in the ITC litigation that would require access to respondents' confidential business information in violation of ITC rules of practice;

e.  Failing to develop and employ a viable strategy for negotiating settlement of the underlying patent claims;

f.  Unilaterally limiting pre-suit investigations in the ITC Litigation as they pertained to potential respondents' importation of infringing products, thereby limiting the scope of any Limited Exclusion Order issued by the ITC;

g.  Disclosing the existence and producing a copy of the Funding Agreement and the Engagement Letter to the respondents in the ITC Litigation;

h.  Failing to communicate with RevoLaze regarding, among other things, conflicts of interest, the disclosure and production of the Funding Agreement and the Engagement Letter, the subsequent motion to compel, and the motions for disqualification, all in direct violation of Rule 1.4 of the Ohio Rules of Professional Conduct;

i.  Failing to conduct discovery to any reasonable degree;

j.  Failing to abide by the schedule of the joint discovery plan set forth in the ITC Litigation;

k.  Failing to address the respondents' inadequate responses to the complaint in the ITC Litigation;

l.  Failing to address the respondents' inadequate responses to or refusal to respond to the discovery requests in the ITC Litigation;

35

m. Failing to identify in the ITC Litigation all denim jean manufacturers that were producing and exporting infringing products into the U.S.;

n. Stipulating without consultation with RevoLaze, that RevoLaze would not rely on the prior Levi settlement license, which would have established the domestic industry argument in the ITC Litigation;

o. Failing to prosecute RevoLaze's claims with the intention of ultimately trying the claims either in the ITC Litigation, where a much higher percentage of cases are tried, or in the Phase 1 District Court Litigation;

p. Submitting a settlement demand for $150,000 to H&M through its counsel without the knowledge or approval of RevoLaze; and

q. Withholding RevoLaze's legal file from RevoLaze and its alternate counsel following the disqualification of Defendants.

101.    As billings began to approach the Phase 1 funding cap, Defendants acted with actual malice, intentionally neglecting the right of RevoLaze to conduct discovery in the Litigation with the knowledge that this inaction would necessarily restrict RevoLaze's ability to prosecute its claims or reach fair and reasonable settlements. Defendants strategically employed this inaction because the Funding Agreement Defendants had

36

agreed to be bound by would not allow Defendants to continue to bill for fees once the funding cap had been met. Accordingly, Defendants knowingly acted to maximize their own profits to the detriment of RevoLaze.

102.     Ultimately, as a result of Defendants' negligence, RevoLaze forfeited its enforcement rights on numerous high-value patents and was forced to settle its remaining claims for a fraction of their actual value in order to (without limitation) attempt to preserve its business viability.

103.     As a direct and proximate result of Defendants' negligence and deviations from the applicable standard of care, RevoLaze has suffered a series of injuries, including, but not limited to:

    a. The loss of enforcement rights on RevoLaze's patents resulting in damages no less than $51,900,000 and potentially as high as $160,620,000;

    b. Funds and resources expended developing the claim charts and the Analysis in an amount no less than $701,222;

    c. The loss of leverage in the Litigation resulting from the improper production of the Funding Agreement; and

    d. The less favorable terms contained within renegotiated Funding Agreement resulting from RevoLaze's compromised posture as a result of Defendants' series of failures listed above.

104.    But for Defendants' negligence, RevoLaze would have successfully prosecuted its underlying claims for their full value and obtained an exclusion order in the ITC Litigation, with reach impacting a substantial number of brands and denim jean manufacturers who either already are or are likely to infringe on RevoLaze's patents.

WHEREFORE, Plaintiff, RevoLaze, LLC, respectfully requests that this Honorable Court enter judgment in favor of RevoLaze and against Defendants, Dentons US, Atty. Hogge, and Atty. Stein, for compensatory damages in an amount to be proven at trial but no less than $52,601,222, for punitive damages, for the disgorgement of all fees claimed due and previously paid, and for all other relief this Court deems just and appropriate.

**Count Two – Breach of Fiduciary Duty as to all Defendants**

105.    RevoLaze incorporates by reference the allegations of paragraphs 1 through 96, as though fully set forth herein.

106.    On February 7, 2014, RevoLaze and Defendants entered into an Engagement Letter through which Defendants would provide professional services to RevoLaze in connection with the Litigation, as well as any incidental matters.

107.    Through this relationship, Defendants owed the fiduciary duties of care, loyalty, and good faith to RevoLaze. These duties included obligations to exercise good business judgment, to act prudently in the protection of RevoLaze's interests, to discharge Defendants' actions in

38

good faith, and, specifically, to put the interests of RevoLaze above those of any of RevoLaze's litigation opponents without compromise.

108.     Defendants breached their fiduciary duties by, among other things, simultaneously engaging in a conflicted relationship with at least one litigation opponent, directly resulting in the disqualification of Dentons US from representing RevoLaze in the Litigation.

109.     Defendants acted with actual malice, intentionally disregarding the conflicted representation that would eventually lead to the disqualification of Dentons US to the detriment of RevoLaze. This decision to disregard the conflicted representation is a deliberate and acknowledged business strategy of Defendants, as outlined above in paragraphs 38 and 39. By advancing this approach, Defendants were able to collect an excess of $2.4 million in fees from RevoLaze in only a matter of months prior to being disqualified. This number is not inclusive of the fees Defendants were able to collect from other conflicted clients.

110.     As a result of Defendants' failures, RevoLaze was required to retain alternate counsel to replace Defendants. Despite the fact that Defendants had billed RevoLaze for over 81% of the agreed budget for all of the ITC Litigation and the Phase 1 District Court Litigation, RevoLaze was required to duplicate many of these expenses with its alternate counsel.

111.     Further, in order to proceed with alternate counsel, RevoLaze was required to renegotiate its Funding Agreement with Longford,

39

sacrificing an ownership interest in the proceeds of the claims, which directly resulted in a compromised value of the claims for RevoLaze.

112.    As a direct and proximate result of Defendants' failure to observe their fiduciary duties, RevoLaze has suffered a series of injuries, including, but not limited to:

    a. Fees paid to Defendants, rendered valueless, in an amount no less than $2,471,973;

    b. Fees still owed to Defendants, rendered valueless, in an amount no less than $538,175;

    c. Fees paid to alternate counsel—for work which had been previously negotiated and paid for through the Dentons US Engagement Letter—in an amount no less than $1,055,471;

    d. Fees still owed to alternate counsel—for work which had been previously negotiated and paid for through the Dentons US Engagement Letter—in an amount no less than $983,243; and

    e. The lost value of the proceeds of the claims belonging to RevoLaze in an amount no less than $1,474,667 resulting from the necessary renegotiation of the Funding Agreement with Longford immediately following the disqualification of Dentons US.

WHEREFORE, Plaintiff, RevoLaze, LLC, respectfully requests that this Honorable Court enter judgment in favor of RevoLaze and against Defendants, Dentons US, Atty. Hogge, and Atty. Stein, for compensatory damages in an amount to be proven at trial but no less than $6,523,529, for punitive damages, and for all other relief this Court deems just and appropriate.

Respectfully submitted,

Troy L. Moore (0030043)
BALLENGER & MOORE CO., L.P.A.
405 Madison Avenue, 20th Floor
Toledo, Ohio 43604
Telephone: (419) 243-1040
Email: tlmoore@ballengermoore.com

Jefferey Ogden Katz
Thomas E. Patterson
Eric J. Chisholm
Michael D. Haeberle
PATTERSON LAW FIRM, LLC
1 North LaSalle Street, Suite 2100
Chicago, Illinois 60602
Telephone: (312) 223-1699
Email: jkatz@pattersonlawfirm.com
(All pending *pro hac vice* admission)

Counsel for Plaintiff, RevoLaze, LLC

## Jury Demand

Plaintiff, RevoLaze, LLC, hereby demands trial by jury of its peers as to all issues so triable herein.

_____
Troy L. Moore

1

# Intellectual Property and Technology

大成 **DENTONS**

## Overview

Businesses around the globe value intellectual property and technology services. These services allow maximum efficiency for companies, providing their customers with their own unique services. In perpetual motion, players must create innovative products and services to feed constant and escalating market demand. Everyone from the developer to the user has an enormous amount invested in products. In this high-stakes environment, you need protection for your original work. This requires a partner with extensive knowledge of different solutions who can choose the best legal remedy.

Dentons' lawyers understand these requirements and work relentlessly to protect your investment, whether it's a new medical device, company logo or computer software program. Together, we address complex legal questions with advice tailored to your business needs. From protecting intellectual property rights, through advising on data security issues, technology licensing and sourcing strategies, you receive practical and informed guidance.

Our integrated approach to litigation, counseling and transactions is a powerful strategy that delivers optimal results to you. To provide you with seamless service, members of our Intellectual Property and Technology (IP&T) practice frequently team with lawyers from other practice areas. Our enviable track record includes representing individual inventors, artists and entrepreneurs, public institutions, emerging companies, venture capital groups and global corporations.

Protecting your work to the highest caliber drives our efforts to learn about and promote the latest developments in the intellectual property arena. Our IP&T professionals lecture, teach and publish on intellectual property subjects. Additionally, we participate in committees of related organizations.

Areas of focus include:

- Advertising
- Commercial Agreements
- Communications
- Copyright
- Defamation and Reputation Management
- Designs
- E-Commerce, Internet and E-Payments
- Intellectual Property Litigation
- IP and the Internet
- IP Contracts, Assignment and Licensing

- Patent Litigation
- Patents
- Post-Grant Proceedings
- Privacy and Security
- Strategic IP Planning
- Strategic Sourcing and Outsourcing
- Technology Procurement, Development and Licensing
- Trademarks
- Unfair Competition

## Representative Experience

- **Canadian purchaser:** Advising on 405 linocuts by Pablo Picasso worth $20 million and the charitable donation of this highly significant art to an art gallery in Saskatchewan. Our advice covers issues relating to the purchase, export of the art from England and importation of the art into Canada, donation, transportation, insurance and taxation of this noteworthy donation, the largest in the province's history.
- **Global entertainment company:** Advising in regards to intellectual property enforcement and litigation in Canada with respect to trade-mark and copyright infringement, counterfeit goods, domain name disputes and brand dilution.
- **Leading multinational high-tech company:** Representing company in a major ongoing patent litigation in France (on the merits and preliminary injunction) regarding the continuity of the sale of some of its products in France.
- **Major multinational online music service provider:** Advising on the copyright clearances required to launch in Canada. Our assistance helped lay the groundwork for the continued worldwide expansion of this popular, cutting-edge music service.

Exhibit 1     1

- **Monsanto Company:** Serving as outside patent counsel to the global agricultural biotechnology company, prosecuting a substantial portion of their patents and managing patent portfolios worldwide.
- **Several luxury brand owners:** Advising in obtaining the seizure, delivery up and destruction of counterfeit luxury goods together with interim and permanent injunctions to prevent the continued distribution of the branded goods.
- **Steam distribution and sand control company:** Advising for enhanced recovery solutions in the oil and gas industry leading to the successful defense of an action involving claims of patent infringement and invalidity in respect of slotted liner technology.
- **Vkontakte:** Advising one of the largest Eastern European social network on almost all legal aspects of the company's activities in Russia. For years our team has handled a large number of high-profile litigation cases for the client regarding the network's liability for illegal audio and video content uploaded by users. Some court decisions for these cases set precedents in Russia and have been actively discussed in mass media sources. Our work demonstrated our ability to handle highly complex litigations to the benefit of our clients. In addition to a series of litigation mandates, our team has recently advised the client on data protection issues, corporate, employment, and general commercial issues. We have also achieved a recognition of the VKontakte logo as a well-known trademark in the Russian Federation.
- **Yahool:** Representing the online service giant in a variety of transactions involving content, data feeds and technology licensing. We also work with the company on various Internet issues including online privacy, publishing issues, contracting and pending legislation.

# Your Key Contacts

## Canada


**John C. Goetz**
Partner, Calgary
D +1 403 268 7167
john.goetz@dentons.com


**Thomas (Tom) A. Houston**
Partner, Ottawa
D +1 613 783 9611
M +1 613 291 8757
tom.houston@dentons.com


**John Lee**
Partner, Ottawa
D +1 613 783 9672
john.lee@dentons.com


**Robert D. McDonald, Q.C.**
Partner, Edmonton
D +1 780 423 7305
rob.mcdonald@dentons.com


**Craig T. McDougall**
Partner, Edmonton
D +1 780 423 7398
craig.mcdougall@dentons.com


**Tom A. Sides**
Partner, Edmonton
D +1 780 423 7138
tom.sides@dentons.com

## United States


**Samuel Fifer**
Partner, Chicago
D +1 312 876 3114
samuel.fifer@dentons.com


**Robert E. Hanson, P.C.**
Partner, Dallas
D +1 214 259 0931
robert.hanson@dentons.com


**Song K. Jung**
Partner, Washington, DC
D +1 202 496 7413
song.jung@dentons.com

## Europe


**Peter Homberg**
Partner, Frankfurt
D +49 69 45 00 12 311
peter.homberg@dentons.com


**Isabelle Leroux**
Partner, Dubai
D +971 4 402 0861
isabelle.leroux@dentons.com


**David Masson**
Partner, Paris
D +33 1 42 68 48 00
david.masson@dentons.com


**Dr. Constantin Rehaag, M.A.**
Partner, Frankfurt
D +49 69 45 00 12 248
constantin.rehaag@dentons.com


**Denis Voevodin**
Partner, Moscow
D +7 495 644 0500
denis.voevodin@dentons.com

## United Kingdom


**Catherine Bingham**
Partner, London
D +44 20 7320 6367
catherine.bingham@dentons.com


**Scott Singer**
Partner, London
D +44 20 7320 6599
scott.singer@dentons.com

## Central and Eastern Europe


**Özgür Akman**
Partner, Istanbul
Balcıoğlu Selçuk Akman Keki
Attorney Partnership
D +90 212 329 3099
oakman@baseak.com


**Igor Ostrowski**
Partner, Warsaw
D +48 22 242 56 73
igor.ostrowski@dentons.com

## Russia, CIS and the Caucasus


**Oleg V. Batyuk**
Managing Partner, Kyiv
D +380 44 494 4774
oleg.batyuk@dentons.com


**James E. Hogan**
Partner, Baku
D +994 12 4 90 75 65
james.hogan@dentons.com


**Aigoul Kenjebayeva**
Partner, Almaty
D +7 727 258 2380
aigoul.kenjebayeva@dentons.com


**Victor Naumov**
Managing Partner, St. Petersburg
D +7 812 325 8444
victor.naumov@dentons.com


**Denis Voevodin**
Partner, Moscow
D +7 495 644 0500
denis.voevodin@dentons.com

## Africa


**Catherine Bingham**
Partner, London
D +44 20 7320 6367
catherine.bingham@dentons.com


**Isabelle Leroux**
Partner, Dubai
D +971 4 402 0861
isabelle.leroux@dentons.com

## Middle East


**Joby Beretta**
Partner, Dubai
D +971 4 4020 860
joby.beretta@dentons.com


**Catherine Bingham**
Partner, London
D +44 20 7320 6367
catherine.bingham@dentons.com


**Ibrahim Elsadig**
Partner, Dubai
D +971 4 4020 859
ibrahim.elsadig@dentons.com


**Simon Topping**
Head of Telecommunications,
Middle East, Muscat
D +968 2457 3012
simon.topping@dentons.com

## Central Asia


**Aigoul Kenjebayeva**
Partner, Almaty
D +7 727 258 2380
aigoul.kenjebayeva@dentons.com


**Marla Valdez**
Partner, Muscat
D +968 2457 3047
marla.valdez@dentons.com

## Asia Pacific


**Julianne Doe**
Partner, Hong Kong
D +852 2533 3689
julianne.doe@dentons.com


**Mitch Dudek**
Partner, Shanghai
D +86 21 2315 6088
mitch.dudek@dentons.com


**Todd Liao**
Partner, Shanghai
D +86 21 2315 6028
todd.liao@dentons.com

© 2016 Dentons. Dentons is a global legal practice providing client services worldwide through its member firms and affiliates. Please see dentons.com for Legal Notices.

4

**大成 DENTONS**

# Mark L. Hogge
## Partner



Partner

Washington, DC

D +1 202 408 6443

mark.hogge@dentons.com

## Overview

Mark Hogge is a chair of Dentons' legacy Patent Litigation practice. He is one of the most experienced patent litigators in the country, having litigated many patents in all areas of technology for all sizes of companies. Mark is experienced in all the tribunals where IP is likely to be litigated such as inter partes and appellate proceedings at the U.S. Patent and Trademark Office, the International Trade Commission, the District Courts, the U.S. Court of Appeals for the Federal Circuit, the Supreme Court, mediation and arbitration. He is routinely involved in counseling clients on patent prosecution, portfolio building, strategic alliances, designarounds, and litigation strategy. He has run a number of successful licensing campaigns, has tried a number of jury trials to successful verdict and is a master of the bench with the American Inns of Court. Mark also has wide-ranging experience with all aspects of trademarks, trade secrets, copyrights and business torts including fraud, Sherman I and II, and RICO.

## Experience

- *Halo Electronics, Inc. v. Pulse Electronics*, Inc., No. 14-1513, Supreme Court. Appellate counsel for respondent Pulse on issue of Willful patent infringement. This case is in merits briefing.

- *In the Matter of Certain Activity Tracking Devices, Systems and Components Thereof* (2015), Investigation No. 337-TA-963: Lead Counsel representing respondent Flextronics, Inc. against allegations of patent infringement and trade secret misappropriation related to wearable monitoring/fitness devices.

- *In the Matter of Certain Resealable Packages with Slider Devices* (2015), Investigation No. 337-TA-962: Lead Counsel representing respondents Inteplast Group Ltd. And Minigrip LLC in patent infringement suit on manufacturing process and use of closure apparatus for plastic bags. Case is in discovery phase.

- *Halo Electronics, Inc. v. Pulse Electronics, Inc.,* No. 2:07-CV-00331-PMP-PAL (D. Nevada 2013 and Nos. 2013-1472, 2013-1657 (Fed. Cir. 2014-2015): Lead counsel for defendants in patent infringement case concerning transformers for printed circuit boards.

- *In the Matter of Certain Cases for Portable Electronic Devices* (2012 and 2013) USITC Investigation No. 337-861 and 867: Counsel for a US product design company. Technology at issue is the patented technology used in the manufacture of cases by numerous infringers and direct copiers.

Exhibit 2          1

- *In the Matter of Certain Coenzyme Q10 Products and Methods of Making Same* (2011) Investigation No. 337-TA-790: Represent Kaneka Corporation as co-counsel on investigation related to coenzyme Q10 products and methods of making same. CoQ10 is the primary ingredient in nutritional supplements shown to have benefits in numerous areas including cardiovascular related conditions.

- *In the Matter of Certain Polyimide Films, Products Containing Same, And Related Methods* (2011) Investigation No. 337-TA-772: Represent Kaneka Corporation in a 337 action concerning polyimide films used to coat items such as printed circuit boards.

- Certain Starter Motors and Alternators (2012) Investigation No. 337-TA-755. Lead counsel for complainant Remy International Inc. concerning infringing imports of DELCO starters and alternators. Favorable settlements, consent orders and an exclusion order. All infringing imports have stopped.

- Remy International, Inc. v. Wetherill Associates, Inc. d/b/a WAIGlobal (2010) Southern District of Indiana. Lead counsel for plaintiff, the leader in remanufactured starters and alternators (formerly AC Delco) in a seven patent infringement suit.

- IPVentures v. AT&T et al. (2012) Northern District of California. Lead counsel for AT&T, Sprint and vendor Location Labs in patent infringement action on location based services. Settlement favorable to defendants.

- Child Protect, LLC v. Sprint Spectrum LP, et al. (2009) Eastern District of Texas. Lead counsel for Alltel, Sprint, and AT&T under indemnification agreement for WaveMarket Technology, Inc. filed by Acacia shell corporation. Settlement favorable to defendants.

- Arrival Star S.A. v. WaveMarket, et al. (2010) Southern District of Indiana. Lead counsel for WaveMarket, Sprint, Best Buy, and AT&T in case filed by non-practicing entity related to cell phone positioning and location technology. Settlement favorable to defendants.

- Arlington Industries, Inc. v. Bridgeport Fittings, Inc. (2009-2010) Middle District of Pennsylvania. Lead trial counsel for patentee concerning 30 types of electrical connectors. Two week jury trial with verdicts for patentee of willful infringement, breach of contract, and lost profits. The case is on appeal.

- Certain Machine Vision Software, Machine Vision Systems and Products Containing Same (2010) Investigation No. 337-TA-680. Represent Omron Corporation concerning patents on machine vision and image analysis. The case is on appeal to the Commission.

- Certain Foldable Stools (2010) Investigation No. 337-TA-693. Represent K-Mart in third party discovery practice concerning prior art issues.

- Certain Video Game Machines and Related Three-Dimensional Pointing Devices (2009). Represent Canon U.S.A., Inc. in third party discovery practice concerning prior art issues.

- Pod-Ners, LLC v. Tutuli Produce Corporation and Rebecca Gilliland (2009) Central District of California. Lead counsel for defendants, importers of yellow beans from Mexico, concerning a utility patent on a yellow bean. The patent was declared invalid upon re-examination/reissue by the USPTO. Case dismissed.

- Centillion Data Systems, LLC v. Convergys Corp. et al. (2009) Southern District of Indiana. Represent insurer of Defendant in patent action concerning invoicing software, supervising the litigation, and settling the case during court ordered settlement conference.

- Enzo Life Sciences v. Affymetrix et al. (2010) Southern District of NY. Co-lead counsel for Enzo concerning infringement of its patents on nucleotides by certain manufacturers of DNA sequencing assays. The case is stayed pending appeal of issues from a companion case in Connecticut.

- Certain Hair Irons and Packaging Thereof (2009) USITC Investigation No. 337-TA-637. On behalf of Farouk Systems, U.S. maker and distributor of CHI® hair irons and other products, we filed a Section 337 complaint to Washington to stop the importation of counterfeit hair irons from China and other countries sold through numerous internet websites. We have successfully secured consent orders from certain named respondents and have requested the issuance of a general exclusion order against counterfeit imports that the ITC Investigative Attorney supports. We expect this case to be successfully completed by the end of the first

2

quarter of 2009.

- Certain Power Supplies (2009) USITC Investigation No. 337-TA-646. On behalf of Ultra Products, maker and distributor of computers and other computer supplies, we filed a Section 337 complaint targeting certain power supplies for personal computers that infringe Ultra's patent. We have successfully secured consent orders and license agreements from most of the defendants.

- Certain Endodontic Instruments (2008) USITC Investigation No. 337-TA-610. Represented a French company, Micro-Mega International, in a patent infringement investigation before the U.S. International Trade Commission under Section 337 of the Tariff Act of 1930, as amended. The U.S. complainant alleged that the French company infringed two of its patents in the manufacture of certain endodontic instruments. As a result of aggressive discovery on behalf of the French company suggesting invalidity of one patent and non-infringement of the other, the U.S. complainant withdrew its complaint and dropped all claims against our client.

- Certain Digital Televisions (2008) USITC Investigation No. 337-TA. Represented Syntax-Brillian Corporation and Taiwan Kolin Co., which make and sell Olevia brand televisions, in a Section 337 case involving patents related to digital television technology.

- Certain Nitrile Gloves (2008) USITC Investigation No. 337-TA-608/612. Represented three importers in a Section 337 case involving a patent related to nitrile rubber gloves. The patent at issue has been invalidated by the Commission.

- Certain Laminated Floor Panels (2008) USITC Investigation No. 337-TA-545. Represented Uniboard Canada Inc. in a Section 337 Enforcement and Advisory Opinion Proceeding involving three patents related to laminate floor panels. The parties have reached a settlement.

- Certain Laminated Floor Panels (2006) USITC Investigation No. 337-TA-545. Represent 6 respondents amongst 32 respondents in a 337 action brought by Unilin Beheer B.V., Flooring Industries Ltd., and Unilin Flooring N.C. LLC concerning alleged infringement of 3 patents on laminated floor covering. 15 of the respondents went to trial. Lead trial counsel at two week trial from which the key patent in the case was invalidated, another patent rendered wholly non-infringed, and on the remaining patent, mixed infringement and non-infringement. The case is on review by the full Commission.

- Certain Personal Watercraft and Components Thereof (2002) USITC Investigation No. 337-TA- 452. Represent respondent Bombardier Inc. et al. in a 337 action brought by Yamaha Motor Company, Ltd. et al. concerning alleged infringement of 11 patents on personal watercraft. Settlement without exclusion.

- Certain Oscillating Sprinklers, Sprinkler Components, and Nozzles (2002) USITC Investigation No. 337-TA-448. Represent respondent Melnor, Inc. in a 337 action brought by L.R. Nelson Corporation concerning alleged infringement of a patent on water sprinklers.

- Certain Garage Door Operators Including Components Thereof (2002) USITC Investigation No. 337-TA-459. Represent the respondent Wayne-Dalton Corp. in a 337 action concerning two reissue patents on the electrical components of garage door openers. Settlement without exclusion.

- Certain Gun Barrels Used in Firearms Systems (2002) Investigation No. 337-TA- 505 Represented two respondents concerning alleged infringements of two patents on gun barrels used in firearms training systems.

- Certain Bearings and Packaging Thereof (2002) 337-TA- 469. Represented respondent concerning alleged trademark infringement and gray market goods.

- MedQuist Litigation - Putative Class Action (2008) Civil Action No. 05-CV-2206 - (JBS-JBR), District Court of New Jersey and Federal False Claims Case No. 0104-11821PB5 (2009 - District of Massachusetts), No. 07-2076 (Third Circuit). Lead Counsel on behalf of over 200 governmental and non-governmental hospitals concerning RICO and Corporate Fraud. The case involved a successful appeal to the Third Circuit. Settlement in excess of $14 million dollars.

- Provide Commerce, Inc. v. Preferred Commerce, Inc. (2008) Southern District of Florida at West Palm Beach.

3

Lead Counsel for defendant in Federal and State trademark infringement, cyber squatting, and dilution action. Summary Judgment for defendant on the Federal and State dilution action, directed verdict on cyber squatting, withdrawal of state unfair competition claim during trial, and jury verdict for defendant on Federal trademark infringement claim.

- Kaiser Permanente et al. v. MedQuist, Inc et el. (2009) District of New Jersey. Lead Counsel in a fraud action against medical transcription vendor. Settlement favorable to Plaintiffs.

- Authentec, Inc. v. Atrua Technologies, Inc. (2009) Northern District of California. Lead Counsel for defendant/counterclaimant in a patent and unfair competition action concerning the parties patents on finger print sensors. The case is in the discovery phase.

- Welding Services, Inc. v. Welding Technologies, Inc. (2008) Northern District of Georgia at Gainesville. Lead Counsel for plaintiff in a patent action concerning welding overlay method for 312 stainless steel. The case was dismissed on suitable design-around.

- Contacts Synchronization Corporation v. Alltel Corp. et al. (2008) Western District of Wisconsin. Lead Counsel for vendor FusionOne, and co-counsel for defense of Alltel and Verizon Wireless in a patent action brought by shell corporation formed by Acacia. The patent concerned synchronizing address books in cell phones with desk top computers. Settlement favorable to defendants.

- Hesco Bastion Limited v. ACS Holdings USA, LLC (2009) District of Delaware. Lead Counsel for defendant in a patent action concerning building and shoring block. The case is in the discovery stage.

- General Signal Power Systems, Inc. v. American Power Conversion Corp. (2000) Western District of Wisconsin. Represented plaintiff in this patent case concerning five patents covering uninterruptible power supplies. Lead counsel. The case went to trial on one patent. Defendant settled prior to closing arguments for $48 million dollars.

- Ion Beam Applications s.a. et al. v. The Titan Corporation et al. (2002) Southern District of California. Represent plaintiff in a declaratory judgment action for patent invalidity, unenforceability, noninfringement, false advertisement, Sherman §§ 1,2. Lead trial counsel in a case that concerned food radiation technology. Favorable settlement for plaintiff.

- Global Mail, Limited v. United States Postal Service (1998) Eastern District of Virginia. Represented plaintiff in trademark action. The case involved an appeal to the Fourth Circuit Court of Appeals regarding a claim of Sovereign Immunity, which was denied. Lead attorney against the Justice Department. Conducted discovery and directed the negotiations resulting in a $2 million dollar settlement for plaintiff.

- John Labatt Limited v. Miller and Molson (1997) Eastern District of Michigan. Lead patent counsel for patentee in action over ICE BEER. $20 million dollar settlement for Plaintiff.

- Arlington Industries, Inc. v. Bridgeport Fittings, Inc. (2002) Middle District of Pennsylvania. Co-lead counsel for patentee concerning electrical junction box extenders. Jury trial with verdict for patentee, permanent injunction, and damages in the form of a reasonable royalty at 37% of gross sales. The case was affirmed on appeal. Arlington Industries, Inc. v. Bridgeport Fittings, Inc., 345 F.3d 1318 (Fed. Cir. 2003).

- Arlington Industries, Inc. v. Bridgeport Fittings, Inc. (2002) Middle District of Pennsylvania. Represent plaintiff in a patent infringement action concerning electrical junction box connectors. Lead trial counsel. Eleven month markman proceedings involving two bench trials. Markman and willful infringement rulings in favor of plaintiff. Arlington Industries, Inc. v. Bridgeport Fittings, Inc., 290 F. Supp. 2d 508 (M.D.Pa 2003). Settlement on eve of trial favorable to plaintiff with removal of all 23 accused products from the market. A permanent injunction was entered against Bridgeport on the 23 products in 2006.

- Erico International Corp. v. Arlington Industries, Inc.(2002) Northern District of Ohio. Represent defendant in a patent infringement case concerning cable straps. Lead trial counsel. Summary judgment of non-infringement for the defendant.

- Ross Systems, Inc. v. Prime Software Consulting, Inc. (2002) District of New Jersey. Represent defendant in

4

a copyright and unfair competition case concerning remote access to source code. Lead trial counsel. Nine month preliminary injunction proceeding including a bench trial. No injunction. Settlement favorable to defendant with a license to continue.

- Musculoskeletal Transplant Foundation and Synthes Spine Company, L.P., v. Osteotech, Inc. and Osteotech Investment Corporation (2001) District of New Jersey. Represent the defendant patentee in a declaratory judgment action that concerns demineralized bone powder products. Co-counsel. Settlement favorable to defendant.

- Trueform Manufacturing Company, Inc v. Schering-Plough Healthcare Products, Inc. (2001) Circuit Court Tennessee. Represent plaintiff in a trade secret misappropriation and breach of contract case concerning shoe insert products. Lead counsel. Settlement in favor of plaintiff.

- Strategic Diagnostics, Inc. et al. v. Beacon Analytical Systems, Inc. et al. (1999) District of Maine. Represented plaintiff in patent, trademark, trade secret, trade dress, breach of contract, and tortious interference case. Preliminary injunctive relief was sought: Co-lead counsel. The case was settled with an injunction and asset transfer to plaintiff.

- TANO Corp. v. IDAX, Inc. et al. (2000) Eastern District of Louisiana. Represent defendant in this patent case. Lead counsel. The case was transferred to Maryland's federal court. Settlement favorable to defendant.

- IDAX Inc. et al v. TANO Corp. (2000) District of Maryland. Represent plaintiff in this declaratory judgment action. Settlement favorable to plaintiff.

- DIA-COMPE, USA, Inc. d/b/a Cane Creek Cycling Components v. Team Vision International Corp. (2000) Western District of North Carolina. Represent plaintiff in this patent case. Lead counsel. This case settled after a favorable Markman determination to plaintiff. Dia -Compe, USA, Inc. v. Team Vision International Corp., 2000 WL 1409867 (W.D.N.C. 2000). Defendant ceased and desisted and transferred all assets to plaintiff.

- Spancrete Machinery Corporation v. RH&M Machine Co. (1992-1994) Eastern District of Virginia and U.S. Court of Appeals for the Federal Circuit. Lead trial counsel and co-appellate counsel in the jury trial and appeal. This case concerned a patent on backhoes and resulted in a permanent injunction.

- HCC, Inc. v. RH&M Machine Co. and Herbert David Edgell, Jr. (1996-1999) Southern District of New York. Lead counsel for patentee in litigation against infringing modifications of enjoined backhoes. This case settled with a second permanent injunction on the defendants.

- RH&M Machine Co. v. Spancrete Machinery Corporation and HCC, Inc. (1997) Eastern District of Virginia. Lead counsel for defendants in an attack by plaintiff on a permanent injunction preventing plaintiff from competing in the backhoe market. The case was dismissed with prejudice on summary judgment.

- MPR & Associates v. The General Electric Company (1995) Eastern District of Virginia. Local and co-counsel for defendant in this patent and trade secret case. Conducted discovery and motion practice including approximately 70 depositions and a motion for preliminary injunction. The case settled after Judge Bryan advised the patentee that the patent-in-suit was invalid.

- BASF v. DuPont (1994) Eastern District of Virginia Local and co-counsel for defendant in this patent action concerning STAINMASTER® carpets. The work involved transferring the action to Delaware to obtain a slower docket.

- IKI, Ltd. v. Tommy Hilfiger (1993) Eastern District of Virginia. Co-counsel for defendant in patent action concerning Indigo dyed cotton yarn. The case settled for a nominal amount.

- Anheuser-Busch v. John Labatt Limited (1995) Eastern District of Missouri. Co-counsel for defendant in declaratory judgment trademark action concerning ICE BEER. There were approximately 50 depositions, jury trial and appeal to the 8th Circuit.

- Wright Manufacturing, Inc. v. Great Dane Power Equipment, Inc. (1997-1999) District of Maryland. Co-counsel for defendant in this patent action concerning commercial lawnmowers. Developed the defense damage model. The case settled.

5

- James A. Bethel, Jr. v. Charcoal Companion, Inc. (1998-1999) District of Maryland. Lead and local counsel for defendants in this design patent infringement action. Conducted discovery and motion practice to dismiss corporate plaintiff.

- Joseph E. Berrios v. Wright Manufacturing, Inc. (1997-1999) District of Maryland. Co-counsel for plaintiff in this patent action that was transferred from the District of Wisconsin. The case involved commercial lawn mowers and settled favorable to plaintiff.

- Beckman Instruments, Inc. v. LKB Producter AB (1989) District of Maryland. Co-counsel for defendants in electrical patent action. Conducted discovery.

- Signet v. Signet (1987) Northern District of California. Co-counsel for plaintiff in trademark action. Responsible for preparing pleadings and preliminary injunction papers. A consent decree injunction was entered.

- Manildra Milling Corp. v. Ogilvie Mills, Inc. (1986-1996), District of Kansas. Lead patent counsel and co-trial counsel for defendant in declaratory judgment patent/antitrust action. Conducted discovery including approximately 70 depositions. There were two jury trials and three appeals to the Federal Circuit Court of Appeals.

- Hard Rock Café v. John Doe (1988) District of Columbia. Lead counsel for defendant store owner in a TRO and preliminary injunction case concerning counterfeit t-shirts. Case settled during defendant's motion for summary judgment.

- Green Point Marina v. Green Point Wharf Marina (1990) District Court of Maryland. Lead counsel for plaintiff in trademark action. Action included a bench trial for a preliminary injunction.

- Petro Tube v. Tube Alloy (1985) Eastern District Court of Louisiana. Co-counsel for defendant in a patent and trade secret action. The case resulted in a mixed settlement for both parties.

- Telechek v. Telechek (1986) Western District of New York. Co-counsel for plaintiff in a dealership termination action. Obtained a preliminary injunction that was affirmed by the 2d Circuit Court of Appeals.

- CBAY Systems, Ltd. and Arrendale Associates, Inc. v. G&G Technologies, Inc., (2003) AAA Arbitration in D.C. Represent complainants in an action against vendor programmers concerning ownership of source code and breach of contract concerning deliverables. Settlement on eve of trial in favor of the plaintiffs after full discovery.

## Reported Cases

- Manildra Milling Corporation v. Ogilvie Mills, Inc., 783 F.Supp. 1288 (D. Kan. 1990)

- Bruce v. U.S., 617 A.2d 986 (D.C. 1992)

- Manildra Milling Corp. v. Ogilvie Mills, Inc., 76 F. 3d 1178 (Fed. Cir. 1996)

- Arlington Industries, Inc. v. Bridgeport Fittings, Inc. 290 F.Supp. 2d 508 (M.D. Pa. 2003)

- Arlington Industries, Inc. v. Bridgeport Fittings, Inc. 345 F.3d 1318 (Fed. Cir. 2003)

- Halo Electronics, Inc. v. Pulse Electronics, Inc. et al., 769 F.3d 1371 (Fed Cir. 2014), *cert. granted* 136 S. Ct. 356 (2015)

- Halo Electronics, v. Pulse Electronics, Inc. 780 F.3d 1357 (Fed. Cir. 2015)

# Insights

- Co-author, "Willful Infringement Post-Seagate," *Law360,* March 2010

6

# Activities and Affiliations

## Presentations

- Presenter, "Seminar On Intellectual Property Litigation And Management Strategies In A Cost-Cutting Economy," Taiwan Technology Industries Legal Officers Association, TILO, April 28, 2009, Taipei, Taiwan

- Lecturer, "Technology Transfer at the Second Annual Workshop on Intellectual Property and Technology Commercialization," in conjunction with the Intellectual Property Office of the Philippines and U.S. Department of Commerce CLDP (Continuing Law Development Program), April 21-23, 2009, Manila, Philippines

- Lecturer, Graduate School of the Department of Agriculture on Technology Transfer

- Speaker, "Damages and Remedies for Patent Infringement," National Forum on Preventing and Defending Pharmaceutical and Biotech Patent Litigation, 2005, Washington, DC.

- Speaker, "Patent Claim Construction," Corporate Counsel Symposium of 2003, Minneapolis

## Memberships

- Member, American Intellectual Property Law Association

- Member, Federal Circuit Bar Association

- Master of the Bench, Federal American Inn of Court, President 2005-2006

# Areas of focus

## Practices

- Intellectual Property and Technology

- Intellectual Property Litigation

- Patent Litigation

- Patents

- Post-Grant Proceedings

## Industry sectors

- Communications

- Digital Media

- Information Technology (IT)

- Life Sciences and Health Care

- Media and Entertainment

- Media, Entertainment and Sports

- Technology

# Education

- George Mason University School of Law, 1984, JD
- George Mason University, 1976, BA, Biology, with distinction

# Admissions and qualifications

- District of Columbia Bar
- Virginia
- US Court of Appeals for the District of Columbia Circuit
- US Court of Appeals for the Eighth Circuit
- US Court of Appeals for the Federal Circuit
- US Court of Appeals for the Fourth Circuit
- US Court of Appeals for the Tenth Circuit
- US Court of Federal Claims
- US District Court for the District of Columbia
- US District Court for the District of Maryland
- US District Court for the Eastern District of Michigan
- US District Court for the Eastern District of Texas
- US District Court for the Eastern District of Virginia
- US District Court for the Western District of Wisconsin
- US Patent and Trademark Office
- US Supreme Court

© 2016 Dentons. Dentons is a global legal practice providing client services worldwide through its member firms and affiliates. Please see dentons.com for Legal Notices.

3



**From:** **Stein, Steven J.** steven.stein@dentons.com
**Subject:** "LA Defendants"
**Date:** November 4, 2013 at 4:46 PM
**To:** darryl@revolaze.com
**Cc:** Maheshwari, Shailendra K. shailendra.maheshwari@dentons.com, Hogge, Mark L. mark.hogge@dentons.com, jschnorf@wsscapital.com



Darryl, great meeting and great meeting you. I am more confident than ever we will be able to join the Revolaze team.
I want to jump on the conflicts clearance right away. Pls send the names of the importers as well as the LA group. We realize this is a continuing process and will add other parties later.

Steven J. Stein

D +1 212 398 4879
steven.stein@dentons.com
www.dentons.com

Dentons US LLP

SNR Denton is proud to join Salans and FMC as a founding member of Dentons.

Dentons is an international legal practice providing client services worldwide through its member firms and affiliates. This email may be confidential and protected by legal privilege. If you are not the intended recipient, disclosure, copying, distribution and use are prohibited; please notify us immediately and delete this email from your systems. Please see dentons.com for Legal Notices, including IRS Circular 230.

Exhibit 3

4

**From:** **Stein, Steven J.** steven.stein@dentons.com 
**Subject:** Conflicts
**Date:** January 8, 2014 at 1:00 PM
**To:** jschnorf@wsscapital.com
**Cc:** wfarrell@longfordcapital.com, Michael A. Nicolas (mnicolas@longfordcapital.com) mnicolas@longfordcapital.com, Hogge, Mark L.
mark.hogge@dentons.com, darryl@technolines.com, Korn, Chip peter.korn@dentons.com, Damari, Tamir
tamir.damari@dentons.com

Exhibit 4

Jim,

As we move toward a successful conclusion of the funding and engagement agreements, I am writing to update the conflicts process.

In addition to obtaining information concerning relationships between Dentons and certain of the parties identified as potential respondents (" PR or PRs") we intend to further investigate the necessity of naming such PRs based on whether such PR is an actual importer of the infringing products into the US. This is a process that will require the assistance of Revolaze appointing its expert/investigator and/or otherwise gain information publicly available as to the chain of distribution of the PRs. This leaves open the possibility that Revolaze, based on the investigation results and as advised professionally may not bring action against any such PR.

The foregoing aside, at this moment Dentons is clear as to the PRs identified by Darryl with the exception of the following which have been determined to preclude Dentons from acting in this matter:

1. Target is a present client of our US and Canadian regions and a waiver is not likely to be available.
2. Ralph Lauren is a present client of the Canadian region.

Our investigation of other PRs include Gap, Diesel, True Religion, Gucci, Tommy Hilfiger, Lucky Brands and Juicy. Based on ongoing discussions, it is unlikely that conflicts will be found to exist as to all of these PRs or even a majority. Moreover, their respective chains of potential importation and distribution will be considered by the investigation of the expert.

Let me know what is needed in the way of more detail or otherwise.

Steve


**DENTONS** ▶ Steven J. Stein

D +1 212 398 4879 | US Internal 14879
steven.stein@dentons.com
Bio | Website

Dentons US LLP

SNR Denton is proud to join Salans and FMC as a founding member of Dentons.

Dentons is an international legal practice providing client services worldwide through its member firms and affiliates. This email may be confidential and protected by legal privilege. If you are not the intended recipient, disclosure, copying, distribution and use are prohibited; please notify us immediately and delete this copy from your system. Please see dentons.com for Legal Notices, including IRS Circular 230.

5

**From:** **Darryl Costin** darryl@revolaze.com
**Subject:** Re: Revolaze
**Date:** August 16, 2014 at 9:56 AM
**To:** Hogge, Mark L. mark.hogge@dentons.com



Mark

Lets discuss a plan to deal with Ralph Lauren, Calvin Klein and Zara who represent big players.  I take it if Dentons believe they could clear the conflict, then we could amend the complaint.  Otherwise as we discussed at the beginning, we could get one of our buddy law firms to file a sister complaint mirroring the original one.

Darryl

On Aug 15, 2014, at 6:42 PM, Hogge, Mark L. <mark.hogge@dentons.com> wrote:

> Note that Calvin Klein did not get filed.  Our General Counsel is checking with the Hong Kong office, that had done some work there in the past.  So we are waiting on the all clear from him.  We don't want to draw a motion to disqualify.
>
> <image001.png>
> ### Mark L. Hogge
>
> D +1 202 408 6443  |  US Internal 26443
> mark.hogge@dentons.com
> Bio  |  Website
>
> Dentons US LLP
>
> SNR Denton is proud to join Salans and FMC as a founding member of Dentons.
>
> Dentons is an international legal practice providing client services worldwide through its member firms and affiliates. This email may be confidential and protected by legal privilege. If you are not the intended recipient, disclosure, copying, distribution and use are prohibited; please notify us immediately and delete this copy from your system. Please see dentons.com for Legal Notices.

Exhibit 5

6

| Mark L. Hogge | mark.hogge@dentons.com | Salans FMC SNR Denton |
| Partner | D +1 202 408 6443 | dentons.com |
| | | |
| | Dentons US LLP | |
| | 1301 K Street, NW | |
| | Suite 600, East Tower | |
| | Washington, DC 20005-3364 USA | |
| | | |
| | T  +1 202 408 6400 | |
| | F  +1 202 408 6399 | |

February 7, 2014

**PRIVILEGED AND CONFIDENTIAL**

Revolaze LLC
29300 Clemens Rd
Suite D
Westlake, OH 44145

Attention:  Darryl Costin, CEO

Re:    *Engagement Agreement*

Dear Darryl:

Thank you for choosing Dentons US LLP ("Dentons") to represent you in the matter described below.

**Our Client.**  The purpose of this Engagement Letter, as well as the associated Terms of Business, is to set forth the Engagement Agreement by which Dentons will represent Revolaze LLC, a Delaware limited liability company ("you" or "Revolaze").

**Scope of Representation.**  We have agreed to provide legal services in connection with the enforcement of Revolaze's patent portfolio covering laser abrasion of denim products and laser patterns etched on denim products (the "Litigation"), as well as incidental matters, such as responding to audit letter requests. More specifically and as further described in that certain Funding Agreement, dated February 7, 2014 (the "Funding Agreement") by and between Revolaze, Technolines, LLC and Longford Capital Fund I, LP ("Longford"), the Litigation will comprise all pre-trial, trial, appeal and collections of any settlements, judgments and awards in connection with  (i) proceedings at the United States International Trade Commission pursuant to Section 337 of the Tariff Act of 1930 and related U.S. district court actions (as per the Funding Agreement, "Phase I"), (ii) conventional patent litigation under United Stated patent law held in the federal district courts of the United States ("Phase II") and (iii) international enforcement actions (with an initial focus on China, Mexico and Turkey) ("Phase III").  In addition, we will also represent you in connection with any counterclaims raised against Revolaze in connection with the Litigation ("Counterclaims").  At any point should Dentons withdraw or otherwise not continue representation of you in a particular geography or case or against a particular defendant, Dentons shall waive all future payment rights (other than with respect to those already accrued as of the date of such withdrawal) in connection with those geographies, cases, and defendants.

**Terms of Business.**  Attached is a copy of our Terms.

**Our Team and Charges.**  Subject to the terms hereof, our fees will be based on the time devoted to the representation, and the billing rates charged by each timekeeper.  Currently, our standard hourly charges range from $195 to over $1,000 per hour depending on the lawyer's or professional's experience.  As you

81711738\V-10

Exhibit 6

**DENTONS**

Revolaze LLC
February 7, 2014
Page 2

Salans FMC SNR Denton
dentons.com

have requested, we anticipate that the primary attorneys responsible for the engagement will be Steve Stein, Mark Hogge and Shailendra Maheshwari whose applicable rates (following application of the discount described in the next sentence) are $772.50, $637.50, and $468.75, respectively. As discussed, we have agreed (i) to discount our rates for all timekeepers by twenty-five percent (25%) with respect to the Litigation; (ii) to cap our fees and expenses (which expenses shall be billed at 100% of cost) as follows: Phase 1 - $3,715,000; Phase 2 - $2,134,000; and Phase 3 - $1,746,000; and (iii) to accept, in consideration of the foregoing, a portion of the Proceeds, as described in the Funding Agreement. Our budgets attached to the Funding Agreement as Exhibit G (Phase 1), Exhibit H (Phase 2), and Exhibit I (Phase 3), respectively, are based on an estimate of our fees and expenses prior to application of the discount referenced in clause (i) above. You have agreed to pay to Dentons a portion of the Proceeds, as further detailed in the Funding Agreement. So long as Longford shall have complied with its obligations pursuant to the Funding Agreement, Dentons shall continue its representation with respect to the Litigation, notwithstanding the Budget may have been exceeded, subject to Dentons' ethical obligations. In the event you terminate our representation of you without cause, in addition to all other compensation provided herein and the Funding Agreement, we shall be entitled to receive the Dentons share of the Proceeds with respect to any settlements entered into with six months of the date of such termination.

In the event of (i) any monetary Counterclaims which are not separately the obligation of Longford to fund or (ii) Longford's failure to fund due to a "Material Adverse Event" (as defined in the Funding Agreement), the existence of which remains the subject of a Dispute as provided in Section 10.3 of the Funding Agreement, we will represent you with respect to such matters and our standard hourly charges shall apply to our continued representation and, while we will send you regular informational billing updates, we will defer collection of such amounts and any expenses incurred in connection therewith until such time as you have received distributions of Proceeds at least equal to such amount due. You hereby agree to pay any and all such invoiced amounts at such time. The proceeds to which Dentons is entitled is specified in the Funding Agreement, subject to the "Buyout Terms" as described in Exhibit A attached.

Our representation of you also will involve costs which include as many investigators, travel, technical analysis, and product purchases as necessary to confirm which companies and denim brands are using lasers to abrade, or to import patterns on denim, which are reviewed in the Terms. Dentons has estimated $375,000 in its aggregate Budget for such costs, the majority of which to be incurred in Phase I as described in the Funding Agreement. All costs incurred in connection with the Litigation shall be paid pursuant to the Funding Agreement and all costs incurred in connection with any monetary Counterclaims shall be paid as set forth in the preceding paragraph.

**Conflicts.** Our Terms include provisions regarding conflicts. In addition, as we have discussed, in the event a conflict arises and Dentons declines to pursue a component of the Litigation, alternate counsel may be engaged in accordance with the terms of the Funding Agreement. The costs of any such alternate counsel shall serve to reduce the amounts available to Dentons pursuant to Dentons unconditional fee cap. Exhibit B identifies all current conflicts Dentons has with potential respondents contained in the Longford Funding Agreement

**Third-Party Payor.** Pursuant to the Funding Agreement, Longford has agreed to reimburse us for all amounts due in connection with the Litigation, subject to the limitations otherwise set forth herein and in the Funding Agreement. Because of this payment arrangement, we wish to make you aware that the potential for conflicts of interest to arise exists when a third party assumes responsibility for paying the legal expenses of another, including the perception of favoritism should the interests of our client(s) diverge from that of the third party at some point in the future. We have no reason to expect this will occur, but we want you to be fully informed about this possibility, and secure your acknowledgement and

**DENTONS**

Revolaze LLC
February 7, 2014
Page 3

Salans FMC SNR Denton
dentons.com

waiver of any such conflict of interest. Dentons acknowledges that (i) in the event of any conflict in language and terms between this agreement and the Funding Agreement, then the terms of the Funding Agreement shall prevail, and (ii) that other than the defense of "monetary counterclaims" as described herein and the obligation to share Proceeds as provided herein and the Funding Agreement, that the financial obligation of Revolaze to Dentons shall be limited to the lesser of amounts that Revolaze shall receive from Longford for payment of legal fees to Dentons or the amount of legal fees which Dentons is entitled pursuant to this agreement and the Funding Agreement.

* * *

Please indicate your agreement to the Letter and Terms by executing a copy of this Letter in the space provided below and returning it. A facsimile or scanned copy delivered via email are as acceptable as an original. We appreciate prompt receipt of an executed copy, but will commence work based on the understandings contained in this letter prior to our receipt of your signature. Of course, please contact me if you have any questions about anything in this Letter or the Terms, or with respect to any aspect of our representation of you.

Again, we are very pleased to have this opportunity to be of service and to work with you.

Sincerely,

Dentons US LLP

Mark L. Hogge
Partner

Enclosure: Terms of Business

_____

Agreement and Acceptance

The undersigned hereby acknowledges and agrees that he or she has reviewed and understands the terms and conditions of this Letter and the Terms. The undersigned further agrees and accepts these provisions, including, but not limited to, all disclosures regarding conflicts of interest, and hereby waives any conflict or potential conflict of interest as set forth therein.

REVOLAZE LLC

**DENTONS**

Revolaze LLC
February 7, 2014
Page 4

Salans FMC SNR Denton
dentons.com

## EXHIBIT A

In connection with the sale of all or substantially all the assets of Revolaze, any merger, consolidation or acquisition of Revolaze with where the shareholders of Revolaze immediately prior to the transaction do not hold at least a majority of the equity of the surviving entity, by or into another corporation, entity or person, the initial public offering of Revolaze's equity or a reverse merger into an entity whose shares are publicly traded or any change in the ownership of more than fifty percent (50%) of the voting interests of Revolaze in one or more related transactions, you may, by delivery of written notice to Dentons and payment of the amount set forth herein, terminate this engagement and Dentons' right to receive any portion of the Proceeds with respect to unresolved Claims as of the date of such notice and payment. The amount of such payment shall be equal to the unpaid portion of the budgeted amount for any Phase of the Litigation that has been commenced as of such date.  Notwithstanding the foregoing, Dentons shall retain the right to receive its portion of the Proceeds with respect to any Claims which have been resolved on or prior to such date, with such payments to be made in accordance with the terms of the Funding Agreement.

**DENTONS**

Revolaze LLC
February 7, 2014
Page 5

Salans FMC SNR Denton
dentons.com

# EXHIBIT B

## Existing Conflicts

Gap

Ralph Lauren

Target

Diesel

Gucci

Guess

7

# IN THE UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| REVOLAZE, LLC,                )<br>          Plaintiff,   )<br>                )<br>v.                     )<br>THE GAP, INC.       )<br>         Defendant.  )<br>                ) | Civil Action No. _____ |

## COMPLAINT AND JURY DEMAND

1.      Plaintiff RevoLaze LLC ("Plaintiff" or "RevoLaze"), for its Complaint against Defendant The Gap, Inc. ("Defendant" or "Gap"), herein alleges as follows:

## THE PARTIES

2.      RevoLaze is a Delaware limited liability company with its principal place of business at 29300 Clemens Road, Westlake, Ohio 44145. RevoLaze is an operating company and a developer of laser scribing technology to impart graphics and patterns on a myriad of substrates to solve current environmental, quality and cost problems associated with manufacturing and decorating garments and textiles.

3.      Upon information and belief, Gap is a company incorporated under the laws of Delaware, having a business address at 2 Folsom Street, San Francisco, California 94105.

4.      Upon information and belief, Gap may be served through its registered agent, The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

Exhibit 7

## JURISDICTION AND VENUE

5.     This is an action for patent infringement arising under the patent laws of the United States, Title 35 of the United States Code. Accordingly, this Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338(a).

6.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) in that a substantial part of the events giving rise to the patent infringement claims herein have taken place and are still taking place in this judicial district.

7.     The Court has personal jurisdiction over Gap because Gap is engaged in substantial and not isolated activities within this state and district, including providing, using, offering for sale, and selling its infringing product within this state and district at least through the website www.gap.com. On information and belief, Gap also operates multiple retail stores within this state and district selling infringing products including one at 206 Market Street, Westlake, Ohio. Due to these infringing activities, Plaintiff has suffered injury in this judicial district.

## PLAINTIFF'S PATENTS

8.     On November 23, 1999, the United States Patent and Trademark Office duly issued United States Patent No. 5,990,444 ("the '444 Patent"), entitled "Laser Method and System of Scribing Graphics." A true and correct copy of the '444 Patent is attached hereto as Exhibit A. RevoLaze is the owner of the '444 Patent by assignment.

9.     On October 31, 2000, the United States Patent and Trademark Office duly issued United States Patent No. 6,140,602 ("the '602 Patent"), entitled "Marking of Fabrics and Other Materials Using a Laser." A true and correct copy of the '602 Patent is attached hereto as Exhibit B. RevoLaze is the owner of the '602 Patent by assignment.

2

10.     On June 26, 2001, the United States Patent and Trademark Office duly issued United States Patent No. 6,252,196 ("the '196 Patent"), entitled "Laser Method of Scribing Graphics." A true and correct copy of the '196 Patent is attached hereto as Exhibit C. RevoLaze is the owner of the '196 Patent by assignment.

11.     On December 16, 2003, the United States Patent and Trademark Office duly issued United States Patent No. 6,664,505 ("the '505 Patent"), entitled "Laser Processing of Materials Using Mathematical Tools." A true and correct copy of the '505 Patent is attached hereto as Exhibit D. RevoLaze is the owner of the '505 Patent by assignment.

12.     On November 16, 2004, the United States Patent and Trademark Office duly issued United States Patent No. 6,819,972 ("the '972 Patent"), entitled "Material Surface Processing With a Laser That Has a Scan Modulated Effective Power to Achieve Multiple Worn Looks." A true and correct copy of the '972 Patent is attached hereto as Exhibit E. RevoLaze is the owner of the '972 Patent by assignment.

13.     On February 22, 2005, the United States Patent and Trademark Office duly issued United States Patent No. 6,858,815 ("the '815 Patent"), entitled "Denim Designs From Laser Scribing." A true and correct copy of the '815 Patent is attached hereto as Exhibit F. RevoLaze is the owner of the '815 Patent by assignment.

## COUNT I — INFRINGEMENT OF THE '444 PATENT

14.     RevoLaze restates and incorporates by reference paragraphs 1 through 13 as if fully stated herein.

15.     Defendant has infringed and is still infringing the '444 Patent by making, selling, offering for sale, importing and/or using denim garments that embody the patented

invention including the Gap Floral Print Always Skinny Jeans (Item No. 600542) ("Gap Product"), and Defendant will continue to do so unless enjoined by this Court.

16.     As a direct and proximate result of Defendant's direct infringement of the '444 Patent, RevoLaze is suffering damages and irreparable injury for which it has no adequate remedy at law.

<u>**COUNT II — INFRINGEMENT OF THE '602 PATENT**</u>

17.     RevoLaze restates and incorporates by reference paragraphs 1 through 16 as if fully stated herein.

18.     Defendant has infringed and is still infringing the '602 Patent by making, selling, offering for sale, importing and/or using denim garments that embody the patented invention including the Gap Product, and Defendant will continue to do so unless enjoined by this Court.

19.     As a direct and proximate result of Defendant's direct infringement of the '602 Patent, RevoLaze is suffering damages and irreparable injury for which it has no adequate remedy at law.

<u>**COUNT III — INFRINGEMENT OF THE '196 PATENT**</u>

20.     RevoLaze restates and incorporates by reference paragraphs 1 through 19 as if fully stated herein.

21.     Defendant has infringed and is still infringing the '196 Patent by making, selling, offering for sale, importing and/or using denim garments that embody the patented invention including the Gap Product, and Defendant will continue to do so unless enjoined by this Court.

22.    As a direct and proximate result of Defendant's direct infringement of the '196 patent, RevoLaze is suffering damages and irreparable injury for which it has no adequate remedy at law.

## COUNT IV — INFRINGEMENT OF THE '505 PATENT

23.    RevoLaze restates and incorporates by reference paragraphs 1 through 22 as if fully stated herein.

24.    Defendant has infringed and is still infringing the '505 Patent by making, selling, offering for sale, importing and/or using denim garments that embody the patented invention including the Gap Product, and Defendant will continue to do so unless enjoined by this Court.

25.    As a direct and proximate result of Defendant's direct infringement of the '505 Patent, RevoLaze is suffering damages and irreparable injury for which it has no adequate remedy at law.

## COUNT V — INFRINGEMENT OF THE '972 PATENT

26.    RevoLaze restates and incorporates by reference paragraphs 1 through 25 as if fully stated herein.

27.    Defendant has infringed and is still infringing the '972 Patent by making, selling, offering for sale, importing and/or using denim garments that embody the patented invention including the Gap Product, and Defendant will continue to do so unless enjoined by this Court.

28.    As a direct and proximate result of Defendant's direct infringement of the '972 Patent, RevoLaze is suffering damages and irreparable injury for which it has no adequate remedy at law.

## COUNT VI — INFRINGEMENT OF THE '815 PATENT

29.    RevoLaze restates and incorporates by reference paragraphs 1 through 28 as if fully stated herein.

30.    Defendant has infringed and is still infringing the '815 Patent by making, selling, offering for sale, importing and/or using denim garments that embody the patented invention including the Gap Product, and Defendant will continue to do so unless enjoined by this Court.

31.    As a direct and proximate result of Defendant's direct infringement of the '815 Patent, RevoLaze is suffering damages and irreparable injury for which it has no adequate remedy at law.

## JURY DEMAND

32.    Plaintiff hereby demands a jury trial on all issues triable to the jury.

WHEREFORE, Plaintiff demands:

(a)    judgment that Defendant has infringed each of the asserted patents;

(b)    permanent injunctive relief prohibiting further infringement of the asserted patents;

(c)    damages for Defendant's infringements;

(d)    prejudgment interest on the damages;

(e)    costs for this lawsuit; and

(f)    any other relief that the Court may deem just and proper.

6

Dated: August 15, 2014                    *s/ Stephen H. Rovak*

Stephen H. Rovak (*Pro Hac Vice*)
      stephen.rovak@dentons.com
Dentons US LLP
211 North Broadway
Suite 3000
St. Louis, Missouri 63102
Telephone: (314) 241-1800

Mark L. Hogge
      mark.hogge@dentons.com
Shailendra K. Maheshwari
      shailendra.maheshwari@dentons.com
Nicholas H. Jackson
      nicholas.jackson@dentons.com
Dentons US LLP
1301 K Street NW
Suite 600
Washington, D.C. 20005
Telephone: (202) 408-6400

Steven J. Stein
      steven.stein@dentons.com
Dentons US LLP
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 768-6700

*Attorneys for Plaintiff RevoLaze LLC*

8

# UNITED STATES INTERNATIONAL TRADE COMMISSION
## WASHINGTON, DC

In the Matter of
**CERTAIN LASER ABRADED DENIM
GARMENTS**

Investigation No. 337-TA-___

## VERIFIED COMPLAINT UNDER
## SECTION 337 OF THE TARIFF ACTION OF 1930

### COMPLAINANTS

RevoLaze, LLC
29300 Clemens Rd.
Westlake, OH 44145
Telephone: 440-617-0502

TechnoLines, LLC
29300 Clemens Rd.
Westlake, OH 44145
Telephone: 440-617-0502

### COUNSEL FOR COMPLAINANTS

Mark L. Hogge
Shailendra K. Maheshwari
Steven J. Stein
Nicholas H. Jackson
DENTONS US LLP
1301 K Street, N.W.
6th Floor, East Tower
Washington, D.C. 20005
Telephone: 202. 408.6400
Facsimile: 202.408.6399

### PROPOSED RESPONDENTS

Abercrombie & Fitch Co.
6301 Fitch Path
New Albany, Ohio 43054
Telephone: 614-283-6500

American Eagle Outfitters, Inc.
77 Hot Metal Street
Pittsburgh, Pennsylvania 15203
Telephone: 412-432-3300

BBC Apparel Group, LLC
1407 Broadway
Suite 503
New York, New York 10018
Telephone: 212-997-0230

Gotham Licensing Group, LLC
1407 Broadway
Suite 506
New York, New York 10018

The Buckle, Inc.
2407 West 24th Street
Kearney, Nebraska 68845
Telephone: 800-626-1255

Buffalo International ULC
400 Sauve West
Montreal, Quebec H3L 1Z8
Canada
Telephone: 1-888-883-8710

Exhibit 8

1724982 Alberta ULC
400 Sauve West
Montreal, Quebec H3L1Z8
Canada
Telephone: 1-888-883-8710

Diesel S.p.A.
via dell'Industria, 4/6
36042 Breganze (VI)
Italy
Telephone:    00642650246
From U.S.: +01139.0642.265.0246

DL1961 Premium Denim Inc.
530 7th Avenue
Suite 1505
New York, New York 10018
Telephone: 646-514-9736, ext. 130

Eddie Bauer LLC
10401 NE 8th Street
Suite 500
Bellevue, Washington 98004
Telephone: 425-755-8100

The Gap, Inc.
2 Folsom Street
San Francisco, California 94105
Telephone: 415-427-0100

Guess?, Inc.
1444 South Alameda Street
Los Angeles, California 90021
Telephone: 213-765-5578

H&M Hennes & Mauritz AB
Mäster Samuelsgatan 46A
SE-106 38 Stockholm
Sweden
Telephone: +46 8 796 55 00

H&M Hennes & Mauritz LP
110 Fifth Avenue, 11th Floor
New York, New York 10011
Telephone:  212-564-9922

Roberto Cavalli S.p.A.
Piazza San Babila 3
20122 Milan
Italy
Telephone: +39 02 763 0771

Koos Manufacturing, Inc.
2741 Seminole Ave.
South Gate, CA 90280
Telephone: 323-564-2100

Levi Strauss & Co.
1155 Battery Street
San Francisco, California 94111
Telephone: 415-501-6000

Lucky Brand Dungarees, Inc.
540 S. Santa Fe Ave.
Los Angeles, CA 90013
Telephone: 213-443-5700

Fashion Box S.p.A.
Via Marcoui, 1
31011 Localita Casella
Asolo (Treviso)
Italy
Telephone: +39 0423 9251

VF Corporation
105 Corporate Center Blvd.
Greensboro, North Carolina 27408
Telephone: 336-424-6000

## TABLE OF CONTENTS

**Page**

LIST OF EXHIBITS ...................................................................................................... iii

LIST OF APPENDICES ................................................................................................. xi

I. INTRODUCTION ............................................................................................... 1

II. THE PARTIES .................................................................................................... 2

    A. Complainants .......................................................................................... 2

    B. Proposed Respondents ........................................................................... 4

III. THE PATENTS AT ISSUE ................................................................................ 12

    A. The '444 Patent – Laser Method and System of Scribing Graphics ...................... 12

    B. The '602 Patent – Marking of Fabrics and Other Materials Using a Laser .......... 12

    C. The '196 Patent – Laser Method of Scribing Graphics .......................................... 13

    D. The '505 Patent – Laser Processing of Materials Using Mathematical Tools ...... 13

    E. The '972 Patent – Material Surface Processing with a Laser that has a Scan Modulated Effective Power to Achieve Multiple Worn Looks ............................. 14

    F. The '815 Patent – Denim Designs from Laser Scribing ........................................ 14

    G. Foreign Counterparts ............................................................................ 15

    H. Licensees ............................................................................................... 16

    I. Non-Technical Description of the Patented Technologies ...................... 16

IV. THE PRODUCTS AT ISSUE ............................................................................. 18

    A. Complainants Products ......................................................................... 18

    B. Respondent's Infringing Products ........................................................ 18

V. UNLAWFUL AND UNFAIR ACTS OF THE RESPONDENTS ..................... 19

    A. A&F ........................................................................................................ 19

    B. American Eagle Outfitters ..................................................................... 20

    C. BlankNYC .............................................................................................. 20

    D. Buckle .................................................................................................... 21

i

E. Buffalo ......................................................................................................... 22

F. [Reserved] .................................................................................................... 22

G. Diesel ........................................................................................................... 22

H. DL1961 ........................................................................................................ 23

I. Eddie Bauer .................................................................................................. 24

J. Gap .............................................................................................................. 24

K. Guess? .......................................................................................................... 25

L. H&M ............................................................................................................ 25

M. Just Cavalli ................................................................................................... 26

N. Koos ............................................................................................................. 27

O. Levi's ........................................................................................................... 27

P. Lucky ........................................................................................................... 28

Q. Replay .......................................................................................................... 29

R. VF Corp. ...................................................................................................... 30

VI. SPECIFIC INSTANCES OF IMPORTATION AND SALE ............................................ 30

VII. CLASSIFICATION OF THE INFRINGING PRODUCTS UNDER THE
HARMONIZED TARIFF SCHEDULE OF THE UNITED STATES, ............................. 31

VIII. RELATED LITIGATION ...................................................................................... 31

IX. DOMESTIC INDUSTRY ....................................................................................... 32

A. Technical Prong ........................................................................................... 32

B. Economic Prong ........................................................................................... 34

X. GENERAL EXCLUSION ORDER ........................................................................... 35

XI. RELIEF REQUESTED ......................................................................................... 36

| Exhibit Number | Description | Designation |
|---|---|---|
| | **Exhibit List** | |
| **1** | **Certified Copies of the Asserted Patents** | |
| A | U.S. Patent No. 5,990,444 | Public |
| B | U.S. Patent No. 6,140,602 | Public |
| C | U.S. Patent No. 6,252,196 | Public |
| D | U.S. Patent No. 6,664,505 | Public |
| E | U.S. Patent No. 6,819,972 | Public |
| F | U.S. Patent No. 6,858,815 | Public |
| **2** | **Certified Assignment Records of the Asserted Patents** | |
| A | Certified Assignment Record for U.S. Patent No. 5,990,444 | Public |
| B | Certified Assignment Record for U.S. Patent No. 6,140,602 | Public |
| C | Certified Assignment Record for U.S. Patent No. 6,252,196 | Public |
| D | Certified Assignment Record for U.S. Patent No. 6,664,505 | Public |
| E | Certified Assignment Record for U.S. Patent No. 6,819,972 | Public |
| F | Certified Assignment Record for U.S. Patent No. 6,858,815 | Public |
| **3** | **Foreign Counterparts to Asserted Patents** | |
| **4** | **Licenses** | |
| A | DVUV, LLC | Confidential |
| B | GST AutoLeather | Confidential |
| C | Lear Corp. | Confidential |
| D | Green Bay Decking, LLC | Confidential |
| **5** | **Accused Products Images** | |
| A | A&F - Hollister Product | Public |
| B | American Eagle Product | Public |
| C | BlankNYC Product | Public |
| D | Buckle Product | Public |
| E | Buffalo Product | Public |
| F | [Reserved] | |
| G | Diesel Product | Public |
| H | DL1961 Product | Public |
| I | Eddie Bauer Product | Public |
| J | Gap Product | Public |
| K | Guess Product | Public |
| L | H&M Product | Public |
| M | Just Cavalli Product | Public |
| N | Koos - AG Jeans Product | Public |
| O | Koos - Big Star Product | Public |

| | P | Levi's Product | Public |
|---|---|---|---|
| | Q | Lucky Product | Public |
| | R | Replay Product | Public |
| | S | VF (Seven for All Mankind) Product | Public |
| **6** | | **Importation** | |
| | A | Ryan Ripley Declaration | Public |
| | B | A&F - Hollister Receipt | Public |
| | C | American Eagle Receipt | Public |
| | D | BlankNYC Receipt | Public |
| | E | Buckle Receipt | Public |
| | F | Buffalo Receipt | Public |
| | G | [Reserved] | |
| | H | Diesel Receipt | Public |
| | I | DL1961 Receipt | Public |
| | J | Eddie Bauer Receipt | Public |
| | K | Gap Receipt | Public |
| | L | Guess Receipt | Public |
| | M | H&M Receipt | Public |
| | N | Just Cavalli Receipt | Public |
| | O | Koos - AG Jeans Receipt | Public |
| | P | Koos - Big Star Receipt | Public |
| | Q | Levi's Receipt | Public |
| | R | Lucky Receipt | Public |
| | S | Replay Receipt | Public |
| | T | VF (Seven For All Mankind) Receipt | Public |
| **7** | | **Claim Analysis Against Accused Products** | |
| | A | Marcatex Flexi Manual Rev 1.3.1 _English_FDA | Public |
| | B | YouTube Video – Jeanologia, Flexi3 ONE MACHINE, MULTIPLE OPTIONS (https://www.youtube.com/watch?v=apPFfm78_1E&feature=c4-overview&list=UUXQ2v180qUhLWKYzvGkNMQg) | Public |
| | C | YouTube Video – Jeanologia, Laser System_ Twin HS at Itma Barcelona 2011 (https://www.youtube.com/watch?v=CsP_ZxgIQQI) | Public |
| | D | YouTube Video – Tonello, Laser Blaze by Tonello (https://www.youtube.com/watch?v=a2BJiDM8kpg) | Public |
| | E | YouTube Video – Macsa ID, S.A., DENIM - LASERTEX Pro - Macsa Laser Systems (https://www.youtube.com/watch?v=IDAt9dcSMv8) | Public |

| | F | YouTube Video – Jeanologia, Laser Technology in Siete Leguas (https://www.youtube.com/watch?v=8u4WPumH6Kg) | **Public** |
|---|---|---|---|
| | G | YouTube Video – Jeanologia, Finishing Jeans Present And Future Trends And Technologies In Denim 02 (http://www.youtube.com/watch?v=HgxvoYgl-tM) | **Public** |
| | H | YouTube Video – Replay Laserblast | **Public** |
| | I | YouTube Video – Replay Laserblast - Official Teaser | **Public** |
| | J | CBS This Morning, Levi's New Stadium – Brand launches $1.2 billion sports arena | **Public** |
| **8** | | **Abercrombie Claim Charts** | |
| | A | Abercrombie Claim Chart U.S. Patent 5,990,444 | **Public** |
| | B | Abercrombie Claim Chart U.S. Patent 6,140,602 | **Public** |
| | C | Abercrombie Claim Chart U.S. Patent 6,252,196 | **Public** |
| | D | Abercrombie Claim Chart U.S. Patent 6,664,505 | **Public** |
| | E | Abercrombie Claim Chart U.S. Patent 6,819,972 | **Public** |
| | F | Abercrombie Claim Chart U.S. Patent 6,858,815 | **Public** |
| **9** | | **American Eagle Claim Charts** | |
| | A | American Eagle Claim Chart U.S. Patent 5,990,444 | **Public** |
| | B | American Eagle Claim Chart U.S. Patent 6,140,602 | **Public** |
| | C | American Eagle Claim Chart U.S. Patent 6,252,196 | **Public** |
| | D | American Eagle Claim Chart U.S. Patent 6,664,505 | **Public** |
| | E | American Eagle Claim Chart U.S. Patent 6,819,972 | **Public** |
| | F | American Eagle Claim Chart U.S. Patent 6,858,815 | **Public** |
| **10** | | **BlankNYC Claim Charts** | |
| | A | BlankNYC Claim Chart U.S. Patent 5,990,444 | **Public** |
| | B | BlankNYC Claim Chart U.S. Patent 6,140,602 | **Public** |
| | C | BlankNYC Claim Chart U.S. Patent 6,252,196 | **Public** |
| | D | BlankNYC Claim Chart U.S. Patent 6,664,505 | **Public** |
| | E | BlankNYC Claim Chart U.S. Patent 6,819,972 | **Public** |
| | F | BlankNYC Claim Chart U.S. Patent 6,858,815 | **Public** |
| **11** | | **Buckle Claim Charts** | |
| | A | Buckle Claim Chart U.S. Patent 5,990,444 | **Public** |
| | B | Buckle Claim Chart U.S. Patent 6,140,602 | **Public** |
| | C | Buckle Claim Chart U.S. Patent 6,252,196 | **Public** |
| | D | Buckle Claim Chart U.S. Patent 6,664,505 | **Public** |
| | E | Buckle Claim Chart U.S. Patent 6,819,972 | **Public** |
| | F | Buckle Claim Chart U.S. Patent 6,858,815 | **Public** |
| **12** | | **Buffalo Claim Charts** | |
| | A | Buffalo Claim Chart U.S. Patent 5,990,444 | **Public** |
| | B | Buffalo Claim Chart U.S. Patent 6,140,602 | **Public** |

| | | |
|---|---|---|
| C | Buffalo Claim Chart U.S. Patent 6,252,196 | **Public** |
| D | Buffalo Claim Chart U.S. Patent 6,664,505 | **Public** |
| E | Buffalo Claim Chart U.S. Patent 6,819,972 | **Public** |
| F | Buffalo Claim Chart U.S. Patent 6,858,815 | **Public** |
| 13 | **[Reserved]** | |
| 14 | **Diesel Claim Charts** | |
| A | Diesel Claim Chart U.S. Patent 5,990,444 | **Public** |
| B | Diesel Claim Chart U.S. Patent 6,140,602 | **Public** |
| C | Diesel Claim Chart U.S. Patent 6,252,196 | **Public** |
| D | Diesel Claim Chart U.S. Patent 6,664,505 | **Public** |
| E | Diesel Claim Chart U.S. Patent 6,819,972 | **Public** |
| F | Diesel Claim Chart U.S. Patent 6,858,815 | **Public** |
| 15 | **DL1961 Claim Charts** | |
| A | DL1961 Claim Chart U.S. Patent 5,990,444 | **Public** |
| B | DL1961 Claim Chart U.S. Patent 6,140,602 | **Public** |
| C | DL1961 Claim Chart U.S. Patent 6,252,196 | **Public** |
| D | DL1961 Claim Chart U.S. Patent 6,664,505 | **Public** |
| E | DL1961 Claim Chart U.S. Patent 6,819,972 | **Public** |
| F | DL1961 Claim Chart U.S. Patent 6,858,815 | **Public** |
| 16 | **Eddie Bauer Claim Charts** | |
| A | Eddie Bauer Claim Chart U.S. Patent 5,990,444 | **Public** |
| B | Eddie Bauer Claim Chart U.S. Patent 6,140,602 | **Public** |
| C | Eddie Bauer Claim Chart U.S. Patent 6,252,196 | **Public** |
| D | Eddie Bauer Claim Chart U.S. Patent 6,664,505 | **Public** |
| E | Eddie Bauer Claim Chart U.S. Patent 6,819,972 | **Public** |
| F | Eddie Bauer Claim Chart U.S. Patent 6,858,815 | **Public** |
| 17 | **Gap Claim Charts** | |
| A | Gap Claim Chart U.S. Patent 5,990,444 | **Public** |
| B | Gap Claim Chart U.S. Patent 6,140,602 | **Public** |
| C | Gap Claim Chart U.S. Patent 6,252,196 | **Public** |
| D | Gap Claim Chart U.S. Patent 6,664,505 | **Public** |
| E | Gap Claim Chart U.S. Patent 6,819,972 | **Public** |
| F | Gap Claim Chart U.S. Patent 6,858,815 | **Public** |
| 18 | **Guess Claim Charts** | |
| A | Guess Claim Chart U.S. Patent 5,990,444 | **Public** |
| B | Guess Claim Chart U.S. Patent 6,140,602 | **Public** |
| C | Guess Claim Chart U.S. Patent 6,252,196 | **Public** |
| D | Guess Claim Chart U.S. Patent 6,664,505 | **Public** |
| E | Guess Claim Chart U.S. Patent 6,819,972 | **Public** |

| | | | |
|---|---|---|---|
| F | Guess Claim Chart U.S. Patent 6,858,815 | | Public |
| **19** | **H&M Claim Charts** | | |
| A | H&M Claim Chart U.S. Patent 5,990,444 | | Public |
| B | H&M Claim Chart U.S. Patent 6,140,602 | | Public |
| C | H&M Claim Chart U.S. Patent 6,252,196 | | Public |
| D | H&M Claim Chart U.S. Patent 6,664,505 | | Public |
| E | H&M Claim Chart U.S. Patent 6,819,972 | | Public |
| F | H&M Claim Chart U.S. Patent 6,858,815 | | Public |
| **20** | **Just Cavalli Claim Charts** | | |
| A | Just Cavalli Claim Chart U.S. Patent 5,990,444 | | Public |
| B | Just Cavalli Claim Chart U.S. Patent 6,140,602 | | Public |
| C | Just Cavalli Claim Chart U.S. Patent 6,252,196 | | Public |
| D | Just Cavalli Claim Chart U.S. Patent 6,664,505 | | Public |
| E | Just Cavalli Claim Chart U.S. Patent 6,819,972 | | Public |
| F | Just Cavalli Claim Chart U.S. Patent 6,858,815 | | Public |
| **21** | **Koos – The Matchbox (AG Jeans) Claim Charts** | | |
| A | Koos - The Matchbox (AG Jeans) Claim Chart U.S. Patent 5,990,444 | | Public |
| B | Koos - The Matchbox (AG Jeans) Claim Chart U.S. Patent 6,140,602 | | Public |
| C | Koos - The Matchbox (AG Jeans) Claim Chart U.S. Patent 6,252,196 | | Public |
| D | Koos - The Matchbox (AG Jeans) Claim Chart U.S. Patent 6,664,505 | | Public |
| E | Koos - The Matchbox (AG Jeans) Claim Chart U.S. Patent 6,819,972 | | Public |
| F | Koos - The Matchbox (AG Jeans) Claim Chart U.S. Patent 6,858,815 | | Public |
| **22** | **Koos – Big Star Claim Charts** | | |
| A | Koos - Big Star Claim Chart U.S. Patent 5,990,444 | | Public |
| B | Koos - Big Star Claim Chart U.S. Patent 6,140,602 | | Public |
| C | Koos - Big Star Claim Chart U.S. Patent 6,252,196 | | Public |
| D | Koos - Big Star Claim Chart U.S. Patent 6,664,505 | | Public |
| E | Koos - Big Star Claim Chart U.S. Patent 6,819,972 | | Public |
| F | Koos - Big Star Claim Chart U.S. Patent 6,858,815 | | Public |
| **23** | **Levi's Claim Charts** | | |
| A | Levi's Claim Chart U.S. Patent 5,990,444 | | Public |
| B | Levi's Claim Chart U.S. Patent 6,140,602 | | Public |
| C | Levi's Claim Chart U.S. Patent 6,252,196 | | Public |

| | | | |
|---|---|---|---|
| | D | Levi's Claim Chart U.S. Patent 6,664,505 | **Public** |
| | E | Levi's Claim Chart U.S. Patent 6,819,972 | **Public** |
| | F | Levi's Claim Chart U.S. Patent 6,858,815 | **Public** |
| **24** | | **Lucky Brand Claim Charts** | |
| | A | Lucky Brand Claim Chart U.S. Patent 5,990,444 | **Public** |
| | B | Lucky Brand Claim Chart U.S. Patent 6,140,602 | **Public** |
| | C | Lucky Brand Claim Chart U.S. Patent 6,252,196 | **Public** |
| | D | Lucky Brand Claim Chart U.S. Patent 6,664,505 | **Public** |
| | E | Lucky Brand Claim Chart U.S. Patent 6,819,972 | **Public** |
| | F | Lucky Brand Claim Chart U.S. Patent 6,858,815 | **Public** |
| **25** | | **Replay Claim Charts** | |
| | A | Replay Claim Chart U.S. Patent 5,990,444 | **Public** |
| | B | Replay Claim Chart U.S. Patent 6,140,602 | **Public** |
| | C | Replay Claim Chart U.S. Patent 6,252,196 | **Public** |
| | D | Replay Claim Chart U.S. Patent 6,664,505 | **Public** |
| | E | Replay Claim Chart U.S. Patent 6,819,972 | **Public** |
| | F | Replay Claim Chart U.S. Patent 6,858,815 | **Public** |
| **26** | | **VF Corp. Claim Charts** | |
| | A | VF Claim Chart U.S. Patent 5,990,444 | **Public** |
| | B | VF Claim Chart U.S. Patent 6,140,602 | **Public** |
| | C | VF Claim Chart U.S. Patent 6,252,196 | **Public** |
| | D | VF Claim Chart U.S. Patent 6,664,505 | **Public** |
| | E | VF Claim Chart U.S. Patent 6,819,972 | **Public** |
| | F | VF Claim Chart U.S. Patent 6,858,815 | **Public** |
| | | **Domestic Industry** | |
| **27** | | **Linear Processing Claim Charts** | |
| | A | Linear Processing Claim Chart for U.S. Patent No. 5,990,444 | **Confidential** |
| | B | Linear Processing Claim Chart for U.S. Patent No. 6,140,602 | **Confidential** |
| | C | Linear Processing Claim Chart for U.S. Patent No. 6,252,196 | **Confidential** |
| | D | Linear Processing Claim Chart for U.S. Patent No. 6,664,505 | **Confidential** |
| | E | Linear Processing Claim Chart for U.S. Patent No. 6,819,972 | **Confidential** |
| | F | Linear Processing Claim Chart for U.S. Patent No. 6,858,815 | **Confidential** |
| | G | Video - RevoLaze Linear Processing | **Public** |
| **28** | | **Sports Logos Claim Charts** | |
| | A | Sport Logos Claim Chart for U.S. Patent No. 5,990,444 | **Confidential** |
| | B | Sport Logos Claim Chart for U.S. Patent No. 6,140,602 | **Confidential** |
| | C | Sport Logos Claim Chart for U.S. Patent No. 6,252,196 | **Confidential** |
| | D | Sport Logos Claim Chart for U.S. Patent No. 6,664,505 | **Confidential** |
| | E | Sport Logos Claim Chart for U.S. Patent No. 6,819,972 | **Confidential** |

| | | |
|---|---|---|
| F | Sport Logos Claim Chart for U.S. Patent No. 6,858,815 | **Confidential** |
| G | Video - Chicago Bears Logo | **Confidential** |
| **29** | **Terrain (Green Bay Decking) Claim Charts** | |
| A | Terrain Claim Chart for U.S. Patent No. 5,990,444 | **Confidential** |
| B | Terrain Claim Chart for U.S. Patent No. 6,140,602 | **Confidential** |
| C | Terrain Claim Chart for U.S. Patent No. 6,252,196 | **Confidential** |
| D | Terrain Claim Chart for U.S. Patent No. 6,664,505 | **Confidential** |
| E | Terrain Claim Chart for U.S. Patent No. 6,819,972 | **Confidential** |
| F | Terrain Claim Chart for U.S. Patent No. 6,858,815 | **Confidential** |
| G | Video - Plastic Lumber | **Public** |
| **30** | **Cloth Upholstery (Lear Corp.) Claim Charts** | |
| A | Cloth Upholstery Claim Chart for U.S. Patent No. 5,990,444 | **Confidential** |
| B | Cloth Upholstery Claim Chart for U.S. Patent No. 6,140,602 | **Confidential** |
| C | Cloth Upholstery Claim Chart for U.S. Patent No. 6,252,196 | **Confidential** |
| D | Cloth Upholstery Claim Chart for U.S. Patent No. 6,664,505 | **Confidential** |
| E | Cloth Upholstery Claim Chart for U.S. Patent No. 6,819,972 | **Confidential** |
| F | Cloth Upholstery Claim Chart for U.S. Patent No. 6,858,815 | **Confidential** |
| G | Cloth Upholstery Video | **Confidential** |
| **31** | **Leather Upholstery (GST AutoLeather) Claim Charts** | |
| A | Leather Upholstery Claim Chart for U.S. Patent No. 5,990,444 | **Confidential** |
| B | Leather Upholstery Claim Chart for U.S. Patent No. 6,140,602 | **Confidential** |
| C | Leather Upholstery Claim Chart for U.S. Patent No. 6,252,196 | **Confidential** |
| D | Leather Upholstery Claim Chart for U.S. Patent No. 6,664,505 | **Confidential** |
| E | Ram Adds New Laramie Longhorn, Outdoorsman Models to 2600/3500 Heavy Duty Lineup (Sep. 14, 2010) | **Public** |
| F | 2013 Dodge Ram 1500 Brochure | **Public** |
| **32** | **DVUV Claim Charts** | |
| A | DVUV Claim Chart for U.S. Patent No. 5,990,444 | **Confidential** |
| B | DVUV Claim Chart for U.S. Patent No. 6,140,602 | **Confidential** |
| C | DVUV Claim Chart for U.S. Patent No. 6,252,196 | **Confidential** |
| D | DVUV Claim Chart for U.S. Patent No. 6,664,505 | **Confidential** |
| E | DVUV Claim Chart for U.S. Patent No. 6,858,815 | **Confidential** |
| F | DVUV Video | **Confidential** |
| G | DVUV Cutting Shop Manual | **Public** |
| **33** | **High Speed Abrasion Claim Charts** | |
| A | High Speed Abrasion Claim Chart for U.S. Patent No. 5,990,444 | **Confidential** |
| B | High Speed Abrasion Claim Chart for U.S. Patent No. 6,140,602 | **Confidential** |
| C | High Speed Abrasion Claim Chart for U.S. Patent No. 6,252,196 | **Confidential** |
| D | High Speed Abrasion Claim Chart for U.S. Patent No. 6,664,505 | **Confidential** |
| E | High Speed Abrasion Claim Chart for U.S. Patent No. 6,819,972 | **Confidential** |

| | | | |
|---|---|---|---|
| F | High Speed Abrasion Claim Chart for U.S. Patent No. 6,858,815 | | **Confidential** |
| G | High Speed Abrasion Taylor Togs Video | | **Public** |
| H | High Speed Abrasion VF Jeanswear Video | | **Public** |
| **34** | **Darryl J. Costin, Ph.D. Domestic Industry Declaration** | | |
| A | Declaration of Darryl J. Costin, Ph.D. | | **Confidential** |
| B | Laser Demonstration and Launch Party Video | | **Public** |
| C | Video - Coach Sports Jeans | | **Public** |
| D | Textile Roll Goods Brochure | | **Public** |
| E | Video - Textile Roll Goods | | **Public** |
| F | Confidentiality and Non-Disclosure Agreement by and between Struktol Company of America and RevoLaze, LLC | | **Confidential** |
| G | RevoLaze/Cone Denim Non-Disclosure Agreement | | **Confidential** |
| **35** | **News Articles and Publications** | | |
| A | Jeanologia Seeking a Friendlier Denim Finish | | **Public** |
| B | Jeanologia: Ultimate Technology for Jean Finishing | | **Public** |
| C | Easy Laser - Our Customers | | **Public** |
| D | fibre 2 fashion - Jeanologia dominates Mexican garment finishing market | | **Public** |
| E | Jeanologia's lead in sustainable technology for garment finishing | | **Public** |
| F | WWD - Panel: Industry Drives Sustainability Effort | | **Public** |
| G | Koos - Ocean Bill of Lading | | **Public** |
| H | Levi Strauss & Co., Environment, Health and Safety Handbook | | **Public** |
| I | Bobbin, TechnoLines Debuts Laser Applications for Fabric Scribing, Sandblasting | | **Public** |
| J | Laser Scribes Out Fabric Designs - Automotive Engineering | | **Public** |
| | **Technical Declarations** | | |
| **36** | **Darryl J. Costin, Ph.D. Technical Declaration** | | |
| A | Declaration of Darryl J. Costin, Ph.D. | | **Public** |
| B | Costin Resume | | **Confidential** |
| C | Chow et al., Effect of CO2 laser treatment on cotton surface, 18 Cellulose 1635 | | **Public** |
| D | Table - energy density per unit area per unit time (EDPUT) | | **Public** |
| **37** | **William Murcia Technical Declaration** | | |
| A | Declaration of William Murcia | | **Confidential** |
| B | Murcia Resume | | **Public** |

x

| Appendices List | | |
|---|---|---|
| **Appendix** | **Description** | **Designation** |
| | **Certified File Wrappers and Cited References** | |
| A | Certified File Wrapper for U.S. Patent No. 5,990,444 | **Public** |
| B | Cited References for U.S. Patent No. 5,990,444 | **Public** |
| C | Certified File Wrapper for U.S. Patent No. 6,140,602 | **Public** |
| D | Cited References for U.S. Patent No.6,140,602 | **Public** |
| E | Certified File Wrapper for U.S. Patent No. 6,252,196 | **Public** |
| F | Cited References for U.S. Patent No.6,252,196 | **Public** |
| G | Certified File Wrapper for U.S. Patent No. 6,664,505 | **Public** |
| H | Cited References for U.S. Patent No. 6,664,505 | **Public** |
| I | Certified File Wrapper for U.S. Patent No. 6,819,972 | **Public** |
| J | Cited References for U.S. Patent No. 6,819,972 | **Public** |
| K | Certified File Wrapper for U.S. Patent No. 6,858,815 | **Public** |
| L | Cited References for U.S. Patent No. 6,858,815 | **Public** |

## I. **INTRODUCTION**

1.      This Complaint is filed, pursuant to Section 337 of the Tariff Act of 1930 as amended (19 U.S.C. § 1337), by RevoLaze, LLC ("RevoLaze") and TechnoLines, LLC ("TechnoLines") (collectively "Complainants") based on unfair methods of competition and unfair acts in the unlawful importation into the United States, sale for importation into the United States, or sale within the United States after importation by Abercrombie & Fitch Co.; American Eagle Outfitters, Inc.; BBC Apparel Group, LLC; Gotham Licensing Group, LLC; The Buckle, Inc.; Buffalo International ULC; 1724982 Alberta ULC; Diesel S.p.A.; DL1961 Premium Denim Inc.; Eddie Bauer LLC; The Gap, Inc.; Guess?, Inc.; H&M Hennes & Mauritz AB; H&M Hennes & Mauritz LP; Roberto Cavalli S.p.A. d/b/a Just Cavalli; Koos Manufacturing, Inc. d/b/a AG Jeans and Big Star; Levi Strauss & Co.; Lucky Brand Dungarees, Inc.; Fashion Box S.p.A. d/b/a Replay Jeans; and VF Corporation d/b/a 7 for All Mankind (collectively "Respondents") of certain laser abraded denim garments (collectively the "Accused Products"). The Accused Products manufactured, imported, offered for sale, and/or sold by Respondents are manufactured by methods directly infringing, under 19 U.S.C. § 1337(a)(1)(B)(ii), one or more claims (the "Asserted Claims") of the following U.S. patents (the "Asserted Patents" or "Patents-in-Suit") owned by RevoLaze.

- Claims 1-3, 8, 21, 33-34, 46, 69, 70, and 72 of U.S. Patent No. 5,990,444 ("the '444 Patent") ("Exhibit 1A");

- Claims 1, 14, 15, 53, 73, 83, 85, 94, 97, 99, 112, 120, 122-125, and 141-143 of U.S. Patent No. 6,140,602 ("the '602 Patent") ("Exhibit 1B");

- Claims 5, 11, 13, 14, and 16 of U.S. Patent No. 6,252,196 ("the '196 Patent") ("Exhibit 1C");

1

- Claims 1 and 49-51 of U.S. Patent No. 6,664,505 ("the '505 Patent") ("Exhibit 1D");

- Claims 1, 2, 4-6, 11, 12, 16-19, 56-59, 61, 63, 64, 72, 77, 78, 83-87, and 92-95 of U.S. Patent No. 6,819,972 ("the '972 Patent") ("Exhibit 1E"); and

- Claims 13 and 14 of U.S. Patent No. 6,858,815 ("the '815 Patent") ("Exhibit 1F").

2.    Complainants seek a permanent general exclusion order barring infringing denim garments from entry into the United States.  In the alternative, Complainants seek a limited exclusion order barring the infringing denim garments manufactured by or on the behalf of Respondents and are imported, offered for sale, sold, sold for importation, or sold after importation by Respondents.  Complainants also seek permanent cease-and-desist orders against each Respondent prohibiting the importation, sale, offer for sale, advertisement, or solicitation of any sale by Respondents of the Accused Products or other products encompassed by the claims of the Patents-in-Suit.

## II. **THE PARTIES**

### A.    **Complainants**

3.    RevoLaze, LLC is a Delaware limited liability company with its principal place of business at 29300 Clemens Road, Westlake, Ohio 44145.  TechnoLines, LLC, a Delaware limited liability company with the same address, is the majority member of RevoLaze and invested some 20 years in the research, development, obtainment of numerous patents and commercialization of its novel laser scribing technology. Through the use of sophisticated mathematical modeling techniques, TechnoLines overcame the technical barriers to successfully laser scribe high quality graphics and patterns on a host of textile fabrics including denim, cotton, polyester, nylon, and silk, as well as vinyl, suede, and leather.

2

4.      Complainants have made a significant long-term investment to build the textile laser scribing technology business in the United States.  They have dedicated considerable technical manpower, research and development facilities (three in Ohio and one in Minnesota) and financial resources for the invention and commercialization of their unique laser scribing technology to impart graphics and patterns on myriad of substrates.  Importantly, Complainants' technology answers the textile industry's cry for sustainability, eco-friendliness and is in perfect alignment with the green movement for the environment.

5.      Over the course of the last 15 years, Complainants have developed the technology and associated equipment through licensing with garment manufacturers including Sights Denim Systems, Taylor Togs, Inc., VF Corporation, Gear For Sports, Inc., and Final Finish Laundry.  None of these licenses is still in force.  Complainants' subsidiaries also previously operated two denim jean companies offering denim apparel manufactured by the patented technology: Fractal Jean Co. and Fins Denim Co.

6.      Complainants' laser abrasion technology replaces the extremely dangerous and harmful sandblasting process, which has been found to be associated with a disabling lung disease called silicosis, to create a worn look on denim jeans.  Because silicosis may result in death to workers, numerous denim jean companies, including industry leaders, have banned the use of sandblasting.  Complainants, through the use of their 2,500-Watt laser systems, offer a patented laser abrading technology to solve this catastrophic health problem and substantially increase throughput versus the sandblast process.

7.      Complainants also have introduced linear processing technology to the market that may revolutionize the textile industry by reducing the environmental impact associated with processes like enzyme washing jeans.  A worldwide concern exists regarding the

3

environmental hazards associated with enzyme washing jeans and other processes such as the environmentally burdensome chemical printing processes that is used to laser scribe graphics and patterns to denim jeans. Complainants' linear laser etching technology may reduce or eliminate these environmental problems.

8.    Through a combination of software developed by Complainants and specifically designed material delivery systems, Complainants have created the highest speed, highest power galvanometric driven laser machines in the industry that can economically apply graphics and patterns on fabrics and other substrates. Complainants continue to invest in developing new concepts for laser scribing materials in unique ways to solve current environmental, quality and cost problems associated with manufacturing and decorating garments and textiles.

9.    RevoLaze is the owner of each of the Patents-in-Suit. Exhibits 2A-2F.

**B.    Proposed Respondents**

10.    Abercrombie & Fitch Co. ("A&F") d/b/a Hollister Jeans is a Delaware corporation with its principal place of business at 6301 Fitch Path, New Albany, Ohio 43054. On information and belief, A&F makes in Guatemala, has others make in Guatemala, exports from Guatemala into the United States, and imports from Guatemala certain denim garments that are made by methods that are claimed in the Patents-in-Suit. A&F also operates multiple retail stores across the United States under both the Hollister brand and the Abercrombie & Fitch brand. *See* Abercrombie & Fitch Store Locator, http://www.abercrombie.com/webapp/wcs/stores/servlet/StoreLocator?catalogId=10901&langId=-1&storeId=10051 (last visited July 14, 2014); Hollister Co. Store Locator, http://www.hollisterco.com/webapp/wcs/stores/servlet/StoreLocator?catalogId=10201&langId=-

4

1&storeId=10251 (last visited July 14, 2014). Specifically, A&F sells to retail customers and/or wholesalers within the United States imported, infringing garments including the Hollister High Rise Super Skinny – Medium Jeans (Item No. 355-550-0184-024) ("A&F Product"). A sample of the A&F Product is shown in Exhibit 5A.

11. American Eagle Outfitters, Inc. ("AEO") is a Delaware corporation with its principal place of business at 77 Hot Metal Street, Pittsburgh, Pennsylvania 15203. On information and belief, AEO makes in Mexico, has others make in Mexico, exports from Mexico into the United States, and imports from Mexico certain denim garments that are made by methods that are claimed in the Patents-in-Suit. AEO also operates multiple retail stores across the United States. American Eagle Outfitters Store Locator, http://www.ae.com/web/storelocator/default.jsp (last visited July 15, 2014). Specifically, AEO sells to retail customers and/or wholesalers within the United States imported, infringing garments including the American Eagle Men's Original Straight – Dark Tinted Crackle Jeans (Item No. 2870) ("AEO Product"). A sample of the AEO Product is shown in Exhibit 5B.

12. BBC Apparel Group, LLC and Gotham Licensing Group, LLC d/b/a BlankNYC (collectively "BlankNYC") are companies with their principal place of business at 1407 Broadway, New York, New York 10018. BlankNYC has a business address at 275 West 39th Street, New York, New York 10018. On information and belief, BlankNYC makes in China, has others make in China, exports from China into the United States, and imports from China certain denim garments that are made by methods that are claimed in the Patents-in-Suit. Specifically, BlankNYC sells to retail customers and/or wholesalers within the United States imported, infringing garments including the BlankNYC Polka Dot Jeans ("BlankNYC Product"). A sample of the BlankNYC Product is shown in Exhibit 5C.

5

13.     The Buckle, Inc. ("Buckle") is a Nebraska corporation with its principal place of business at 2407 West 24th Street, Kearney, Nebraska 68845. On information and belief, Buckle makes in Mexico, has others make in Mexico, exports from Mexico into the United States, and imports from Mexico certain denim garments that are made by methods that are claimed in the Patents-in-Suit. Buckle also operates multiple retail stores across the United States. Buckle Store Locator, http://www.buckle.com/stores/locator.jsp;jsessionid=hDJGTFHTsYlg6gkNBn9nhBbjGHGgnn3 kGNvkrcvpGnn8v2YKk2Wy!-2113174839!-695411156 (last visited July 15, 2014). Specifically, Buckle sells to retail customers and/or wholesalers within the United States imported, infringing products including the Buckle BKE Payton Bootcut – Porter Jeans (Item No. BPL1403L) ("Buckle Product"). A sample of the Buckle Product is shown in Exhibit 5D.

14.     Buffalo International ULC and 1724982 Alberta ULC d/b/a Buffalo David Bitton (collectively "Buffalo") are Quebec companies with business addresses at 400 Sauve West, Montreal, Quebec H3L 1Z8. On information and belief, Buffalo makes in Thailand, has others make in Thailand, exports from Thailand into the United States, and imports from Thailand certain denim garments that are made by methods that are claimed in the Patents-in-Suit. Specifically, Buffalo sells to retail customers and/or wholesalers within the United States imported, infringing garments including the Buffalo Driven-X (Item No. BM16324) ("Buffalo Product"). A sample of the Buffalo Product is shown in Exhibit 5E.

15.     [Reserved].

16.     Diesel S.p.A. ("Diesel") is an Italian company with its principal place of business at via dell'Industria, 4/6, 36042 Breganze (VI), Italy. On information and belief, Diesel makes in Italy, has others make in Italy, exports from Italy into the United States, and imports

6

from Italy certain denim garments that are made by methods that are claimed in the Patents-in-Suit. Diesel also operates multiple stores across the United States. *See* Diesel Store Locator, www.diesel.com/store-locator (last visited July 14, 2014). Specifically, Diesel sells to retail customers and/or wholesalers within the United States imported, infringing garments including Diesel Shioner Skinny Fit Jeans (Item No. 117009) ("Diesel Product"). A sample of the Diesel Product is shown in Exhibit 5G.

17.     DL1961 Premium Denim Inc. ("DL1961") is a Delaware corporation with its principal place of business at 530 7th Avenue, Suite 1505, New York, New York 10018. On information and belief, DL1961 makes in Pakistan, has others make in Pakistan, exports from Pakistan into the United States, and imports from Pakistan certain denim garments that are made by methods that are claimed in the Patents-in-Suit. Specifically, DL1961 sells to retail customers and/or wholesalers within the United States imported, infringing garments including the DL1961 Emma Legging – McCarren (No. 2264) ("DL1961 Product"). A sample of the DL1961 Product is shown in Exhibit 5H.

18.     Eddie Bauer LLC ("Eddie Bauer") is a Delaware limited liability company with its principal place of business at 10401 NE 8th Street, Suite 500, Bellevue, Washington 98004. On information and belief, Eddie Bauer makes in Sri Lanka, has others make in Sri Lanka, exports from Sri Lanka into the United States, and imports from Sri Lanka certain denim garments that are made by methods that are claimed in the Patents-in-Suit. Eddie Bauer also operates multiple retail stores across the United States. Eddie Bauer Store Locator, http://www.eddiebauer.com/storelocator/store_locator.jsp? (last visited July 15, 2014). Specifically, Eddie Bauer sells to retail customers and/or wholesalers within the United States

imported, infringing garments including the Eddie Bauer Skinny Print Jeans (Style No. 2974) ("Eddie Bauer Product"). A sample of the Eddie Bauer Product is shown in Exhibit 5I.

19. The Gap, Inc. ("Gap") is a Delaware corporation with its principal place of business at 2 Folsom Street, San Francisco, California 94105. On information and belief, Gap makes in China, has others make in China, exports from China into the United States, and imports from China certain denim garments that are made by methods that are claimed in the Patents-in-Suit. Gap also operates multiple retail stores across the United States. *See* Gap Store Locator, http://www.gap.com/customerService/storeLocator.do?mlink=39813,6836749,StoreLocator&clink=6836749 (last visited July 14, 2014). Specifically, Gap sells to retail customers and/or wholesalers within the United States imported, infringing garments including the Gap Floral Print Always Skinny Jeans (Item No. 600542) ("Gap Product"). A sample of the Gap Product is shown in Exhibit 5J.

20. Guess?, Inc. ("Guess?") is a Delaware corporation with its principal place of business at 1444 South Alameda Street, Los Angeles, California 90021. On information and belief, Guess? makes in Mexico, has others make in Mexico, exports from Mexico into the United States, and imports from Mexico certain denim garments that are made by methods that are claimed in the Patents-in-Suit. Guess? also operates multiple retail stores across the United States. Guess? Store Locator, shop.guess.com/en/StoreLocator (last visited July 14, 2014). Specifically, Guess? sells to retail customers and/or wholesalers within the United States imported, infringing products including Guess? Alameda Slim Fit Shorts – Hickory Wash (Style No. M41A01D1A91) ("Guess? Product"). A sample of the Guess? Product is shown in Exhibit 5K.

8

21.     H&M Hennes & Mauritz AB is a Swedish company with its principal place of business at Mäster Samuelsgatan 46A, SE-106 38 Stockholm, Sweden.  H&M Hennes & Mauritz LP is a New York company with a business address at 110 Fifth Avenue, 11th Floor, New York, New York 10011.  H&M Hennes & Mauritz AB and H&M Hennes & Mauritz LP are collectively referred to as "H&M."  On information and belief, H&M makes in Turkey, has others make in Turkey, exports from Turkey into the United States, and imports from Turkey certain denim garments that are made by methods that are claimed in the Patents-in-Suit.  H&M also operates multiple stores across the United States.  *See* H&M Store Locator, http://www.hm.com/us/store-locator (last visited July 15, 2014).  Specifically, H&M sells to retail customers and/or wholesalers within the United States imported, infringing garments including the H&M Boyfriend Low Waist Tapered Leg ("H&M Product").  A sample of the H&M Product is shown in Exhibit 5L.

22.     Roberto Cavalli S.p.A. d/b/a Just Cavalli ("Just Cavalli") is an Italian company with its principal place of business at Piazza San Babila 3 - 0122 Milan, Italy.  On information and belief, Just Cavalli makes in Romania, has others make in Romania, exports from Romania into the United States, and imports from Romania certain denim garments that are made by methods that are claimed in the Patents-in-Suit.  Just Cavalli operates two retail stores, one at One Borgata Way, Atlantic City, New Jersey, and a second at 434 West Broadway, New York, New York.  Roberto Cavalli Store Locator, http://www.robertocavalli.com/store_locator/ (last visited July 15, 2014).  Specifically, Just Cavalli sells to retail customers and/or wholesalers within the United States imported, infringing garments including the Just Cavalli Laser Croc Denim Shirt ("Just Cavalli Product").  A sample of the Just Cavalli Product is shown in Exhibit 5M.

9

23.     Koos Manufacturing, Inc. d/b/a AG Jeans and Big Star Jeans ("Koos") is a California corporation with its principal place of business at 2741 Seminole Avenue, South Gate, California 90280. On information and belief, Koos makes in Mexico, has others make in Mexico, exports from Mexico into the United States, and imports from Mexico certain denim garments that are made by methods that are claimed in the Patents-in-Suit. Koos also operates multiple retail stores across the United States under the AG Adriano Goldschmied name. AG Jeans Store Locator, http://www.agjeans.com/store/storelocator.aspx (last visited July 15, 2014). Specifically, Koos sells to retail customers and/or wholesalers within the United States imported, infringing garments including the AG Jeans, The Matchbox – Skinny Straight LON (Style No. 1131IMALON) and the Big Star – Alex Skinny Pattern Jeans (Style No. SWALXFS) (collectively "Koos Products"). Samples of the Koos Products are shown in Exhibit 5N and 5O.

24.     Levi Strauss & Co. ("Levi's") is a Delaware corporation with its principal place of business at 1155 Battery Street, San Francisco, California. On information and belief, Levi's makes in Mexico, has others make in Mexico, exports from Mexico into the United States, and imports from Mexico certain denim garments that are made by methods that are claimed in the Patents-in-Suit. Levi's also operates multiple stores across the United States. See Levi's Store Locator, us.levi.com/storeLocator/ (last visited July 14, 2014). Specifically, Levi's sells to retail customers and/or wholesalers within the United States imported, infringing garments including Levi's 501 Original Fit Broken Black (Item No. 005011480) ("Levi's Product"). A sample of the Levi's Product is shown in Exhibit 5P.

25.     Lucky Brand Dungarees, Inc. ("Lucky") is a Delaware corporation with its principal place of business at 540 South Santa Fe Avenue, Los Angeles, California 90013. On information and belief, Lucky makes in Mexico, has others make in Mexico, exports from

10

Mexico into the United States, and imports from Mexico certain denim garments that are made by methods that are claimed in the Patents-in-Suit.  Lucky also operates multiple retail stores across the United States.  Lucky Brand Store Locator, http://www.luckybrand.com/stores (last visited July 15, 2014).  Specifically, Lucky sells to retail customers and/or wholesalers within the United States imported, infringing garments including the Lucky Brand 363 New Vintage Straight Jeans (Style No. 7M11649) ("Lucky Product").  A sample of the Lucky Product is shown in Exhibit 5Q.

26.     Fashion Box S.p.A. d/b/a Replay Jeans ("Replay") is an Italian company with its principal place of business at Via Marcoui 1 - 31011 Localita Casella, Asolo (Treviso) Italy.  On information and belief, Replay makes in Tunisia, has others make in Tunisia, exports from Tunisia into the United States, and imports from Tunisia certain denim garments that are made by methods that are claimed in the Patents-in-Suit.  On information and belief, Replay previously operated retail stores at 860 Collins Avenue, Miami Beach, Florida 33139 and 109 Prince Street, New York, New York 10012.  Specifically, Replay sells to retail customers and/or wholesalers within the United States imported, infringing garments including the Replay Re-Army 335 906 – Slim Bootcut Fit Jeans (Item Number WV676.000.335 906) ("Replay Product").  A sample of the Replay Product is shown in Exhibit 5R.

27.     VF Corporation d/b/a 7 for All Mankind ("VF") is a Pennsylvania corporation with its principal place of business at 105 Corporate Center Boulevard, Greensboro, North Carolina 27408.  On information and belief, VF makes in Mexico, has others make in Mexico, exports from Mexico into the United States, and imports from Mexico certain denim garments that are made by methods that are claimed in the Patents-in-Suit.  VF also operates multiple stores in the United States under the 7 for All Mankind name.  7 for All Mankind Store

11

Locator, https://www.7forallmankind.com/store/storelocator.aspx (last visited July 15, 2014).

Specifically, VF sells to retail customers and/or wholesalers within the United States imported,

infringing garments including the Seven for All Mankind Austyn Jeans (Item No. JTA046702S)

("VF Product"). A sample of the VF Product is shown in Exhibit 5S.

## III. THE PATENTS AT ISSUE

### A. The '444 Patent – Laser Method and System of Scribing Graphics

28.     The '444 Patent, entitled "Laser Method and System of Scribing Graphics,"

was issued to Costin on November 23, 1999. A certified copy of the '444 Patent is attached to

the Complaint as Exhibit 1A. U.S. Application No. 08/729,493, which issued as the '444 Patent,

was filed on October 11, 1996 and claims priority as a continuation-in-part to U.S. Patent

Application No. 08/550,339. The '444 Patent has 72 claims including 19 independent claims.

RevoLaze became the owner of the '444 Patent by assignment. Exhibit 2A.

29.     Complainants have filed a certified copy and three additional copies of the

prosecution history for the '444 Patent as Appendix A. Complainants have filed four copies of

each patent and technical reference identified in the prosecution history of the application from

which the '444 Patent issued as Appendix B.

### B. The '602 Patent – Marking of Fabrics and Other Materials Using a Laser

30.     The '602 Patent, entitled "Marking of Fabrics and Other Materials Using a

Laser," was issued to Costin on October 31, 2000. A certified copy of the '602 Patent is attached

to the Complaint as Exhibit 1B. U.S. Application No. 08/844,114, which issued as the '602

Patent, was filed on April 29, 1997. The '602 Patent has 154 claims including 22 independent

claims. RevoLaze became the owner of the '602 Patent by assignment. Exhibit 2B.

31.     Complainants have filed a certified copy and three additional copies of the prosecution history for the '602 Patent as Appendix C.  Complainants have filed four copies of each patent and technical reference identified in the prosecution history of the application from which the '602 Patent issued as Appendix D.

C.     The '196 Patent – Laser Method of Scribing Graphics

32.     The '196 Patent, entitled "Laser Method of Scribing Graphics," was issued to Costin, et al. on June 26, 2001.  A certified copy of the '196 Patent is attached to the Complaint as Exhibit 1C.  U.S. Application No. 09/390,956, which issued as the '196 Patent, was filed on September 7, 1999 and claims priority as a divisional application to U.S. Patent Application No. 08/729,493, which issued as the '444 Patent.  The '196 Patent has 16 claims including six independent claims.  RevoLaze became the owner of the '196 Patent by assignment. Exhibit 2C.

33.     Complainants have filed a certified copy and three additional copies of the prosecution history for the '196 Patent as Appendix E.  Complainants have filed four copies of each patent and technical reference identified in the prosecution history of the application from which the '196 Patent issued as Appendix F.

D.     The '505 Patent – Laser Processing of Materials Using Mathematical Tools

34.     The '505 Patent, entitled "Laser Processing of Materials Using Mathematical Tools," was issued to Martin on December 16, 2003.  A certified copy of the '505 Patent is attached to the Complaint as Exhibit 1D.  U.S. Application No. 09/730,497, which issued as the '505 Patent, was filed on December 5, 2000 and claims priority to Provisional U.S. Patent Application No. 60/169,096.  The '505 Patent has 115 claims including nine independent claims.  RevoLaze became the owner of the '505 Patent by assignment.  Exhibit 2D.

13

35.     Complainants have filed a certified copy and three additional copies of the prosecution history for the '505 Patent as Appendix G.  Complainants have filed four copies of each patent and technical reference identified in the prosecution history of the application from which the '505 Patent issued as Appendix H.

E.     The '972 Patent – Material Surface Processing with a Laser that has a Scan Modulated Effective Power to Achieve Multiple Worn Looks

36.     The '972 Patent, entitled "Material Surface Processing with a Laser that has a Scan Modulated Effective Power to Achieve Multiple Worn Looks," was issued to Martin, et al. on November 16, 2004.  A certified copy of the '972 Patent is attached to the Complaint as Exhibit 1E.  U.S. Application No. 09/653,997, which issued as the '972 Patent, was filed on September 1, 2000 and claims priority to Provisional U.S. Patent Application No. 60/157,904.  The '972 Patent has 95 claims including 12 independent claims.  RevoLaze became the owner of the '972 Patent by assignment.  Exhibit 2E.

37.     Complainants have filed a certified copy and three additional copies of the prosecution history for the '972 Patent as Appendix I.  Complainants have filed four copies of each patent and technical reference identified in the prosecution history of the application from which the '972 Patent issued as Appendix J.

F.     The '815 Patent – Denim Designs from Laser Scribing

38.     The '815 Patent, entitled "Denim Designs from Laser Scribing," was issued to Costin on February 22, 2005.  A certified copy of the '815 Patent is attached to the Complaint as Exhibit 1F.  U.S. Application No. 10/319,163, which issued as the '815 Patent, was filed on December 14, 2002 and claims priority as a continuation of U.S. Application No. 09/408,131 and to Provisional U.S. Patent Application No. 60/102,363.  The '815 Patent has 17

14

claims including three independent claims. RevoLaze became the owner of the '815 Patent by assignment. Exhibit 2F.

      39.    Complainants have filed a certified copy and three additional copies of the prosecution history for the '815 Patent as Appendix K. Complainants have filed four copies of each patent and technical reference identified in the prosecution history of the application from which the '815 Patent issued as Appendix L.

### G.    Foreign Counterparts

      40.    The Patents-in-Suit have the following foreign counterpart patents or patent applications:

- The '444 Patent – PCT Publication No. 1997/016279, Canadian Patent App. No. 2236480 (abandoned), European Patent No. 0954404 (Nationalized in Italy, Spain, France, Germany, Great Britain, and Ireland; currently undergoing opposition proceedings before the European Patent Office), Mexican Patent No. 204894 (expired), Australian Patent App. No. 19960074655 (abandoned);

- The '602 Patent – None;

- The '196 Patent – The '196 Patent is a divisional application filed from the '444 Patent. The foreign counterparts to the '196 Patent are the same as those filed from the '444 Patent;

- The '505 Patent – PCT Publication No. 2001/042554, Australian Patent App. No. 20010047119 (abandoned);

- The '972 Patent – PCT Publication No. 2001/025824, Turkish Patent No. 200201254 (issued), Chinese Patent No. 08816659.5 (issued), Mexican Patent No. 237135 (issued), Mexican Patent No. 202403 (abandoned), Australian Patent App.

No. 20000077306 (abandoned), Canadian Patent No. 2386786 (abandoned),

European Patent Publication No. 1242962 (withdrawn from examination),

Japanese Patent App. No. 2003511242 (abandoned), South Korean Patent No.

564715 (abandoned);

- The '815 Patent – None.

H.    **Licensees**

41.    The Asserted Patents are currently licensed to Lear Corporation; Green

Bay Decking LLC; GST AutoLeather, Inc.; Nike, Inc.; DVUV, LLC; and Fins Denim Co.  The

Asserted Patents were previously licensed to GFSI, Inc. (Gear for Sports); Sights Denim Systems;

Taylor Togs, Inc.; Final Finish Laundry, and VF Corporation, but these licenses are no longer in

force.

I.    **Non-Technical Description of the Patented Technologies**

42.    For the last two decades, the denim market has demanded jeans with a

worn appearance.  This is achieved by abrading the denim jeans along the thighs and buttocks to

give the appearance of jeans that have been worn for a long period of time.  The process of

choice to create this abraded or worn look had been the sandblast process, in which workers blast

sand in the thigh and buttock areas to abrade the denim.  In recent years, however, it has been

confirmed that sandblasting denim can cause a disabling, and sometimes fatal, lung disease

called silicosis for the workers.

43.    Because of this deadly process, Turkey, once a predominant

manufacturing country for sandblasting denim jeans, has completely banned sandblasting denim

country-wide.  Furthermore, all major denim apparel companies, such as Levi's, Gap, VF, and

H&M, have banned the use of sandblasting in the creation of denim jeans with a worn look.  The

two most acceptable alternative methods to create the worn look are hand sanding and laser abrading. This sandblasting ban has thus increased the demand for lasers to abrade denim to help satisfy the market demand for denim featuring the worn look.

44.     Accordingly, denim apparel companies and their jean manufacturers are rapidly scaling up laser abrading processes to produce the denim with a worn look. Complainants have developed laser technology to abrade denim and sought patent protection for their technology.

45.     The '444 Patent is drawn to a method of scribing with a laser on material such as denim. Avoidance of undesired carbonization, melting or burn-through is achieved by controlling continuous power output, spot size of the laser beam on the material and speed of the laser relative to the material.

46.     The '602 Patent is drawn to a method and apparatus for forming a design on material such as denim with a laser. Speed of the laser relative to the material is controlled between a maximum speed that will provide a perceivable change to the material and a minimum speed below which carbonization, undesired burn-through or undesired melting will occur.

47.     The '196 Patent is drawn to a method to prevent over etching of material such as denim with a laser. Before the laser beam is output, the laser is set in motion relative to the material so that it is moving when the beam is output to the material.

48.     The '972 Patent is drawn to a method and apparatus for changing the power of the laser beam "on the fly." A worn look on jeans has areas, for example, in the middle that appear more worn or lighter than areas on the sides or margins that appear less worn or darker. As the laser scribes the worn look it does so one line at a time (scan line), with each line above or below the next as the pattern is developed. The effective power output of the laser

17

changes during the course of a single scan line to provide the variation in intensity to achieve the feathering or variation in color called for by the pattern design.

49. The '505 Patent is drawn to a method of forming images on a material such as denim with a laser. The images to be formed are subdivided into picture elements called pixels. Each specific pixel has an x,y coordinate and is associated with a color or grayscale. Each grayscale is associated with a specified amount of energy from the laser to achieve the grayscale. The amount of energy that is assigned to a grayscale is determined by a mathematical operation.

50. The '815 Patent is drawn to laser scribing material such as denim. The amount of energy applied by the laser is controlled to alter the surface chemistry of a denim article without undesirably damaging the denim article. The laser thus modifies an entire width of the denim article.

## IV. **THE PRODUCTS AT ISSUE**

### A. **Complainants Products**

51. Complainants are innovators in laser scribing of high quality graphics and patterns on a variety of materials including denim, cotton, polyester, nylon, and silk for use in apparel and upholstery, as well as in polymer composites and natural building materials. Complainants have spent years developing and licensing the technology to partners such as Lear Corporation, a global leader in automobile seating and upholstery, Nike, Inc., Green Bay Decking, a manufacturer of composite decking, DVUV, LLC, a manufacturer of powder coated medium density fiberboard. See *infra*, Paragraphs 92 – 104 and associated Exhibits.

### B. **Respondent's Infringing Products**

52. Respondents are each manufacturers, retailers, and/or wholesalers who make or have made and sell denim garments abraded using the Complainants' patented

18

technology. After investigation, Complainants have reason to believe that the Respondents' garments are abraded using a $CO_2$ laser, Technical Declaration of Darryl Costin ("Costin Technical Declaration"), ¶¶ 8-31 (attached as Exhibit 36A), in order to create designs on the garments or to simulate worn sections that are desirable to consumers. On information and belief, Respondents process their garments using a laser system such as that created by Jeanologia – GFK and Easy Laser. Declaration of William Murcia ("Murcia Declaration"), ¶¶ 7-11 (attached as Exhibit 37A).

## V. UNLAWFUL AND UNFAIR ACTS OF THE RESPONDENTS

### A. A&F

53. A&F manufactures for import, has others manufacture for import, imports into the United States, offers for sale, and/or sells in the United States after importation infringing denim garments including, but not limited to the A&F Product. The A&F Product is manufactured by a method that infringes one or more of the Asserted Claims. On information and belief, the A&F Product includes laser abrasion pores formed from a $CO_2$ laser using the patented method such as that used by Easy Laser and Jeanologia – GFK. Exhibit 36A, Costin Technical Declaration, ¶ 12; Exhibit 37A, Murcia Declaration, ¶¶ 7-11. On information and belief, A&F uses Easy Laser and Jeanologia – GFK technology to manufacture its products. *See* Exhibit 35A, Cynthia Martens, Jeanologia: Seeking a Friendlier Denim Finish, Women's Wear Daily (Nov. 9, 2011); Exhibit 35B, Jeanologia: Ultimate technology for jean finishing, The Indian Textile Journal (June 2012).

54. The A&F Product is made by a method infringing the Asserted Claims. Claim charts applying the Asserted Claims to the A&F Product are attached as Exhibits 8A-8F.

The claims charts demonstrate how the A&F Product meets every limitation of the Asserted Claims.

B. **American Eagle Outfitters**

55. AEO manufactures for import, has others manufacture for import, imports into the United States, offers for sale, and/or sells in the United States after importation infringing denim garments including, but not limited to the AEO Product. The AEO Product is manufactured by a method that infringes one or more of the Asserted Claims. On information and belief, the AEO Product includes laser abrasion pores formed from a $CO_2$ laser using the patented method such as that used by Easy Laser and Jeanologia – GFK. Exhibit 36A, Costin Technical Declaration, ¶ 13; Exhibit 37A, Murcia Declaration, ¶¶ 7-11. On information and belief, AEO uses Easy Laser and Jeanologia – GFK lasers and methods to create the AEO Product. *See* Exhibit 35C, Easy Laser, Our Customers.

56. The AEO Product is made by a method infringing the Asserted Claims. Claim charts applying the Asserted Claims to the AEO Product are attached as Exhibits 9A-9F. The claims charts demonstrate how the AEO Product meets every limitation of the Asserted Claims.

C. **BlankNYC**

57. BlankNYC manufactures for import, has others manufacture for import, imports into the United States, offers for sale, and/or sells in the United States after importation infringing denim garments including, but not limited to the BlankNYC Product. The BlankNYC Product is manufactured by a method that infringes one or more of the Asserted Claims. On information and belief, the BlankNYC Product includes laser abrasion pores formed from a $CO_2$

20

laser using the patented method such as that used by Easy Laser and Jeanologia – GFK. Exhibit 36A, Costin Technical Declaration, ¶ 14; Exhibit 37A, Murcia Declaration, ¶¶ 7-11.

58.     The BlankNYC Product is made by a method infringing the Asserted Claims. Claim charts applying the Asserted Claims to the BlankNYC Product are attached as Exhibits 10A-10F. The claims charts demonstrate how the BlankNYC Product meets every limitation of the Asserted Claims.

D.      **Buckle**

59.     Buckle manufactures for import, has others manufacture for import, imports into the United States, offers for sale, and/or sells in the United States after importation infringing denim garments including, but not limited to the Buckle Product. The Buckle Product is manufactured by a method that infringes one or more of the Asserted Claims. On information and belief, the Buckle Product includes laser abrasion pores formed from a $CO_2$ laser using the patented method such as that used by Easy Laser and Jeanologia – GFK. Exhibit 36A, Costin Technical Declaration, ¶ 15; Exhibit 37A, Murcia Declaration, ¶¶ 7-11. On information and belief, Buckle uses Easy Laser and Jeanologia – GFK lasers and methods to create the Buckle Product. *See* Exhibit 35D, Jeanologia dominates Mexican garment finishing market, fibre 2 fashion (Mar. 11, 2014).

60.     The Buckle Product is made by a method infringing the Asserted Claims. Claim charts applying the Asserted Claims to the Buckle Product are attached as Exhibits 11A-11F. The claims charts demonstrate how the Buckle Product meets every limitation of the Asserted Claims.

E.  **Buffalo**

61.  Buffalo manufactures for import, has others manufacture for import, imports into the United States, offers for sale, and/or sells in the United States after importation infringing denim garments including, but not limited to the Buffalo Product.  The Buffalo Product is manufactured by a method that infringes one or more of the Asserted Claims.  On information and belief, the Buffalo Product includes laser abrasion pores formed from a $CO_2$ laser using the patented method such as that used by Easy Laser and Jeanologia – GFK.  Exhibit 36A, Costin Technical Declaration, ¶ 16; Exhibit 37A, Murcia Declaration, ¶¶ 7-11.

62.  The Buffalo Product is made by a method infringing the Asserted Claims.  Claim charts applying the Asserted Claims to the Buffalo Product are attached as Exhibits 12A-12F.  The claims charts demonstrate how the Buffalo Product meets every limitation of the Asserted Claims.

F.  **[Reserved]**

63.  [Reserved].

64.  [Reserved].

G.  **Diesel**

65.  Diesel manufactures for import, has others manufacture for import, imports into the United States, offers for sale, and/or sells in the United States after importation infringing denim garments including, but not limited to the Diesel Product.  The Diesel Product is manufactured by a method that infringes one or more of the Asserted Claims.  On information and belief, the Diesel Product includes laser abrasion pores formed from a $CO_2$ laser using the patented method such as that used by Easy Laser and Jeanologia – GFK.  Exhibit 36A, Costin Technical Declaration, ¶ 18; Exhibit 37A, Murcia Declaration, ¶¶ 7-11.  On information and

22

belief, Diesel uses Easy Laser and Jeanologia – GFK lasers and methods to create the Diesel

Product. *See* Exhibit 35C, Easy Laser, Our Customers.

66.     The Diesel Product is made by a method infringing the Asserted Claims.

Claim charts applying the Asserted Claims to the Diesel Product are attached as Exhibits 14A-

14F. The claims charts demonstrate how the Diesel Product meets every limitation of the

Asserted Claims.

H.     **DL1961**

67.     DL1961 manufactures for import, has others manufacture for import,

imports into the United States, offers for sale, and/or sells in the United States after importation

infringing denim garments including, but not limited to the DL1961 Product. The DL1961

Product is manufactured by a method that infringes one or more of the Asserted Claims. On

information and belief, the DL1961 Product includes laser abrasion pores formed from a $CO_2$

laser using the patented method such as that used by Easy Laser and Jeanologia – GFK. Exhibit

36A, Costin Technical Declaration, ¶ 19; Exhibit 37A, Murcia Declaration, ¶¶ 7-11. DL1961

admits that it uses Jeanologia – GFK equipment in the production of its jeans. Exhibit 35F,

Panel: Industry Drives Sustainability Effort, Women's Wear Daily at 8 (July 24, 2013)

("DL1961 has employed both Lenzing fibers and, in its parent company's plant in Pakistan,

Jeanologia's equipment.").

68.     The DL1961 Product is made by a method infringing the Asserted Claims.

Claim charts applying the Asserted Claims to the DL1961 Product are attached as Exhibits 15A-

15F. The claims charts demonstrate how the DL1961 Product meets every limitation of the

Asserted Claims.

23

I.      **Eddie Bauer**

69.     Eddie Bauer manufactures for import, has others manufacture for import, imports into the United States, offers for sale, and/or sells in the United States after importation infringing denim garments including, but not limited to the Eddie Bauer Product. The Eddie Bauer Product is manufactured by a method that infringes one or more of the Asserted Claims. On information and belief, the Eddie Bauer Product includes laser abrasion pores formed from a $CO_2$ laser using the patented method such as that used by Easy Laser and Jeanologia – GFK. Exhibit 36A, Costin Technical Declaration, ¶ 20; Exhibit 37A, Murcia Declaration, ¶¶ 7-11.

70.     The Eddie Bauer Product is made by a method infringing the Asserted Claims. Claim charts applying the Asserted Claims to the Eddie Bauer Product are attached as Exhibits 16A-16F. The claims charts demonstrate how the Eddie Bauer Product meets every limitation of the Asserted Claims.

J.      **Gap**

71.     Gap manufactures for import, has others manufacture for import, imports into the United States, offers for sale, and/or sells in the United States after importation infringing denim garments including, but not limited to the Gap Product. The Gap Product is manufactured by a method that infringes one or more of the Asserted Claims. On information and belief, the Gap Product includes laser abrasion pores formed from a $CO_2$ laser using the patented method such as that used by Easy Laser and Jeanologia – GFK. Exhibit 36A, Costin Technical Declaration, ¶ 21; Exhibit 37A, Murcia Declaration, ¶¶ 7-11. On information and belief, Gap uses Easy Laser and Jeanologia – GFK lasers and methods to create the Gap Product. *See* Exhibit 35B, Jeanologia: Ultimate technology for jean finishing, The Indian Textile Journal (June 2012); Exhibit 35C, Easy Laser, Our Customers.

24

72.    The Gap Product is made by a method infringing the Asserted Claims. Claim charts applying the Asserted Claims to the Gap Product are attached as Exhibits 17A-17F. The claims charts demonstrate how the Gap Product meets every limitation of the Asserted Claims.

### K.    Guess?

73.    Guess? manufactures for import, has others manufacture for import, imports into the United States, offers for sale, and/or sells in the United States after importation infringing denim garments including, but not limited to the Guess? Product.  The Guess? Product is manufactured by a method that infringes one or more of the Asserted Claims.  On information and belief, the Guess? Product includes laser abrasion pores formed from a $CO_2$ laser using the patented method such as that used by Easy Laser and Jeanologia – GFK.  Exhibit 36A, Costin Technical Declaration, ¶ 22; Exhibit 37A, Murcia Declaration, ¶¶ 7-11.  On information and belief, Guess? uses Easy Laser and Jeanologia – GFK lasers and methods to create the Guess? Product.  *See* Exhibit 35D, Jeanologia dominates Mexican garment finishing market, fibre 2 fashion (Mar. 11, 2014).

74.    The Guess? Product is made by a method infringing the Asserted Claims. Claim charts applying the Asserted Claims to the Guess? Product are attached as Exhibits 18A-18F.  The claims charts demonstrate how the Guess? Product meets every limitation of the Asserted Claims.

### L.    H&M

75.    H&M manufactures for import, has others manufacture for import, imports into the United States, offers for sale, and/or sells in the United States after importation infringing denim garments including, but not limited to the H&M Product.  The H&M Product is

manufactured by a method that infringes one or more of the Asserted Claims. On information and belief, the H&M Product includes laser abrasion pores formed from a $CO_2$ laser using the patented method such as that used by Easy Laser and Jeanologia – GFK. Exhibit 36A, Costin Technical Declaration, ¶ 23; Exhibit 37A, Murcia Declaration, ¶¶ 7-11. On information and belief, H&M uses Easy Laser and Jeanologia – GFK technology to manufacture the H&M Product. *See* Exhibit 35A, Cynthia Martens, Jeanologia: Seeking a Friendlier Denim Finish, Women's Wear Daily (Nov. 9, 2011).

76. The H&M Product is made by a method infringing the Asserted Claims. Claim charts applying the Asserted Claims to the H&M Product are attached as Exhibits 19A-19F. The claims charts demonstrate how the H&M Product meets every limitation of the Asserted Claims.

### M. Just Cavalli

77. Just Cavalli manufactures for import, has others manufacture for import, imports into the United States, offers for sale, and/or sells in the United States after importation infringing denim garments including, but not limited to the Just Cavalli Product. The Just Cavalli Product is manufactured by a method that infringes one or more of the Asserted Claims. On information and belief, the Just Cavalli Product includes laser abrasion pores formed from a $CO_2$ laser using the patented method such as that used by Easy Laser and Jeanologia – GFK. Exhibit 36A, Costin Technical Declaration, ¶ 24; Exhibit 37A, Murcia Declaration, ¶¶ 7-11.

78. The Just Cavalli Product is made by a method infringing the Asserted Claims. Claim charts applying the Asserted Claims to the Just Cavalli Product are attached as Exhibits 20A-20F. The claims charts demonstrate how the Just Cavalli Product meets every limitation of the Asserted Claims.

26

N.  **Koos**

79.  Koos manufactures for import, has others manufacture for import, imports into the United States, offers for sale, and/or sells in the United States after importation infringing denim garments including, but not limited to the Koos Products.  The Koos Products are manufactured by a method that infringes one or more of the Asserted Claims.  On information and belief, the Koos Products include laser abrasion pores formed from a $CO_2$ laser using the patented method such as that used by Easy Laser and Jeanologia – GFK.  Exhibit 36A, Costin Technical Declaration, ¶¶ 25-26; Exhibit 37A, Murcia Declaration, ¶¶ 7-11.  On information and belief, Koos uses Easy Laser and Jeanologia – GFK lasers and methods to create the Koos Products.  *See* Exhibit 35D, Jeanologia dominates Mexican garment finishing market, fibre 2 fashion (Mar. 11, 2014).  In addition, Koos has purchased Jeanologia equipment.  Exhibit 35G, Ocean Bill of Lading for Koos (showing importation of Jeanologia equipment by Koos Manufacturing).  On information and belief, Koos uses the Jeanologia equipment to manufacture the Koos Products.

80.  The Koos Products are made by a method infringing the Asserted Claims. Claim charts applying the Asserted Claims to the Koos Products are attached as Exhibits 21A-21F and 22A-22F.  The claims charts demonstrate how the Koos Products meet every limitation of the Asserted Claims.

O.  **Levi's**

81.  Levi's manufactures for import, has others manufacture for import, imports into the United States, offers for sale, and/or sells in the United States after importation infringing denim garments including, but not limited to the Levi's Product.  The Levi's Product is manufactured by a method that infringes one or more of the Asserted Claims.  On information

27

and belief, the Levi's Product includes laser abrasion pores formed from a $CO_2$ laser using the patented method such as that used by Easy Laser and Jeanologia – GFK. Exhibit 36A, Costin Technical Declaration, ¶ 27; Exhibit 37A, Murcia Declaration, ¶¶ 7-11. On information and belief, Levi's uses Easy Laser and Jeanologia – GFK lasers and methods to create the Levi's Product. *See* Exhibit 35C, Easy Laser, Our Customers. Levi's also provides instructions to its employees on a laser etching process "involv[ing] the use of lasers to fade dyes, giving garments a worn and abraded appearance. This technique may also be used to create faded images or letters." Exhibit 35H, Environment, Health and Safety Handbook, Levi Strauss & Co. at 87 (v2.0 April 2007).

  82. The Levi's Product is made by a method infringing the Asserted Claims. Claim charts applying the Asserted Claims to the Levi's Product are attached as Exhibits 23A-23F. The claims charts demonstrate how the Levi's Product meets every limitation of the Asserted Claims.

  P. **Lucky**

  83. Lucky manufactures for import, has others manufacture for import, imports into the United States, offers for sale, and/or sells in the United States after importation infringing denim garments including, but not limited to the Lucky Product. The Lucky Product is manufactured by a method that infringes one or more of the Asserted Claims. On information and belief, the Lucky Product includes laser abrasion pores formed from a $CO_2$ laser using the patented method such as that used by Easy Laser and Jeanologia – GFK. Exhibit 36A, Costin Technical Declaration, ¶ 28; Exhibit 37A, Murcia Declaration, ¶¶ 7-11. On information and belief, Lucky uses Easy Laser and Jeanologia – GFK lasers and methods to create the Lucky

28

Product. *See* Exhibit 35D, Jeanologia dominates Mexican garment finishing market, fibre 2 fashion (Mar. 11, 2014).

84. The Lucky Product is made by a method infringing the Asserted Claims. Claim charts applying the Asserted Claims to the Lucky Product are attached as Exhibits 24A-24F. The claims charts demonstrate how the Lucky Product meets every limitation of the Asserted Claims.

Q. **Replay**

85. Replay manufactures for import, has others manufacture for import, imports into the United States, offers for sale, and/or sells in the United States after importation infringing denim garments including, but not limited to the Replay Product. The Replay Product is manufactured by a method that infringes one or more of the Asserted Claims. Replay admits that it manufactures, has manufactured, and/or distributes these products using laser-abrading technology. Exhibit 7H, Replay Laserblast – Official Teaser Video *available at* https://www.youtube.com/watch?v=csHda3aEqlk&index=7&list=PLFFE50865E37B4517. On information and belief, Replay uses Easy Laser and Jeanologia – GFK lasers and methods to create the Replay Product. *Id.* On information and belief, the Replay Product includes laser abrasion pores formed from a $CO_2$ laser using the patented method such as that used by Easy Laser and Jeanologia – GFK. Exhibit 36A, Costin Technical Declaration, ¶ 29; Exhibit 37A, Murcia Declaration, ¶¶ 7-11.

86. The Replay Product is made by a method infringing the Asserted Claims. Claim charts applying the Asserted Claims to the Replay Product are attached as Exhibits 25A-25F. The claims charts demonstrate how the Replay Product meets every limitation of the Asserted Claims.

R.    **VF Corp.**

87.    VF manufactures for import, has others manufacture for import, imports into the United States, offers for sale, and/or sells in the United States after importation infringing denim garments including, but not limited to the VF Product. The VF Product is manufactured by a method that infringes one or more of the Asserted Claims. On information and belief, the VF Product includes laser abrasion pores formed from a $CO_2$ laser using the patented method such as that used by Easy Laser and Jeanologia – GFK. Exhibit 36A, Costin Technical Declaration, ¶ 30; Exhibit 37A, Murcia Declaration, ¶¶ 7-11. On information and belief, VF uses Easy Laser and Jeanologia – GFK lasers and methods to create the VF Product. *See* Exhibit 35D, Jeanologia dominates Mexican garment finishing market, fibre 2 fashion (Mar. 11, 2014).

88.    The VF Product is made by a method infringing the Asserted Claims. Claim charts applying the Asserted Claims to the VF Product are attached as Exhibits 26A-26F. The claims charts demonstrate how the VF Product meets every limitation of the Asserted Claims.

## VI. SPECIFIC INSTANCES OF IMPORTATION AND SALE

89.    Each Accused Product is marked as having been made outside of the United States and was sold in the United States after importation or sold for importation into the United States. Exhibit 6A, Ripley Declaration ¶¶ 4-58. The A&F Product was manufactured in Guatemala. *Id.* ¶ 6. The Koos Products, AEO Product, Buckle Product, Guess? Product, Levi's Product, Lucky Product, and VF Product were manufactured in Mexico. *Id.* ¶¶ 9, 15, 36, 49, 52, and 58. The BlankNYC Product and Gap Product were manufactured in China. *Id.* ¶ 12 and 33. The Buffalo Product was manufactured in Thailand. *Id.* ¶ 18. The Diesel Product was manufactured in Italy. *Id.* ¶ 24. The DL1961 Product was manufactured in Pakistan. *Id.* ¶ 27.

30

The Eddie Bauer Product was manufactured in Sri Lanka. *Id.* ¶ 30. The H&M Product was manufactured in Turkey. *Id.* ¶ 39. The Just Cavalli Product was manufactured in Romania. *Id.* ¶ 42. The Replay Product was manufactured in Tunisia. *Id.* ¶ 55.

## VII. CLASSIFICATION OF THE INFRINGING PRODUCTS UNDER THE HARMONIZED TARIFF SCHEDULE OF THE UNITED STATES.

90. The Accused Products are believed to fall within at least the following classifications of the harmonized tariff schedules of the United States: 6203.42.4011 and 6204.62.4011. These classifications are intended for illustrative purposes only and are not intended to restrict the scope or type of product accused of infringing the Asserted Patents.

## VIII. RELATED LITIGATION

91. Complainant RevoLaze has filed complaints alleging patent infringement in the U.S. District Court for the Northern District of Ohio on August 15, 2014, styled as RevoLaze, LLC, v. Abercrombie & Fitch Co. (Case No. 1:14-cv-01797-PAG), RevoLaze, LLC, v. American Eagle Outfitters, Inc. (Case No. 1:14-cv-01799-PAG), RevoLaze, LLC, v. BBC Apparel Group, LLC, et al. (Case No. 1:14-cv-01800-DCN), RevoLaze, LLC, v. The Buckle, Inc. (Case No. 1:14-cv-01801-PAG), RevoLaze, LLC, v. Buffalo International ULC, et al. (Case No. 1:14-cv-01803-JG), RevoLaze, LLC, v. Diesel S.p.A. (Case No. 1:14-cv-01806-DAP), RevoLaze, LLC, v. DL1961 Premium Denim Inc. (Case No. 1:14-cv-01807-DCN), RevoLaze, LLC, v. Eddie Bauer LLC (Case No. 1:14-cv-01809-DCN), RevoLaze, LLC, v. The Gap, Inc. (Case No. 1:14-cv-01821), RevoLaze, LLC, v. Guess?, Inc. (Case No. 1:14-cv-01818), RevoLaze, LLC, v. H&M Hennes & Mauritz AB, et al. (Case No. 1:14-cv-01812-PAG), RevoLaze, LLC, v. Roberto Cavalli S.p.A. (Case No. 1:14-cv-01819), RevoLaze, LLC, v. Koos Manufacturing, Inc. (Case No. 1:14-cv-01814), RevoLaze, LLC, v. Levi Strauss & Co. (Case No. 1:14-cv-01816), RevoLaze, LLC, v. Lucky Brand Dungarees, Inc. (Case No. 1:14-cv-01817),

RevoLaze, LLC, v. Fashion Box S.p.A. (Case No. 1:14-cv-01815), and RevoLaze, LLC, v. VF Corporation (Case No. 1:14-cv-01820), accusing each Respondent of infringing one or more of the Asserted Patents.

## IX.  **DOMESTIC INDUSTRY**

92.    A domestic industry exists and is in the process of being established within the United States as defined by 19 U.S.C. §§1337(a)(3)(A)-(C) relating to significant investments in plant and equipment, significant employment of labor and capital, and significant investment in the exploitation of the Asserted Patents, including engineering and development of domestic industry products. The identified domestic industry products covered by one or more Asserted Claim include the domestic industry of Complainants and their licensees.

### A.    **Technical Prong**

93.    RevoLaze is currently in the process of establishing a domestic industry by utilizing linear processing of rolls of denim or other materials using at least one embodiment of the invention as claimed in the '444 Patent, the '602 Patent, the '196 Patent, the '505 Patent, the '972 Patent, and the '815 Patent. Complainants have attached claim charts detailing how the linear processing industry practices the Asserted Patents. Exhibits 27A-27F.

94.    Complainants are currently in the process of developing a domestic industry for sports apparel marking. By this industry, consumers will be able to purchase apparel having their favorite sports team's logo, likeness, name, or other mark laser etched into an item of apparel. The sports apparel marking process utilizes at least one embodiment of the invention as claimed in the '444 Patent, the '602 Patent, the '196 Patent, the '505 Patent, the '972 Patent, and the '815 Patent. Complainants have attached claim charts detailing how the sports apparel industry practices the Asserted Patents. Exhibits 28A-28F.

95.     Complainants have licensed the claimed technology to Green Bay Decking LLC to scribe simulated wood grain patterns on composite decking to make it appear more realistic like natural wood decking. Exhibit 4D, Green Bay Decking LLC License. The decking industry utilizes at least one embodiment of the invention as claimed in the '444 Patent, the '602 Patent, the '196 Patent, the '505 Patent, the '972 Patent, and the '815 Patent. Complainants have attached claim charts detailing how the composite decking material industry practices the Asserted Patents. Exhibits 29A-29F.

96.     Complainants have licensed the claimed technology to Lear Corporation to scribe graphics and patterns on automotive products. Exhibit 4C, Lear Corp. License. Lear's use of the patented technology for automotive cloth interiors utilizes at least one embodiment of the invention as claimed in the '444 Patent, the '602 Patent, the '196 Patent, the '505 Patent, the '972 Patent, and the '815 Patent. Complainants have attached claim charts detailing how Lear's automotive upholstery industry practices the Asserted Patents. Exhibits 30A-30F.

97.     Complainants have licensed the claimed technology to GST AutoLeather, Inc. to scribe graphics and patterns on leather upholstery products. Exhibit 4B, GST AutoLeather, Inc. License. GST's use of the patented technology for leather upholstery utilizes at least one embodiment of the invention as claimed in the '444 Patent, the '602 Patent, the '196 Patent, and the '505 Patent. Complainants have attached claim charts detailing how GST's leather upholstery industry practices the Asserted Patents. Exhibits 31A-31D.

98.     Complainants have licensed the claimed technology to DVUV, LLC to scribe graphic and patterns on medium density fiberboard. Exhibit 4A, DVUV, LLC License. The laser etched medium density fiberboard industry utilizes at least one embodiment of the invention as claimed in the '444 Patent, the '602 Patent, the '196 Patent, the '505 Patent, and

33

the '815 Patent. Complainants have attached claim charts detailing how DVUV's fiberboard industry practices the Asserted Patents. Exhibits 32A-32E.

99. RevoLaze is currently in the process of developing a domestic industry by utilizing high-speed laser abrasion of denim jeans using at least one embodiment of the invention as claimed in the '444 Patent, the '602 Patent, the '196 Patent, the '505 Patent, the '972 Patent, and the '815 Patent. Complainants have attached claim charts detailing how the high-speed abrasion industry practices the Asserted Patents. Exhibits 33A-33F.

B.   **Economic Prong**

100. Both Complainants and their licensees have made in the past and are continuing to make substantial investments in plants and equipment, labor and capital, and exploitation of the Asserted Patents and products manufactured utilizing the methods and systems claimed in the Asserted Patents. *See* Exhibit 34A, Domestic Industry Declaration of Darryl J. Costin, Ph.D. ("Costin Domestic Industry Declaration") and associated Exhibits.

101. Specifically, RevoLaze has made significant investments to operate offices, research and development, and manufacturing facilities in Westlake, Ohio and St. Paul, Minnesota. In the Westlake, Ohio facility, Complainants operate approximately of office space and of research and development space. Exhibit 34A, Costin Domestic Industry Declaration, ¶ 10. In the St. Paul facility, Complainants operate approximately of manufacturing and research and development space in conjunction with LasX Industries. Exhibit 34A, Costin Domestic Industry Declaration, ¶ 12-13. RevoLaze is in the process of opening a linear processing system at its Westlake facility for which approximately has been contracted for the development and initial operation of the linear processing system. Exhibit 34A, Costin Domestic Industry Declaration, ¶ 16. Over

the past five years, Complainants have also invested approximately          for other laser

equipment, manufacturing and office space, maintenance and repairs, and equipment rental.

Exhibit 34A, Costin Domestic Industry Declaration, ¶ 22.

        102.    RevoLaze, TechnoLines, their affiliates, and their licensees have invested

significant resources in labor and capital as well.  Between 2010 and 2014, they invested

approximately          for the research, development, and commercialization of the

patented technology including the various products identified in Exhibits 29A-29F, 30A-30F,

31A-31D, 32A-32E, and 33A-33F.  Exhibit 34A, Costin Domestic Industry Declaration, ¶ 30-

130.  In addition, personnel costs between 2010 and May 31, 2014 have totaled approximately

          for Complainants.  Exhibit 34A, Costin Domestic Industry Declaration, ¶ 29.

        103.    Complainants have worked to exploit the claimed technology continuously

since the Asserted Patents were filed.  Complainants have participated in numerous trade shows

showcasing the patented technology at a cost of approximately          over the past two years.

Exhibit 34A, Costin Domestic Industry Declaration, ¶¶ 36-63.  Complainants have also licensed

the Asserted Patents and Complainants' technical know-how to multiple licensees over the

course of the last several years, and are continuing to explore new market potential and partners.

Exhibit 34A, Costin Domestic Industry Declaration ¶¶ 64-130.

        104.    Complainants have developed hundreds of graphic files for laser etching

for numerous customers, including one or more of the Respondents, throughout Complainants

history in response to sample requests.  Exhibit 34A, Costin Domestic Industry Declaration ¶¶

119-130.

## X.  **GENERAL EXCLUSION ORDER**

        105.    There is a pattern of violation of the 19 U.S.C. § 1337, as evidenced by the

large number of respondents, and it is difficult to identify all sources of infringing products.

Many manufacturing facilities in many different countries manufacture infringing garments for apparel companies, including the Respondents. It is difficult for Complainants to identify all apparel companies whose apparel is manufactured by the infringing processes. Likewise, it is difficult for Complainants to identify all manufacturing facilities that apparel companies use to manufacture infringing garments. Accordingly, Complainants request a general exclusion order be entered by the United States International Trade Commission.

## XI. RELIEF REQUESTED

106.    Complainants respectfully request that the United States International Trade Commission:

a) institute an immediate investigation pursuant to Section 337(b)(1) of the Tariff Act of 1930 (19 U.S.C. § 1337(b)(1)) into the violations by Respondents of Section 337 arising from the unlawful importation into the United States, sale for importation, and/or sale within the United States after importation of Respondents denim garments that are made and/or processed by methods that infringe the Asserted Claims of the Asserted Patents.

b) schedule and conduct a hearing pursuant to Section 337(c) for purposes of receiving evidence and hearing argument whether there has been a violation of Section 337, and, following the hearing, determine that there has been a violation of Section 337;

c) issue a permanent general exclusion order pursuant to 19 U.S.C. § 1337(d)(2)(B) forbidding entry into the United States of all denim garments manufactured or processed by methods that infringe the Asserted Patents ; or, in the alternative;

d)   issue a limited exclusion order pursuant to 19 U.S.C. §1337(d)(1) forbidding entry of denim garments imported, sold for importation, or sold in the United State following importation by Respondents that infringe the Asserted Patents;

e)   issue permanent cease-and-desist orders pursuant to 19 U.S.C. §1337(f) directing Respondents to cease and desist from the importation, sale, offer for sale, advertising, or solicitation for sale by Respondents of denim garments that are manufactured or processed by methods that infringe one or more of the Asserted Patents;

f)   grant such other relief as the Commission deems just and proper based on the facts determined by the investigation.

Dated: August 18, 2014              Respectfully submitted,

Mark L. Hogge
Shailendra K. Maheshwari
Steven J. Stein
Nicholas H. Jackson
DENTONS US LLP
1301 K Street, N.W.
6th Floor, East Tower
Washington, D.C. 20005

## VERIFICATION

I, Darryl J. Costin, Ph.D., declare under penalty of perjury and in accordance with 19 C.F.R. §§ 210.4 and 210.12(a) that the following statements are true:

    1.    I am CEO of RevoLaze LLC and am duly authorized to sign this complaint on behalf of Complainants;

    2.    I have read the foregoing complaint;

    3.    I certify, to the best of my knowledge, information and belief, formed after reasonable inquiry that:

        a.    the foregoing complaint is not being presented for an improper purpose;

        b.    the claims and other legal contentions contained in the foregoing complaint are warranted by existing law;

        c.    the allegations and other factual contentions contained within the foregoing complaint have evidentiary support or, if specifically identified, are likely to have evidentiary support after a reasonable opportunity to conduct further investigation or discovery.

Date: August 18, 2014

9

**From: Darryl Costin** darryl@revolaze.com
**Subject:** "Something Bad in the Case"
**Date:** December 16, 2014 at 1:48 PM
**To:** William P. Farrell, Jr.  wfarrell@longfordcapital.com,  Michael A. Nicolas  mnicolas@longfordcapital.com



Talked to Mark about Steve Stein's concern re "something bad in the case".  Mark has no knowledge of what that could possibly be and emphasized if he knew something bad, I would know as well.


Darryl Costin, Ph.D
CEO, RevoLaze, LLC
29300 Clemens Rd.
Westlake, OH 44145
440-617-0502
www.revolaze.com

Confidentiality Notice: This transmission and any accompanying documents or attachments contain confidential information from RevoLaze, LLC  which is legally privileged, confidential and exempt from disclosure under applicable law and executed confidentiality agreement(s). If you are not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution, forwarding, or copying of this communication is strictly prohibited.  If you have received this communication in error, please notify the sender immediately by e-mail, or by telephone at (440)617-0502, and delete the original message immediately. Thank you.

Exhibit 9

10

From: **Michael A. Nicolas** mnicolas@longfordcapital.com
Subject: Motion to Compel
Date: December 16, 2014 at 9:55 PM
To: mark.hogge@dentons.com, Shailendra K. Maheshwari shailendra.maheshwari@dentons.com
Cc: William P. Farrell, Jr. wfarrell@longfordcapital.com, Darryl Costin darryl@revolaze.com, Darryl J. Costin Jr. darryljr@revolaze.com

Mark and Shalu:

We understand that one or more of the respondents in the ITC action have filed a motion to compel the production of our funding agreement with Revolaze and other related documents.  We have not received a copy of that motion, nor were previously advised of its filing.  We hope it goes without saying that the requested documents, particularly the funding agreement, are highly confidential.  Please provide us with a copy of the motion to compel as soon as possible, and advise us of the deadline for Revolaze to respond to the motion.

**Michael A. Nicolas**

Managing Director

Longford Capital Management, LP

150 North Michigan Avenue

Suite 2800

Chicago, Illinois 60601

Phone: (312) 212-8240

E-mail: mnicolas@longfordcapital.com

Website: www.longfordcapital.com

Exhibit 10

ℓ

11



From: **Norwood, Sharon M.** sharon.norwood@dentons.com
Subject: RE: Motion to Compel
Date: December 17, 2014 at 10:41 AM
To: Michael A. Nicolas (mnicolas@longfordcapital.com) mnicolas@longfordcapital.com
Cc: Darryl Costin (darryl@revolaze.com) darryl@revolaze.com, darryl@technolines.com, wfarrell@longfordcapital.com, Maheshwari, Shailendra K. shailendra.maheshwari@dentons.com, Hogge, Mark L. mark.hogge@dentons.com

---

The attached is being sent at the request of Mark Hogge.

---

**From:** Michael A. Nicolas [mailto:mnicolas@longfordcapital.com]
**Sent:** Tuesday, December 16, 2014 9:55 PM
**To:** Hogge, Mark L.; Maheshwari, Shailendra K.
**Cc:** William P. Farrell, Jr.; Darryl Costin; Darryl J. Costin Jr.
**Subject:** Motion to Compel

Mark and Shalu:

We understand that one or more of the respondents in the ITC action have filed a motion to compel the production of our funding agreement with Revolaze and other related documents. We have not received a copy of that motion, nor were previously advised of its filing. We hope it goes without saying that the requested documents, particularly the funding agreement, are highly confidential. Please provide us with a copy of the motion to compel as soon as possible, and advise us of the deadline for Revolaze to respond to the motion.

**Michael A. Nicolas**

Managing Director

Longford Capital Management, LP

150 North Michigan Avenue

Suite 2800

Chicago, Illinois 60601

Phone: (312) 212-8240

E-mail: mnicolas@longfordcapital.com

Website: www.longfordcapital.com



Exhibit 11

CONFIDENTIAL BUSINESS INFORMATION - SUBJECT TO PROTECTIVE ORDER

## UNITED STATES INTERNATIONAL TRADE COMMISSION
## WASHINGTON, D.C.

### Before The Honorable Charles E. Bullock
### Chief Administrative Law Judge

| | |
|---|---|
| In the Matter of )<br><br>CERTAIN LASER ABRADED DENIM )<br>GARMENTS ) | Investigation No. 337-TA-930 |

## RESPONDENTS' MOTION TO COMPEL COMPLAINANTS TO WITHDRAW CLAIMS OF PRIVILEGE AND WORK PRODUCT PROTECTION OVER DOCUMENTS PREVIOUSLY PRODUCED BY COMPLAINANTS AND TO PRODUCE CERTAIN DOCUMENTS REFERENCED THEREIN

Pursuant to Commission Rule 210.15 and Ground Rules 3.1, 3.5, and 4.9.2, Respondents

Abercrombie & Fitch Co., American Eagle Outfitters, Inc., The Buckle, Inc., Diesel S.p.A., The

Gap, Inc., Guess?, Inc., H&M Hennes & Mauritz LP and H&M Hennes & Mauritz AB, Koos

Manufacturing, Inc., Levi Strauss & Co., Lucky Brand Dungarees, Inc., Roberto Cavalli S.p.A.,

and VF Corp. (collectively "Respondents") respectfully move to compel RevoLaze, LLC and

TechnoLines, LLC (collectively "Complainants") to withdraw their claims of privilege and work

product protection over certain documents that Complainants produced in this Investigation on

October 20, 2014 and later "clawed back," and to compel Complainants to produce certain

documents referenced in one of the clawed back documents.

Complainants originally produced all of the documents that are the subject of

Respondents' motion on October 20, 2014. Two days later Complainants sought to "clawback"

21 documents in that production, asserting that certain litigation funding documents and

materials created by RevoLaze's CEO, who is not an attorney, are privileged. Respondents

believe that many of these materials are not privileged; Complainants' privilege log omits the

CONFIDENTIAL BUSINESS INFORMATION - SUBJECT TO PROTECTIVE ORDER

key information required by G.R. 4.9.1 and Commission Rule 210.27(e) and fails to substantiate any claim of privilege.

Respondents respectfully move for entry of an order compelling Complainants to re-produce three of the clawed back documents now referenced in Complainants' privilege logs, including Complainants' litigation funding agreement with Longford Capital. Respondents also move for entry of an order compelling Complainants to produce documents exchanged with Longford, as well as documents referenced in the litigation funding agreement. For the reasons described in the memorandum of points and authorities filed herewith, good cause exists for granting the relief sought by Respondents. Respondents' Motion should be granted because Complainants have not met their burden of establishing that the challenged documents are privileged or subject to work product protection.

### Ground Rule 3.2 and 3.5 Certification

Respondents certify that they have made reasonable, good faith efforts to resolve the issues that are the subject of this motion at least two business days prior to the filing of this motion. The parties have met and conferred about the relief sought by way of this motion, including during a meet-and-confer on October 29, 2014, a Discovery Committee Call held on October 31, 2014, and meet-and-confers on November 5, 2014, November 13, 2014, and November 19, 2014 respectively, in addition to in correspondence. The parties participated in a final meet-and-confer on December 2, 2014, and the parties agreed on the call to file briefs regarding the issues discussed. Complainants agreed that Respondents could file their opening brief on December 11, 2014. It is Respondents' understanding that Complainants oppose this motion. The Staff reserves its position until the motion is filed.

**CONFIDENTIAL BUSINESS INFORMATION - SUBJECT TO PROTECTIVE ORDER**

Dated: December 11, 2014

Respectfully submitted,

/s/ Gene W. Lee
Stephen J. Rosenman
Peter M. Brody
ROPES & GRAY LLP
One Metro Center
700 12th Street NW, Suite 900
Washington, DC 20005
Telephone: (202) 508-4600
Facsimile: (202) 508-4650

Gene W. Lee
ROPES & GRAY LLP
1211 Avenue of the Americas
New York, NY 10036
Telephone: (212) 596-9000
Facsimile: (212) 596-9090

*Counsel for Respondent
American Eagle Outfitters, Inc.*

/s/ Andrew F. Pratt
Andrew F. Pratt
Adam R. Hess
Matthew R. Farley
VENABLE LLP
575 7th Street, N.W.
Washington, DC 20004-1604
Telephone: (202) 344-4481

*Counsel for Respondents Abercrombie &
Fitch Co. and Roberto Cavalli S.p.A.*

**CONFIDENTIAL BUSINESS INFORMATION - SUBJECT TO PROTECTIVE ORDER**

*/s/ Gianni Cutri*
Gianni Cutri
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

Mike De Vries
KIRKLAND & ELLIS LLP
333 South Hope Street
Los Angeles, CA 90071
Telephone: (213) 680-8400
Facsimile: (213) 680-8500

D. Sean Trainor
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, DC 20005
Telephone: (202) 879-5000
Facsimile: (202) 879-5200

Jared Barcenas
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

*Counsel for Respondent The Buckle, Inc.*


*/s/ Alper Ertas*
Anthony V. Lupo
Anthony Shaw
Alper Ertas
ARENT FOX LLP
1717 K Street, NW
Washington, DC 20036-5342
Telephone: (415) 757-5500

*Counsel for Respondent Diesel, S.p.A.*

**CONFIDENTIAL BUSINESS INFORMATION - SUBJECT TO PROTECTIVE ORDER**

*/s/ Paul M. Bartkowski*
Louis S. Mastriani
Paul M. Bartkowski
Thomas R. Burns, Jr.
ADDUCI, MASTRIANI & SCHAUMBERG, LLP
1133 Connecticut Avenue, NW, 12th Floor
Washington, DC 20036
Telephone: (202) 467-6300
Facsimile: (202) 466-2006

Robert A. McFarlane
Russell C. Petersen
Ronald S. Wynn
Samantha D. Wolff
Christopher S. Walters
Janie L. Thompson
HANSON BRIDGETT LLP
425 Market Street, 26th Floor
San Francisco, CA 94105
Telephone: (415) 777-3200
Facsimile: (415) 541-9366

James G. Gilliland Jr.
Joshua B. Pond
Matthew C. Holohan
Laura K. Mullendore
KILPATRICK TOWNSEND & STOCKTON LLP
607 14th Street, N.W.
Washington, DC 20005
Telephone: (202) 508-5800
Facsimile: (202) 508-5858
*Counsel for Respondents Levi Strauss Co.*

**CONFIDENTIAL BUSINESS INFORMATION - SUBJECT TO PROTECTIVE ORDER**

*/s/ Shane E. Olafson*

Barbara A. Murphy
James B. Altman
Susan Koegel
Kandis C. Gibson
FOSTER, MURPHY, ALTMAN & NICKEL, PC
1899 L Street, N.W., Suite 1150
Washington, DC 20036
Telephone: 202-822-4100
Facsimile: 202-822-4199

Michael McCue
LEWIS ROCA ROTHGERBER LLP
3993 Howard Hughes Pkwy., Suite 600
Las Vegas, NV 89169
Telephone: 702-949-8200
Facsimile: 702-949-8398

Sean D. Garrison
Shane E. Olafson
W. Brent Rasmussen
LEWIS ROCA ROTHGERBER LLP
201 East Washington Street, Suite 1200
Phoenix, AZ 85004
Telephone: (602) 262-5311
Facsimile: (650) 384-4701

*Counsel for Respondent Lucky Brand
Dungarees, Inc.*

*/s/ Michael E. Schonberg*

Bruce S. Sostek
Michael E. Schonberg
Vishal Patel
THOMPSON & KNIGHT LLP
One Arts Plaza
1722 Routh St., Suite 1500
Dallas, TX 75201
Telephone: (214) 969.1700
Facsimile: (214) 969.1751

*Counsel for Respondent VF Corp.*

8

CONFIDENTIAL BUSINESS INFORMATION - SUBJECT TO PROTECTIVE ORDER

UNITED STATES INTERNATIONAL TRADE COMMISSION
WASHINGTON, D.C.

Before The Honorable Charles E. Bullock
Chief Administrative Law Judge

|  |  |
|---|---|
| In the Matter of | ) |
| | ) |
| **CERTAIN LASER ABRADED DENIM** | )    Investigation No. 337-TA-930 |
| **GARMENTS** | ) |
| | ) |

**RESPONDENTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
OF THEIR MOTION TO COMPEL COMPLAINANTS TO WITHDRAW CLAIMS OF
PRIVILEGE AND WORK PRODUCT PROTECTION OVER DOCUMENTS
PREVIOUSLY PRODUCED BY COMPLAINANTS AND TO
<u>PRODUCE CERTAIN DOCUMENTS REFERENCED THEREIN</u>**

CONFIDENTIAL BUSINESS INFORMATION - SUBJECT TO PROTECTIVE ORDER

## I.  INTRODUCTION

Complainants seek to preclude relevant, responsive documents from being used in this proceeding.  To do so, Complainants rely on an amalgam of unsupported privilege assertions, rolling "clawback" requests, and deficient privilege logs.  But Complainants' true goal is to insulate documents that may be harmful to their case from this investigation and to stymie Respondents' efforts to explore certain defenses to Complainants' allegations and to identify knowledgeable witnesses and relevant information.  Complainants' tactics should be rejected because:

With respect to "Litigation Funding" materials that describe an arrangement whereby third parties are funding Complainants' patent infringement campaign, Complainants have failed to meet their burden to substantiate that those materials are privileged and not business, diligence and financial information exchanged between parties negotiating at arms-length for a cut of Complainants' hoped-for recovery from Respondents.

As for the "Financial Projections" prepared by RevoLaze's CEO, although Complainants assert that this document was prepared at the direction of counsel, they cannot identify any attorney that supposedly gave such direction.  Complainants have failed to meet their burden that the Financial Projections are attorney work product, as claimed, rather than the the musings of RevoLaze's CEO over his potential recovery from Complainants' third-party funded litigation campaign – as the log entry suggests.

As for the "Domestic Industry Document," which like the "Financial Projections" document, Complainants allege was prepared by RevoLaze's CEO at the direction of counsel, Complainants again cannot identify which attorney supposedly did so, insisting that it must have been one of Complainants' current lawyers but failing to specify which one.  Here again,

1

CONFIDENTIAL BUSINESS INFORMATION - SUBJECT TO PROTECTIVE ORDER

## III.   ARGUMENT

### A.   Complainants Have Failed to Establish That Certain "Clawed Back" Documents are Privileged

Complainants bear the burden of establishing their "clawed back" documents are privileged. *Certain Wiper Blades*, Inv. No. 337-TA-816, Order No. 32, 2012 WL 3058166, at \*2 (July 12, 2012).  If Complainants do "not provide sufficient detail to demonstrate fulfillment of all the legal requirements for application of the privilege, [their] claim will be rejected." *Certain Hydraulic Excavators and Components Thereof*, Inv. No. 337-TA-582, Order No. 23, 2007 WL 806657, at \*6 (Mar. 2, 2007).  Here, Complainants have not met their burden of establishing that several of the documents clawed back and then logged on their November 3 and November 6 privilege logs are attorney-client privileged or subject to attorney work product protection. Accordingly, Respondents' Motion should be granted and Complainants should be compelled to produce these documents.

### 1.   The Longford Capital Litigation Funding Agreement

Complainants have not met their burden of establishing that Complainants' litigation funding agreement with Longford Capital Funding ("LCF") ("LCF Funding Agreement") is entitled to attorney-client privilege, common interest privilege, or work product protection as Complainants claim.[3]  As an initial matter, the LCF Funding Agreement is responsive to numerous of Respondents' Requests for Production, including without limitation, Request for Production No. 19 ("***All documents and things relating to*** the ownership, title, transfer, or assignment of ***any interest in any Asserted Patent and Related Patents to or from***

---

[3]   The LCF Funding Agreement is Exhibit 12 hereto.  On November 3, 2014 Complainants re-produced the LCF Funding Agreement for the purpose of allowing the Respondents to assess Complainants' privilege and work product assertions. Ex. 8, G. Cutri Nov. 17, 2014 Letter. Complainants also indicated that Respondents are permitted to refer to the contents of the Funding Agreement in any correspondence or briefing related to their privilege and work product assertions, notwithstanding ¶ 20 of the parties' procedural stipulation. *Id.*

4

CONFIDENTIAL BUSINESS INFORMATION - SUBJECT TO PROTECTIVE ORDER

*[Complainants]*, including all documents and things relating to Prior Owners, ***showing when and how rights were acquired, by and from whom, and on what terms***."); Request for Production No. 20 ("***All documents related to*** the acquisition of any of the Asserted Patents or Related Patents or patent applications, or to ***the acquisition of any ownership or financial interest in any of the Asserted Patents or Related Patents, at any time by any person or entity***, including without limitation such acquisition by TechnoLines and such acquisition by any Prior Owner."); *see also* Request for Production Nos. 34 and 84. Ex. 3 (emphasis added); Ex. 4 (emphasis added). As discussed in detail below, the LCF Funding Agreement is not a privileged communication between Complainants and their counsel but instead a business agreement negotiated at arm's length between Complainants and LCF for a cut of the proceeds from this litigation. Nor is the LCF Funding Agreement protected by a common interest privilege, as Complainants and LCF shared no common *legal* interest at the time of the LCF Funding Agreement. Any interest they shared was solely commercial and not subject to common interest protection. The LCF Funding agreement also is not attorney work product, as it contains financial terms and the details governing the parties' relationship, not the strategies and "mental processes" of Complainants' attorneys.

In the mid-1990s, Darryl Costin incorporated TechnoLines to try to commercialize certain laser products. Mr. Costin ultimately failed in his efforts to do so and, by late 2010, TechnoLines was essentially non-operative with no true source of revenue. In light of this failure, Mr. Costin reformed TechnoLines into "RevoLaze," a patent assertion entity that Mr. Costin hoped could monetize certain patents, including those asserted here. However, because neither RevoLaze nor TechnoLines have any substantial revenue, Mr. Costin needed capital to fund his monetization project.

CONFIDENTIAL BUSINESS INFORMATION - SUBJECT TO PROTECTIVE ORDER

Mr. Costin turned to LCF, which bills itself as a "a private investment company" that "fund[s] attorneys' fees and other costs necessary to pursue claims in return for a share of a favorable settlement or award." *See* Ex. 13, (LCF Frequently Asked Questions Webpage, http://www.longfordcapital.com/longford-capital/frequently-asked-questions).     According to LCF, its approach is to "treat legal claims as discrete assets capable of being partially or completely financed." *Id.* Here, assuming LCF acted in accordance with the procedures set forth on its website, LCF undertook a "two-stage underwriting process" to evaluate Mr. Costin's infringement claims and, in doing so, used a "due diligence process." *Id.* This due diligence process seems to have involved the exchange of numerous documents that Mr. Costin provided to convince LCF to invest in his patent infringement campaign against Respondents. Specifically, Mr. Costin hoped that LCF would conclude that a campaign against Respondents involved "$25 million to more than $1 billion in controversy." *Id.*

Mr. Costin, on behalf of RevoLaze, agreed to give LCF "complete and unlimited access to inspect, investigate and audit all ***non-privileged*** information relating to the Claims, including (i) corporate documents, (ii) documents related to the business, operations, assets, liabilities, and obligations of Claim Owner, (iii) ***non-privileged communications***, and (iv) contracts of Claim Owner." Ex. 12, (LCF Funding Agreement) at §3.7 (emphasis added). Mr. Costin acknowledged that doing so "could result in waiver of the attorney-client privilege, thus potentially adversely affecting" his claims in the instant litigation. *Id.* These limitations reflected the fact that the Complainants and LCF dealt with each other at arm's length as parties on opposing sides of the transaction embodied by the agreement.

Mr. Costin nonetheless participated in the due diligence process, and promised that "all information provided to [LCF] . . . was true and accurate in all material respects,"

6

CONFIDENTIAL BUSINESS INFORMATION - SUBJECT TO PROTECTIVE ORDER

"acknowledge[d] that [LCF] has relied on the accuracy and completeness of this information in agreeing to make" its funding decision and "confirm[ed] that [Complainants have] disclosed all non-privileged material facts in their possession that [Complainants] reasonably believe[] could affect [LCF]'s decision to make (or to withdraw)" its funding. *Id.* at §7.1(n). Respondents have requested all information exchanged between Complainants, LCF and Fulbrook Capital Management, LLC ("Fulbrook"),[4] including where such information or material was sent by their respective counsel (hereinafter "Diligence Material") but Complainants have refused to provide it. Ex. 14 G. Cutri Nov. 25, 2014 Email.

Similarly, LCF also sought to protect its investment by requiring Complainants to supply non-privileged information concerning the prosecution of this litigation:

> Claim Owner shall . . . provide to LCF all non-privileged information and documentation related to the prosecution of the Claims, including providing (i) reports on settlement negotiations . . . and (ii) regular quarterly status reports and timely disclosure of important documents and material events or changes regarding the prosecution of the Claims pursuant to Exhibit B hereto.

Ex. 12 at §3.8. Exhibit B to the Funding Agreement contains detailed instructions concerning the non-privileged "Matter Monitoring" that Complainants are required to provide to LCF, including "Quarterly Monitoring Reports" due every three months. Since the signing of the Funding Agreement in February, 2014, six such reports have been due, but Complainants have failed to produce these reports to Respondents. Respondents request that the Administrative Law Judge ("ALJ") compel Complainants to produce the Quarterly Monitoring Reports, together with any other information provided to LCF by Complainants, including as required by Exhibit B

---

[4] Fulbrook's agreement with LCF states that it will "advise Revolaze as to any contacts that Fulbrook believes may be beneficial in assisting the litigation, and (ii) serve as a liaison to any sources that Fulbrook shall introduce to RevoLaze during the course of this Agreement." *Id.* at Ex. F, Schedule I at 1. Because Fulbrook itself is a litigation funding entity, the parties appear to have arranged for Fulbrook to receive a payout of $370,000 in exchange Fulbrook providing LCF with access to funding sources. *Id.* at §§2.24-2.25.

**CONFIDENTIAL BUSINESS INFORMATION - SUBJECT TO PROTECTIVE ORDER**

(hereinafter "Matter Monitoring Information").  The Diligence Material and Matter Monitoring

Information are referred to collectively herein as "Litigation Funding Material."  Such Litigation

Funding Material is likewise responsive to Respondents' Requests for Production, including

Request for Production No. 34 ("*All documents and things relating to any investigation, opinion,*

*report, assessment, evaluation, analysis, communication or observation as to the patentability,*

*validity, enforceability, inventorship, scope and/or construction of any claim of any Asserted*

*Patent and/or Related Patents*, including without limitation all documents, powerpoint presentations,

charts, and/or other presentations *disclosed to a Third Party by [Complainants] and/or disclosed by*

*a Third Party to [Complainants]*."); and Request for Production Nos. 19-20 and 84.   Ex. 3

(emphasis added); Ex. 4 (emphasis added).

　　　After the due diligence process, Complainants' law firm, Dentons, LCF and Mr. Costin

proceeded to negotiate a deal, each seeking to maximize their return on their respective

investments of time and money.[5]  The terms of the LCF Funding Agreement illustrate the

financial and business nature of the deal they reached.  In the LCF Funding Agreement, Mr.

Costin confirms that he and Complainants did not rely on LCF for any advice in negotiating the

agreement, and instead warrants that "[Complainants have] consulted independent legal counsel

prior to entering into" the Funding Agreement.  *Id*. at §7.1(h).  The Funding Agreement reflects

that the parties ultimately struck the following arrangement: Dentons is paid by LCF upfront,

receiving up to $3,715,000 to cover its fees and expenses (such as expert fees) incurred in

---

[5]   Complainants have not produced any drafts of the Funding Agreement.  Ex. 8, G. Cutri Nov.
　　17, 2014 Letter.  Respondents likewise request that the ALJ compel Complainants to produce
　　these materials, together with any emails or other communications between LCF,
　　Complainants and Fulbrook, including where those communications were sent by their
　　respective counsel (hereinafter "Draft Funding Agreement Materials") in connection with
　　this motion.  The Draft Funding Agreement Materials are responsive to at least Respondents'
　　Request for Production Nos. 19-20, 34 and 84.  Ex. 3; Ex. 4.

CONFIDENTIAL BUSINESS INFORMATION - SUBJECT TO PROTECTIVE ORDER

pursuing this investigation against Respondents; Dentons' fees are capped at that amount and Dentons agreed to bill its fees at only 75% of its ordinary hourly rates. *Id.* at §7.1(p). LCF also committed to pay certain other amounts, including a "Due Diligence Fee" and payments to Fulbrook, resulting in an "Invested Capital" total of $4,000,000 for the ITC litigation. *Id.* at §§2.31; 3.1. In exchange for providing such funding, LCF will receive 100% of money collected from settlements or damages awards, until LCF earns back all of its Invested Capital, plus 25%, for a total of approximately $5,000,000. After LCF is made completely whole and earns a 25% profit on its investment, Mr. Costin and Complainants will receive the next $5,000,000 in settlements or damage awards (if any), and thereafter the parties will share any additional proceeds, with Dentons receiving 5%, LCF receiving 30%, Complainants receiving 63.5%, and Fulbrook receiving 1.5%. *Id.* at §4.2(c).

LCF ensured that it will be paid by taking a security interest in the patents-in-suit, *id.* at §5.1, and further, by obtaining for itself a blocking right, preventing Complainants from transferring ownership of any of the patents-in-suit, *id.* §8.1(f) (Complainants agree to "not transfer, sell, assign, or otherwise dispose of any of the Patents"). LCF also precluded Complainants from allowing any other party to take a security interest in the patents-in-suit, unless those rights are subordinate to LCF's. *Id.* at §8.1(d). LCF further precluded Complainants from using any litigation funding other than from LCF, *id.* at §8.1(c), and required Complainants to continue to prosecute the infringement actions until LCF receives a return on its investment. *id.* at §8.1(b) (Complainants agree to "prosecute, and to the best of its ability take all necessary actions to ensure that it prosecutes, the Claims with all due skill and care, including maintaining the appointment of Claim Owner's Attorneys to act on the behalf of Claim Owner with respect to the prosecution of the Claims."). Finally, LCF insisted that Complainants "maintain the appointment" of the Dentons firm, to ensure that the firm LCF is paying is in control of the litigation. Dentons' engagement letter with RevoLaze

9

acknowledges that doing so could raise an ethical issue, stating that "the potential for conflicts of interest to arise exists when a third party assumes responsibility for paying the legal expenses of another, including the perception of favoritism should the interests of our client(s) diverge from that of the third party at some point in the future." Ex. 12 at Ex. E, Schedule 1 at COM00000737.

### a. The LCF Funding Agreement and Funding Agreement Materials Are Not Privileged

During the parties' meet and confers, Complainants first stated that they do not know who authored the Funding Agreement, nor who received it,[6] but nonetheless asserted that the attorney client privilege and work product immunity apply and that the Funding Agreement is subject to a common interest. Complainants offer no explanation for any of these privileges, as can be seen in the following from Complainants' November 3 privilege log:

| CONTROL_NUM | ATTACH_RANGE | AUTHOR | RECIPIENT | TOPIC | DOCDATE | AC | Common Interest | WP |
|---|---|---|---|---|---|---|---|---|
| COM00000695 | COM00000695 - COM00000762 | Unknown | Unknown | Longford Capital Agreement | 2/5/2014 | YES | YES | YES |

Ex. 9, Nov. 3 Log at COM00000695-762. It is thus clear that Complainants have not demonstrated that either the attorney-client privilege or the work product immunity applies to the LCF Funding Agreement, Litigation Funding Material or the Draft Funding Agreement Materials (collectively "Funding Agreement Materials").

The attorney-client privilege covers communications made between privileged persons, in confidence, for the purpose of obtaining or providing legal assistance for the client. *See* Restatement (Third) of the Law Governing Lawyers §68 (2000). In order to meet the

---

[6] Complainants' later attempted to update their Nov. 3 Log, belatedly asserting that the Funding Agreement was authored by Mr. Costin, Mark Hogge (an attorney from Dentons), two managing directors at LCF and the CEO of Fulbrook. Ex 15, Nov. 26 Privilege Log at Row 129. As explained above, this proposed update was provided on November 26, 2014, well after the due date for a log required by 210.27(e)(2) and a week after the extension offered by Respondents, but rejected by Complainants. Thus, this belated amendment should be rejected by the Court.

CONFIDENTIAL BUSINESS INFORMATION - SUBJECT TO PROTECTIVE ORDER

requirements of attorney-client privilege, such confidential communication must be "made by a client to an attorney *for the purpose of obtaining legal advice or services*." *See Certain Muzzle-Loading Firearms and Components Thereof*, Inv. No. 337-TA-777, Order No. 23, 2011 WL 6002058, at \*2 (Nov. 29, 2011) (emphasis added); *see also Certain Video Game Systems and Controllers*, Inv. No. 337-TA-743, Order No. 16, 2011 WL 7574009, at \*1 (May 26, 2011) ("Because the attorney-client privilege inhibits the truth-finding process, it has been narrowly construed.").

The LCF Funding Agreement is not a privileged communication between Complainants and their counsel. Instead, it is a business agreement negotiated at arm's length between Complainants and LCF, a "private investment company," as parties on opposing sides of the transaction embodied by the agreement. Complainants negotiated and entered into this agreement *after* "consult[ing] independent legal counsel." Ex. 12 at §7.1(h). LCF likewise retained its own law firm to conduct diligence on Complainants' claims. *Id.* at §7.2(g) ("Global IP Law Group assisted LCF in the second stage of its due diligence"). Further, LCF's Managing Directors advanced their own interests (not Complainants') as they sought to maximize their return on capital, ultimately securing the possibility of earning a million dollars for themselves. *See* Ex. 16 (LCF Website Biographies of William P. Farrell, Jr. and Michael A. Nicolas)

Indeed, the LCF Funding Agreement itself contradicts Complainants' assertion of privilege, expressly stating that *"[n]o attorney-client relationship is intended, sought, or created by or through the execution of this Agreement."* Ex. 12 at § 7.2(e) (emphasis added). Complainants were not seeking legal advice from LCF – they were seeking money to pay their lawyers. These business arrangements, the agreements reflecting them, and the documents exchanged between the parties to reach their ultimate agreement thus do not fall under the purview of attorney-client privilege. *See, e.g., Certain Optical Disk Controller Chips & Chipsets & Products Containing*

CONFIDENTIAL BUSINESS INFORMATION - SUBJECT TO PROTECTIVE ORDER

*Same, Including DVD Players & PC Optical Storage Devices II*, Inv. No. 337-TA-523, Order No. 26, 2005 WL 482887, at *6 (Feb. 22, 2005) ("a business decision . . . as such, is not privileged."); *Certain Hardware Logic Emulation Systems and Components Thereof*, Inv. No. 337-TA-383, Order No. 70, 1997 WL 972944, at *3-4 (Jan. 28, 1997). The Funding Agreement Material is likewise not attorney-client privileged material, as the parties explicitly agreed that no such material would be exchanged between them.[7]

With respect to Complainants' vague statements that the attorney-client privilege assertion "only applies to the correspondence attached as exhibits" to the LCF Funding Agreement, Respondents submit that the only document that could possibly be privileged is Schedule I to the Funding Agreement, which is RevoLaze's engagement letter with Dentons. But Complainants' privilege log contains no such assertion nor the explanation of privilege required under 210.27(e)(1)(ii) ("Within 10 days of making the claim produce to the requester a privilege log that describes the nature of the information not produced or disclosed, in a manner that will enable the requester to assess the claim without revealing the information at issue."). Thus, Complainants failed to meet their burden to establish this document is subject to attorney client privilege. Moreover, any attorney-client privilege over that engagement letter was waived when Complainants turned it over to LCF, a third party. *Certain Muzzle-Loading Firearms and Components Thereof*, Inv. No. 337-TA-777, Order No. 23, 2011 WL 6002058, at *3 (Nov. 29, 2011) ("A voluntary disclosure of a privileged communication to a third party . . . waives

---

[7] Complainants at one point agreed with this conclusion, stating that "Our claim of attorney-client privilege with respect to this [Litigation Funding] document only applies to the correspondence attached as exhibits." Ex. 17, Nov. 20 N. Jackson Email. But, since that time, Complainants have produced additional logs which call into question whether Complainants have abandoned their position, requiring Respondents to address this issue here.

CONFIDENTIAL BUSINESS INFORMATION - SUBJECT TO PROTECTIVE ORDER

privilege as to that communication . . ."). Thus, the Agreement and all exhibits are not privileged and should be produced to Respondents.

> **b.**  **LCF and Complainants Do Not Share a Common Legal Interest**

Complainants have put a "Yes" regarding the LCF Funding agreement on their privilege log in the column labeled "Common Interest," apparently to suggest that the disclosure of the LCF Funding Agreement would not result in a waiver of privilege because LCF and Complainants share a common legal interest. Again, however, Complainants make no effort to substantiate this privilege and thus have failed to meet their burden to establish a common interest. A common interest requires more than a mere "joint business strategy that includes a concern about litigation." *Certain Video Game Controllers*, Inv. No. 337-TA-743, Order No. 16, 2011 WL 7574009, at *2 (May 26, 2011).

Here, Complainants cannot meet their burden of establishing a common interest privilege between Complainants and LCF because there was no common *legal* interest, much less an identical legal interest, at the time of the LCF Funding Agreement. *See Certain Video Game Controllers*, Inv. No. 337-TA-743, Order No. 16, 2011 WL 7574009, at *2 ("[T]he party asserting the privilege bears the burden of showing that the privileged documents were made in the course of the joint defense or common legal interest; that the statements were designed to further that effort ...."). During the meet and confer process with Respondents, Complainants claim that an interest in the "recovery in the infringement case" is sufficient to establish a common legal interest" Ex. 8, G. Cutri Nov. 17, 2014 Letter.

A common interest cannot be "solely commercial." *Certain Voltage Regulators, Components Thereof and Products Containing Same*, Inv. No. 337-TA-564, Order No. 10, 2006 WL 3308761, at *2 (stating that a "business or commercial interest cannot form the basis of any

13

CONFIDENTIAL BUSINESS INFORMATION - SUBJECT TO PROTECTIVE ORDER

privilege, including the joint defense privilege"); *see also Net2Phone, Inc. v. eBay, Inc.*, 2008 WL 8183817 at *7-10 (D.N.J. June 26, 2008) (rejecting common interest privilege between the patentee and a potential financier of a patent litigation in part because the interest was commercial, not legal and there was no confidentiality agreement); *see also Leader Techs., Inc. v. Facebook, Inc.*, 719 F.Supp. 2d 373, 375-78 (D. Del. 2010) (rejecting a claim that a potential financier and patent plaintiff shared a common interest); *Berger v. Seyfarth Shaw LLP*, 2008 WL 4681834, at *1 (N.D. Cal. 2008) (requiring non-party to produce documents "pertinent to his financial assistance to the plaintiffs"); *Abrams v. First Tennessee Bank Nat. Ass'n*, 2007 WL 320966, at *1 (E.D. Tenn. 2007) (holding litigation financing agreement was discoverable). Complainants and LCF do not share any common legal interest in Complainants' campaign, only an overlapping hope that some financial recovery will benefit each of them individually. Ex. 8, G. Cutri Nov. 17, 2014 Letter.

Tellingly, Complainants have not supplied any evidence of any agreement between LCF and Complainants sufficient to establish a common interest, which is required to establish a common interest. *See, e.g., Hunton & Williams v. U.S. Dept. of Justice*, 590 F.3d 272, 285 (4th Cir. 2010) ("While agreement need not assume a particular form, an agreement there must be."). This is not surprising, as the LCF Funding Agreement states explicitly that there will be no coordinated legal strategy between them:

> LCF [and its affiliates] are not a law firm and do not provide legal advice. . . . LCF [and its affiliates] have not provided, nor will provide at any time in the future, legal advice to [Complainants] regarding or in conjunction with this Agreement or the Claims. . . . LCF will not seek to influence the professional judgment of [Complainants'] legal counsel or otherwise exert control over any threatened or actual litigation. Further, LCF will not constrain, coerce, or otherwise pressure [Complainants] to take any action that it believes is adverse to [Complainants'] interests, including negotiating or settling the Claims in a manner other than [Complainants] believe[] is in [their] best interests. **LCF AGREES THAT IT SHALL HAVE NO RIGHT TO AND WILL NOT MAKE ANY**

CONFIDENTIAL BUSINESS INFORMATION - SUBJECT TO PROTECTIVE ORDER

**DECISIONS WITH RESPECT TO THE CONDUCT OF THE UNDERLYING CIVIL ACTION OR CLAIM OR ANY SETTLEMENT OR RESOLUTION THEREOF AND THAT THE RIGHT TO MAKE THOSE DECISIONS REMAINS SOLELY WITH [COMPLAINANTS] AND [THEIR] ATTORNEY IN THE CIVIL ACTION OR CLAIM.**

Ex. 12 at §§7.2(e)-(f) (emphasis in original). The Funding Agreement and Funding Agreement Materials are not subject to a common interest. Instead, the Funding Agreement simply documents the financing arrangements made between independently represented parties, while the Funding Agreement Materials are non-privileged materials the parties exchanged in furtherance of their financial goals. This arrangement cannot form the basis for a common interest privilege to shield these materials from disclosure in discovery. *See Net2Phone*, 2008 WL 8183817 at *7-10; *Leader Techs.*, 719 F.Supp. 2d at 375-78; *Berger*, 2008 WL 4681834, at *1; *Abrams*, 2007 WL 320966, at *1.

### c. The LCF Funding Agreement and Funding Agreement Materials are Not Protected Attorney Work Product

Complainants' privilege log also includes a "Yes" regarding the LCF Funding Agreement under the column labeled "WP," apparently to suggest that the work product doctrine shields the Funding Agreement from discovery. Again, however, despite repeated requests from Respondents for evidence substantiating this claim, Complainants have provided none. This is not surprising, as the work product privilege does not apply to the Funding Agreement and the Funding Agreement Materials.

"The purpose of the [work product] doctrine is to guard the 'mental processes of the attorney.'" *Certain Muzzle-Loading Firearms and Components Thereof*, Inv. No. 337-TA-777, Order No. 23, 2011 WL 6002058, at *3 (Nov. 29, 2011). Complainants fail to identify any "mental processes" related to the conduct of this litigation that are disclosed in the Funding Agreement or Funding Agreement Materials. The Funding Agreement contains financial terms

15

CONFIDENTIAL BUSINESS INFORMATION - SUBJECT TO PROTECTIVE ORDER

and the details governing the parties' relationship, not the strategies of Complainants' attorneys. Similarly, the Funding Agreement Materials were provided to LCF to assist its investment decisions, and the parties took great pains to ensure that that no privileged materials would be turned over. The parties agreed that:

> Claim Owner is not required to provide to LCF, documents and information protected by the attorney-client privilege. Claim Owner understands and acknowledges that in the event its Representatives provide privileged information to LCF, such disclosure may be deemed waiver of the applicable privilege. In the event that Claim Owner inadvertently provides privileged information to LCF, LCF will return such information to Claim Owner without reviewing the information.

Ex. 12 at §12.1; *see also id.* at §3.8 ("[i]n no event shall Claim Owner be obligated to disclose any privileged information related to the prosecution of the Claims at any time or for any purpose"). Complainants instead only provided LCF with "complete and unlimited access to inspect, investigate and audit *all non-privileged information relating to the Claims*, including (i) corporate documents, (ii) documents related to the business, operations, assets, liabilities, and obligations of Claim Owner, (iii) *non-privileged communications*, and (iv) contracts of Claim Owner," not the "mental impressions" of Complainants' counsel. *Id.* at §3.7 (emphasis added). Indeed, although Dentons must provide LCF with its billing statements, the parties agreed that Dentons must first "review billing records prior to Claim Owner's sending them to LCF to ensure that they do not contain privileged information." *Id.* at §3.2. The same is true of the Monitoring Material. *Id.* at §12.1. Thus, all information exchanged between the parties to the LCF Funding Agreement is, by the terms of their own agreement, not privileged and does not reflect the "mental processes" of Complainants' attorneys. This material is therefore not protected by the work product doctrine.

During the meet and confer process with Respondents, Complainants insisted that *Miller UK Ltd. v. Caterpillar, Inc.*, 2014 WL 67340 (N.D. Il. 2014) establishes that the LCF Funding

CONFIDENTIAL BUSINESS INFORMATION - SUBJECT TO PROTECTIVE ORDER

Agreement and Funding Agreement Materials should not be produced. But that decision does not support Complainants' position. The *Miller* court's holdings concerning work product do not apply in the context of the Funding Agreement or the materials the parties exchanged pursuant to that agreement because, in *Miller*, the litigant and funder did not explicitly agree, as Complainants and LCF have done here, that the materials exchanged would be limited to "non-privileged information relating to the Claims." Ex. 12 at §3.7; *Miller,* 2014 WL 67340, at *2-3. In fact, in *Miller*, the Court concluded that the parties did ***not*** share a common legal interest and that the interest was merely financial. *Miller*, 2014 WL 67340, at *13 ("In short, the funders and Miller did not share a common legal interest, and materials shared with any actual or prospective funders lost whatever attorney-client privilege they might otherwise have enjoyed.").

Additionally, unlike the plaintiff in *Miller*, Complainants, as the holders of the alleged work product privilege did not make reasonable efforts to ensure that the Funding Agreement and its drafts were only disclosed to parties that had agreed to keep such information confidential. For example, Complainants distributed the final signed versions of the Litigation Funding Agreement and December 28, 2013 Funding letter, along with 16 drafts thereof, to Jim Schnorf a non-lawyer CPA who works for Wall Street Capital. Ex. 18, Dec. 2, 2014 Log at Rows 323-326, 332-335, 338, 341, 344-348, 368-369, 640 and 647. When Respondents asked Complainants to provide a signed confidentiality agreement between Mr. Schnorf and Complainants, Complainants responded by pointing to the document attached at Ex. 19 (COM00001277). However, that agreement is ***unsigned*** and is more than two years old. And even if it were signed, it would not be evidence of a confidentiality agreement between Mr. Schnorf and RevoLaze (which is listed as an author of the Litigation Funding Agreement) because the unsigned document only lists TechnoLines. And because it is dated April 25, 2012 it

17

CONFIDENTIAL BUSINESS INFORMATION - SUBJECT TO PROTECTIVE ORDER

cannot possibly be evidence that Mr. Schnorf agreed to keep RevoLaze's information confidential, because RevoLaze appears not to have existed on that date.

Similarly, Complainants gave six drafts of the Litigation Funding Agreement to Barney Theisen. Ex. 18, Dec. 2, 2014 Log at Rows 338, 344-348. As for the two NDAs that Complainants claim bind Barney Theisen with a confidentiality obligation, the first expired in July 2013 and by its terms only applies to documents exchanged prior to that date. Ex. 20, at COM00009722-9724. Because Mr. Theisen received the drafts in January 2014, that NDA did not require him to keep them confidential. As for the other NDA, while it was in place during January 2014, it also states that "The Disclosers of Confidential Information are Lear and TechnoLines, LLC." Ex. 21, at COM00015981. Thus, Mr. Theisen was under no obligation to keep RevoLaze's drafts of the Litigation Funding Agreement confidential.

The issue here is whether the LCF Funding Agreement and Funding Agreement Materials are *discoverable*. *See* 19 C.F.R. §201.27(b)("It is not grounds for objection that the information sought will be inadmissible at the hearing if the information sought appears reasonably calculated to lead to the discovery of admissible evidence.") The Funding Agreement and Materials are reasonably calculated to lead to the discovery of admissible evidence. For example, once the Funding Agreement is produced in discovery, it will lead to discovery of third parties (including for example, LCF, Fulbrook, their principals, employees and consultants) likely to have information relevant to this investigation. The same is true of the Funding Agreement Materials. For example, Complainants almost certainly provided their potential investor with business information and financial projections that related directly to the domestic industry requirement, as well as the strength of their infringement and invalidity claims. Complainants agree that "all information provided to [LCF] . . . was true and accurate in all

CONFIDENTIAL BUSINESS INFORMATION - SUBJECT TO PROTECTIVE ORDER

material respects," and that the factual material they disclosed was "non-privileged." Ex. 12 at §7.1(m). Therefore the materials Complainants provided will be highly relevant to obtaining an accurate assessment of the Complainants' claims, including with respect to infringement and invalidity, which are central issues in this case.

Additionally, although Respondents need not show relevance, Respondents believe that the LCF Funding Agreement is relevant because it might convey to LCF rights in the asserted patents that are relevant to issues of standing. *See* LCF Funding Agreement at § 8; *see, e.g., Devices with Secure Communication Capabilities*, 337-TA-818, Order No. 15, 2012 WL 7857467, at *2 (July 18, 2012), unreviewed, Comm'n Notice (Aug. 20, 2012); *Electronic Devices with Commc'n Capabilities, Components Thereof, & Related Software*, 337-TA-808, Order No. 15, 2012 WL 2584887, at *4 (June 8, 2012), unreviewed, Comm'n Notice (July 10, 2012). In particular, the Funding Agreement suggests that LCF, and not Complainants, retained substantial, important rights to the patents-in-suit, such as the right to block transfer of the patents, to choose and maintain Complainants' counsel, to recover the proceeds from the assertion campaign and to preclude Complainants from providing interests in the patents to others. The Funding Agreement also is highly relevant to Complainants' alleged domestic industry as the financial arrangement suggests that RevoLaze is merely a licensing entity used as a vehicle to generate revenue for its investors. Revenue-driven licensing is generally entitled to less weight than production-driven licensing. *See, e.g., Motiva, LLC, v. U.S. International Trade Commission and Nintendo Co., Ltd., and Nintendo of America, Inc.*, 716 F.3d 596, 601 (Fed. Cir. 2013).

CONFIDENTIAL BUSINESS INFORMATION - SUBJECT TO PROTECTIVE ORDER

### 2. Complainants Should be Compelled to Produce The Documents That Make Up The Entire LCF Funding Agreement

During the parties' meet-and-confer regarding the LCF Funding Agreement, Respondents identified several documents referenced in the Funding Agreement that appeared to exist, but are being improperly withheld. Specifically, Respondents sought "Perfection Documents"[8] and a December 28, 2013 Letter Agreement between the parties to the Funding Agreement.[9]  Ex. 8, G. Cutri Nov. 17, 2014 Letter (referencing *inter alia* §§ 2.36, 12.2, and Exh. B of the Funding Agreement).  Complainants were aware these documents existed at least as early as October 22, 2014, by which time they had reviewed the Funding Agreement in connection with the First Clawback Request. These documents are responsive to numerous of Respondents' Requests for Production, including without limitation, Request for Production No. 84 ("*All documents relating to any contract or agreement that [Complainants] entered into*, discussed, or considered with any third party *concerning the subject matter of any Asserted Patent or any Related Patent.*"); in addition to Request for Product Nos. 19-20 and 34 referenced above. Ex. 3  (emphasis added); Ex. 4 (emphasis added).

On November 5, 2014, Respondents asked Complainants to produce these documents by no later than Friday, November 7.  To date, Complainants have not fully complied with that request, instead claiming, *inter alia*, that they have not located the Perfection Documents. Ex. 22 N. Jackson November 26, 2014 Email.  It is highly unlikely that these documents, which are tied

---

[8]  "Perfection Documents" are defined by the Funding Agreement as "any agreement, document, or financing statement (and any amendments or continuation statements related thereto) that LCF deems necessary to perfect the security interest provided by Section 5 of this Agreement." Ex. 12 at §2.36.

[9]  The December 28, 2013 Letter Agreement is identified as a constituent part of the "entire agreement" between the parties to the Funding Agreement. Ex. 12 at §12.2 ("Except as set forth in Section 2(f) of that certain Letter Agreement, dated as of December 28, 2013, by and between LCF and Claim Owner, this Agreement and the other Funding Documents constitute the entire agreement between the Parties with respect to the matters covered herein.")

CONFIDENTIAL BUSINESS INFORMATION - SUBJECT TO PROTECTIVE ORDER

to key aspects of a multi-million dollar litigation funding agreement, cannot be located by Complainants, the company receiving the litigation funding. Complainants concede as much in their refusal to state that the documents do not exist. *Id.* ("I am unable to answer your question as to whether these exist or have just not yet been located.") Respondents therefore request that the ALJ order Complainants to produce the Perfection Documents.

On December 2, 2014, nearly a month after Respondents' request, Complainants represented in correspondence that the December 28, 2013 Letter Agreement had finally been logged for privilege in their late-served December 2, 2014 Log. Ex. 23, Dec. 2, 2014 N. Jackson Email. However, despite the fact that the December 28, 2013 Letter Agreement is closely related to the LCF Funding Agreement (and indeed is referenced therein), Complainants do *not* claim that this Letter Agreement is subject to a common interest, as their December 2, 2014 log lists "No" under the "Common Interest" column for this document. Ex. 18, Dec. 2 Log at row 335. Rather, it is only marked as work product. *Id.* Therefore, as of today, Complainants are taking the position that there is no common interest between and among the individuals that drafted and exchanged the December 28, 2013 Letter Agreement, but there is a common interest among the individuals who drafted the Funding Agreement signed February 5, 2014 just two months later. This is illogical, given that nearly the same individuals are listed as having drafted or received both documents.[10]

---

[10] The parties listed in the author and recipient columns for the December 28, 2013 Letter Agreement are "William P. Farrell, Jr. Managing Director, Longford Investment Group, LLC." and "Costin, Darryl., CEO, TechnoLines LLC; Jim Schnorf, Consultant, Wall Street Capital; Selvyn Seidel, Fulbrook Capital Management LLC;, Attorney, Dentons US LLP; Mark L. Hogge, Attorney, Dentons US LLP; Shailendra K. Maheshwari, Attorney, Dentons US LLP," respectively. Ex. 18, Dec. 2 Log at row 335. All but three of these individuals (Jim Schnorf, Steven Stein and Shailendra K. Maheshwari) are listed as authors of the LCF Funding Agreement. *Id.* at 129.

CONFIDENTIAL BUSINESS INFORMATION - SUBJECT TO PROTECTIVE ORDER

For the same reasons that the LCF Funding Agreement is not attorney work product, the December 28, 2013 Letter Agreement also is not work product, including because it is another example of business information exchanged between parties negotiating at arms-length for a cut of Complainants' hoped-for recovery from Respondents, not the attorney strategies and legal impressions the work product doctrine is intended to protect. *Certain Muzzle-Loading Firearms and Components Thereof*, Inv. No. 337-TA-777, Order No. 23, 2011 WL 6002058, at *4 (Nov. 29, 2011). Respondents therefore request that the ALJ order Complainants to produce the December 28, 2013 Letter Agreement.

### 3. Complainants Should be Compelled to Re-Produce Certain other Documents Identified in their First and Second Clawback Requests[11]

#### a. Complainants' Financial Projections Document Is Not Work Product

Complainants also have failed to meet their burden of establishing that a document identified as "First Order Financial Projections" on their November 6 Log is attorney work product (the "Financial Projections Document."). As illustrated by the excerpt from Complainants' November 6 Log below, Complainants only claim work product protection for the Financial Projections Document, not attorney client-privilege or common interest privilege:

| BegBate | EndBate | Author | To | From |
|---|---|---|---|---|
| COM00000423 | COM00000423 | Darryl Costin, CEO, RevoLaze LLC | Unknown | |

| CC | DocDate | DocTitle | A/C | W/P |
|---|---|---|---|---|
| | Unknown | First Order Financial Projections | NO | YES |

Ex. 10, Nov. 6 Log at COM00000423.[12]

---

[11] Complainants have refused Respondents' request to reproduce the documents identified in this section for the purpose of this briefing, but have confirmed that they will "disclose [them] directly to the administrative law judge for in camera review relating to [this] motion to compel [briefing]." Ex. 22, Nov. 26 N. Jackson Email.

CONFIDENTIAL BUSINESS INFORMATION - SUBJECT TO PROTECTIVE ORDER

Complainants' privilege log entry does not supply the information necessary to substantiate their work product claim. As an initial matter, it does not identify any attorney involved in the creation of the document, listing only non-attorney Darryl Costin as the author. It likewise does not identify any attorney as the recipient of this document, belying any suggestion by Complainants that the document was prepared at the direction of an attorney. It also does not list a document date. Based on all of this missing information, it appears that Complainants do not know the origin of this document or whether and to whom it was ultimately disclosed. Therefore, Complainants simply cannot substantiate a work product claim. *See* 210.27(e)(1)(ii) (requiring that a privilege log "describe[] the nature of the information not produced or disclosed, in a manner that will enable the requester to assess the claim. . . "); *Certain Hydraulic Excavators and Components Thereof*, Inv. No. 337-TA-582, Order No. 23, 2007 WL 806657, at *6 (Mar. 2, 2007) ("if the party invoking the privilege does not provide sufficient detail to demonstrate fulfillment of all the legal requirements for application of the privilege, his claim will be rejected.").

Moreover, as was the case with the LCF Funding Agreement, Complainants fail to identify any attorney "mental processes" related to the conduct of this litigation that are disclosed in the Financial Projections Document; indeed it would be impossible for Complainants to do so, as Mr. Costin is not an attorney, no attorney is identified as a recipient or co-author, and the entry's description does not indicate any attorney thoughts contained in the document. *Certain Muzzle-Loading Firearms and Components Thereof*, Inv. No. 337-TA-777, Order No. 23, 2011 WL 6002058, at *3 (Nov. 29, 2011) ("[t]he purpose of the [work product] doctrine is to guard

---

[12] Complainants' belated attempt to update this log, which as explained in footnote 2 above Respondents contend should not be considered, did not substantively change this November 6 Log entry. Ex 15, Nov. 26 Privilege Log at Row 142.

23

CONFIDENTIAL BUSINESS INFORMATION - SUBJECT TO PROTECTIVE ORDER

the 'mental processes *of the attorney*.'") (emphasis added). Accordingly, Complainants have no basis to claim that the Financial Projections Document, which is responsive to Respondents' requests for production,[13] is attorney work product.

### b. Complainants' Domestic Industry Document is Not Work Product

In much the same way Complainants failed to meet their burden of establishing the Financial Projections Document was attorney work product, Complainants failed to substantiate their work product claim for a document identified on their November 3 log as "Information for RevoLaze Domestic Inudstry [sic] Requirement" (the "Domestic Industry Document."). While the excerpt from Complainants' November 3 Log below includes a claim for attorney-client privilege, Complainants explained during the November 5, 2014 meet-and-confer that Complainants are only claiming attorney work product protection for this document, and that the attorney-client privilege claim was made in error:[14]

| CONTROL_NUM | ATTACH_RANGE | AUTHOR | RECIPIENT | TOPIC | DOCDATE | AC | Common Interest | WP |
|---|---|---|---|---|---|---|---|---|
| COM00007151 | COM00007151 - COM00007172 | Darryl Costin, CEO, TechnoLines LLC | Unknown | Information for RevoLaze Domestic Inudstry Requirement | 10/1/2013 | YES | NO | YES |

Ex. 9, Nov. 3 Log at COM00007151-7172; Ex. 8, G. Cutri Nov. 17, 2014 Letter.

---

[13] *See, e.g.*, Ex. 3, Request for Production No. 65 to both RevoLaze and TechnoLines ("All documents and things relating to any assignment, transfer, advertisement, sale, auction, license, attempt to license, litigation, threat to litigate, cease and desist letter, covenant not to sue, settlement agreement, or any other enforcement attempt or agreement relating to any Asserted Patent or Related Patents, including without limitation all documents related to the negotiation and drafting of any potential or actual agreement, all documents generated or exchanged as part of any discussions regarding any such actual or potential agreement, minutes, notes, term sheets, and all other documents relating thereto, regardless of whether or not any agreement was eventually executed."); *see also* Ex. 4 (same).

[14] This is confirmed in Complainants' late-served privilege log, which removed the attorney-client privilege claim while adding no additional substantive information. Ex. 15, Nov. 26 Log at Row 132.

CONFIDENTIAL BUSINESS INFORMATION - SUBJECT TO PROTECTIVE ORDER

Complainants' privilege log entry for the Domestic Industry Document suffers from the same deficiencies as the entry for the Financial Projections Document. It does not identify any attorney involved in the creation of the document, listing only non-attorney Darryl Costin as the author. And it does not identify any attorney as the recipient of this document. In correspondence, Complainants have represented to Respondents that "based on the time frame of the document, [the Domestic Industry Document] was requested by either Shalu Maheshwari or Mark Hogge," both of whom are attorneys at Dentons. Ex. 17, Nov. 20, 2014 N. Jackson Email. Yet Complainants did not include this information in their November 3 Log, or even their November 26 Log, which came *after* Complainants speculated in correspondence that Mr. Maheshwari or Mr. Hogge might have been involved in requesting the document. Here again, Complainants may contend that the Domestic Industry Document *looks like* it was prepared at the direction of an attorney, but that is not sufficient to substantiate a work product claim. *See* 210.27(e)(1)(ii); *Certain Hydraulic Excavators and Components Thereof*, Inv. No. 337-TA-582, Order No. 23, 2007 WL 806657, at *4 (Mar. 2, 2007). Complainants have not identified any attorney "mental processes" related to the conduct of this litigation that are disclosed in the Domestic Industry Document, and cannot do so, given that the author of this document is not an attorney. *Certain Muzzle-Loading Firearms and Components Thereof*, Inv. No. 337-TA-777, Order No. 23, 2011 WL 6002058 at *3 (Nov. 29, 2011). Accordingly, Complainants have no basis to claim that the Domestic Industry Document, which is responsive to many of Respondents' requests for production,[15] is attorney work product.

---

[15] *See, e.g.*, Ex. 3, Request for Production No. 38 to RevoLaze and TechnoLines ("All documents provided to or received from any Licensee or Prior Owner relating to this investigation, including all documents relating to any alleged Domestic Industry, any

CONFIDENTIAL BUSINESS INFORMATION - SUBJECT TO PROTECTIVE ORDER

## IV.    CONCLUSION

Complainants have failed to meet their burden to show that the documents described herein are subject to attorney-client privilege, common interest, and/or attorney work product protection.  Accordingly, Respondents request that the ALJ grant this motion to compel and order Complainants to produce:

(1) LCF Funding Agreement (Control Number COM00000695 on Complainants' Nov. 3 Log);

(2) Diligence Material as defined in Section III.A.1;

(3) Matter Monitoring Material as defined in Section III.A.1;

(4) Draft Funding Agreement Materials as defined in Section III.A.1;

(5) Perfection Documents as defined in Section III.A.2;

(6) December 28, 2013 Letter Agreement (Item 335 on Complainants' Dec. 2 Log);

(7) Financial Projections Document (Control Number COM00000423 on Complainants' Nov. 6 Log); and

(8) Domestic Industry Document (Control Number COM00007151 on Complainants' Nov. 3 Log).

---

Domestic Industry Product, or any of the Asserted Patents.") and Request for Production Nos. 39–42; *see also* Ex. 4 (same).

**CONFIDENTIAL BUSINESS INFORMATION - SUBJECT TO PROTECTIVE ORDER**

Dated: December 11, 2014

Respectfully submitted,

/s/ Gene W. Lee
Stephen J. Rosenman
Peter M. Brody
ROPES & GRAY LLP
One Metro Center
700 12th Street NW, Suite 900
Washington, DC 20005
Telephone: (202) 508-4600
Facsimile: (202) 508-4650

Gene W. Lee
ROPES & GRAY LLP
1211 Avenue of the Americas
New York, NY 10036
Telephone: (212) 596-9000
Facsimile: (212) 596-9090

*Counsel for Respondent*
*American Eagle Outfitters, Inc.*

/s/ Andrew F. Pratt
Andrew F. Pratt
Adam R. Hess
Matthew R. Farley
VENABLE LLP
575 7th Street, N.W.
Washington, DC 20004-1604
Telephone: (202) 344-4481

*Counsel for Respondents Abercrombie &*
*Fitch Co. and Roberto Cavalli S.p.A.*

**CONFIDENTIAL BUSINESS INFORMATION - SUBJECT TO PROTECTIVE ORDER**

*/s/ Gianni Cutri*
Gianni Cutri
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

Mike De Vries
KIRKLAND & ELLIS LLP
333 South Hope Street
Los Angeles, CA 90071
Telephone: (213) 680-8400
Facsimile: (213) 680-8500

D. Sean Trainor
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, DC 20005
Telephone: (202) 879-5000
Facsimile: (202) 879-5200

Jared Barcenas
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

*Counsel for Respondent The Buckle, Inc.*

*/s/ Alper Ertas*
Anthony V. Lupo
Anthony Shaw
Alper Ertas
ARENT FOX LLP
1717 K Street, NW
Washington, DC 20036-5342
Telephone: (415) 757-5500

*Counsel for Respondent Diesel, S.p.A.*

**CONFIDENTIAL BUSINESS INFORMATION - SUBJECT TO PROTECTIVE ORDER**

*/s/ Marcia Sundeen*
Michelle Mancino Marsh
KENYON & KENYON LLP
One Broadway
New York, NY 10004-1007
Telephone: (212) 425-7200
Facsimile: (212) 425-5288

Marcia H. Sundeen
Aimee N. Soucie
KENYON & KENYON LLP
1500 K Street, N.W.
Washington, DC 20005-1257
Telephone: (202) 220-4200
Facsimile: (202) 220-4201

Megan Whyman Olesek
KENYON & KENYON LLP
1801 Page Mill Road, Suite 210
Palo Alto, CA 94304
Telephone: (650) 384-4700
Facsimile: (650) 384-4701

*Counsel for Respondent The Gap, Inc.*

*/s/ Laura J. Cunningham*
Stephen R. Smith
Laura J. Cunningham
Rose S. Whelan COOLEY LLP
1299 Pennsylvania Avenue, NW, Suite 700
Washington, DC 20004
Telephone: (202) 842-7800
Facsimile: (202) 842-7899

*Counsel for Respondent Guess?, Inc.*

29

**CONFIDENTIAL BUSINESS INFORMATION - SUBJECT TO PROTECTIVE ORDER**

*/s/ Staci Jennifer Riordan*
Staci Jennifer Riordan
NIXON PEABODY LLP
555 West Fifth St., 46th Floor
Los Angeles, CA 90013-1010
Telephone: (213) 629-6041
Facsimile: (844) 722-9604

*Counsel for Respondents*
*H&M Hennes Mauritz L.P. and*
*H&M Hennes & Mauritz AB*


*/s/ Brian K. Brookey*
Brian K. Brookey
Steven E. Lauridsen
TUCKER ELLIS LLP
515 South Flower Street, Forty-Second Floor
Los Angeles, CA 90071-2223
Telephone: (213) 430-3400
Facsimile: (213) 430-3409

*Counsel for Respondent*
*Koos Manufacturing, Inc.*

**CONFIDENTIAL BUSINESS INFORMATION - SUBJECT TO PROTECTIVE ORDER**

*/s/ Paul M. Bartkowski*
Louis S. Mastriani
Paul M. Bartkowski
Thomas R. Burns, Jr.
ADDUCI, MASTRIANI & SCHAUMBERG, LLP
1133 Connecticut Avenue, NW, 12th Floor
Washington, DC 20036
Telephone: (202) 467-6300
Facsimile: (202) 466-2006

Robert A. McFarlane
Russell C. Petersen
Ronald S. Wynn
Samantha D. Wolff
Christopher S. Walters
Janie L. Thompson
HANSON BRIDGETT LLP
425 Market Street, 26th Floor
San Francisco, CA 94105
Telephone: (415) 777-3200
Facsimile: (415) 541-9366

James G. Gilliland Jr.
Joshua B. Pond
Matthew C. Holohan
Laura K. Mullendore
KILPATRICK TOWNSEND & STOCKTON LLP
607 14th Street, N.W.
Washington, DC 20005
Telephone: (202) 508-5800
Facsimile: (202) 508-5858
*Counsel for Respondents Levi Strauss Co.*

**CONFIDENTIAL BUSINESS INFORMATION - SUBJECT TO PROTECTIVE ORDER**

*/s/ Shane E. Olafson*
Barbara A. Murphy
James B. Altman
Susan Koegel
Kandis C. Gibson
FOSTER, MURPHY, ALTMAN & NICKEL, PC
1899 L Street, N.W., Suite 1150
Washington, DC 20036
Telephone: 202-822-4100
Facsimile: 202-822-4199

Michael McCue
LEWIS ROCA ROTHGERBER LLP
3993 Howard Hughes Pkwy., Suite 600
Las Vegas, NV 89169
Telephone: 702-949-8200
Facsimile: 702-949-8398

Sean D. Garrison
Shane E. Olafson
W. Brent Rasmussen
LEWIS ROCA ROTHGERBER LLP
201 East Washington Street, Suite 1200
Phoenix, AZ 85004
Telephone: (602) 262-5311
Facsimile: (650) 384-4701

*Counsel for Respondent Lucky Brand
Dungarees, Inc.*

*/s/ Michael E. Schonberg*
Bruce S. Sostek
Michael E. Schonberg
Vishal Patel
THOMPSON & KNIGHT LLP
One Arts Plaza
1722 Routh St., Suite 1500
Dallas, TX 75201
Telephone: (214) 969.1700
Facsimile: (214) 969.1751

*Counsel for Respondent VF Corp.*

CONFIDENTIAL BUSINESS INFORMATION - SUBJECT TO PROTECTIVE ORDER

## CERTIFICATE OF SERVICE

I hereby certify that on December 11, 2014, copies of the foregoing RESPONDENTS' MOTION  AND MEMORANDUM IN SUPPORT OF MOTION TO COMPEL COMPLAINANTS TO WITHDRAW CLAIMS OF PRIVILEGE AND WORK PRODUCT PROTECTION OVER DOCUMENTS PREVIOUSLY PRODUCED BY COMPLAINANTS AND TO PRODUCE CERTAIN DOCUMENTS REFERENCED THEREIN., were caused to be served upon the following, via delivery methods indicated:

**BY EDIS (+ paper copies, as required)**
The Honorable Lisa R. Barton
Secretary to the Commission
U.S. International Trade Commission
500 E Street SW
Washington, DC 20436

**BY HAND (2 copies)**
The Honorable Charles E. Bullock
Chief Administrative Law Judge
U.S. International Trade Commission
500 E Street SW, Room 317
Washington, DC 20436

**BY E-MAIL**
Sarah Zimmerman, Esq.
U.S. International Trade Commission
500 E Street SW, Room 317
Washington, DC 20436
sarah.zimmennan@usitc.gov

**BY E-MAIL**
Peter Sawert, Esq.
Office of Unfair Import Investigations
U.S. International Trade Commission
500 E Street SW
Washington, DC 20436
peter.sawert@usitc.gov

**BY E-MAIL**
Mark L. Hogge, Esq.
DENTONS US LLP
1301 K Street, N.W.
6th Floor, East Tower
Washington, D.C. 20005
RevoLazeITC@dentons.com
*Attorney for Complainants RevoLaze, LLC and TechnoLines, LLC*

33

**CONFIDENTIAL BUSINESS INFORMATION - SUBJECT TO PROTECTIVE ORDER**

**BY E-MAIL**
Andrew F. Pratt, Esq.
Venable LLP
575 7th Street, N.W.
Washington, DC 20004-1604
Telephone: (202) 344-4389
AFPratt@Venable.com
Abercrombie-ITC@venable.com
*Counsel for Respondent Abercrombie & Fitch Co.*

**BY E-MAIL**
Gregory F. Ahrens
WOOD, HERRON & EVANS, L.L.P.
441 Vine Street
Cincinnati, OH 45202
gahrens@whe-law.com
Telephone: 513-241-2324
*Counsel for 1724982 Alberta ULC and Buffalo International ULC*

**BY E-MAIL**
Anthony W. Shaw
ARENT FOX LLP
1717 K Street, N.W.
Washington, DC 20006-5344
Telephone (202) 857-6000
Facsimile (202) 857-6395
anthony.shaw@arentfox.com
DIESELITC@arentfox.com
*Counsel for Respondent Diesel S.p.A*

**BY E-MAIL**
Joseph A. Martin
Gregory J. Winsky
Darth M. Newman
ARCHER & GREINER, P.C.
One Centennial Square
Haddonfield, NJ 08033
Tel.: (856) 795-2121
Fax: (856) 795-0574
jmartin@archerlaw.com
dl1961@archerlaw.com
*Counsel for Respondent DL1961 Premium Denim, Inc.*

34

**CONFIDENTIAL BUSINESS INFORMATION - SUBJECT TO PROTECTIVE ORDER**

**BY E-MAIL**
Peter I. Bernstein
SCULLY SCOTT MURPHY & PRESSER PC
400 Garden City Plaza
Suite 200
Garden City, NY 11530
FashionBoxITC@ssmp.com
*Counsel for Respondent Fashion Box S.p.A.*

**BY E-MAIL**
Marcia H. Sundeen, Esq.
KENYON & KENYON LLP
1500 K Street, N.W.
Washington, DC 20005-1257
Telephone: (202) 220-4200
Fax: (202) 220-4201
GapITC@kenyon.com
*Counsel for Respondent Gap, Inc.*

**BY E-MAIL**
Stephen R. Smith, Esq.
COOLEY LLP
1299 Pennsylvania Avenue, NW
Suite 700
Washington, DC 20004
Tel: (202) 842-7800
Fax: (202) 842-7899
Guess-ITC@cooley.com
*Counsel for Respondent Guess?, Inc.*

**BY E-MAIL**
Staci Jennifer Riordan
NIXON PEABODY LLP
555 West Fifth Street, 46th Floor
Los Angeles, CA 90013-1010
sriordan@nixonpeabody.com
*Counsel for Respondents H&M Hennes & Mauritz AB and H&M Hennes & Mauritz LP*

**BY E-MAIL**
Brian K. Brookey, Esq.
TUCKER ELLIS LLP
515 South Flower Street
Forty-Second Floor
Los Angeles, CA 90071-2223
Tel.: 213-430-3400
Fax: 213-430-3409
KoosITC@tuckerellis.com
*Counsel for Respondent Koos Manufacturing, Inc.*

**BY E-MAIL**
Louis S. Mastriani, Esq.
ADDUCI MASTRIANI & SCHAUMBERG LLP
1133 Connecticut Avenue, N.W.
Washington, DC 20036
Telephone: (202) 467-6300
Facsimile: (202) 466-2006
LEVISTRAUSS-REVOLAZEITC@adduci.com
LeviStraussITC@hansonbridgett.com
LevisITC@kilpatricktownsend.com
*Counsel for Respondent Levi Strauss & Co.*

**BY E-MAIL**
Barbara A. Murphy, Esq.
FOSTER, MURPHY, ALTMAN & NICKEL, PC
1899 L Street, NW, Suite 1150
Washington, D.C. 20036
Phone: 202-822-4100
Fax: 202-822-4199
FM-Lucky-930@fostermurphy.com
Lucky-ITC@LRRLaw.com
*Counsel for Respondent Lucky Brand Dungarees, Inc.*

**BY E-MAIL**
Adam R. Hess, Esq.
VENABLE LLP
575 7th Street, N.W.
Washington, DC 20004-1604
Telephone: (202) 344-4481
Cavalli-ITC@venable.com
*Counsel for Respondent Roberto Cavalli S.P.A.*

**CONFIDENTIAL BUSINESS INFORMATION - SUBJECT TO PROTECTIVE ORDER**

**BY E-MAIL**
D. Sean Trainor
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, D.C. 20005
Telephone: (202) 879-5000
Facsimile: (202) 879-5200
930ITC@kirkland.com
*Counsel for Respondents Eddie Bauer, LLC and The Buckle, Inc.*

**BY E-MAIL**
Bruce S. Sostek
THOMPSON & KNIGHT, LLP
1722 Routh Street, Suite 1500
Dallas, Texas 75201
Telephone: 214.969.1500
Facsimile: 214.969.1751
VFCorp-ITC@tklaw.com
*Counsel for Respondent VF Corporation*

*/s/ Sophia Antzoulatos*
Sophia Antzoulatos

12

From: **Hogge, Mark L.** mark.hogge@dentons.com
Subject: RE: Motion to Compel
Date: December 17, 2014 at 11:09 AM
To: Norwood, Sharon M. sharon.norwood@dentons.com, Michael A. Nicolas (mnicolas@longfordcapital.com)
mnicolas@longfordcapital.com
Cc: Darryl Costin (darryl@revolaze.com) darryl@revolaze.com, darryl@technolines.com, wfarrell@longfordcapital.com,
Maheshwari, Shailendra K. shailendra.maheshwari@dentons.com

---

Opposition due date is 12/22/14 .

**DENTONS** Mark L. Hogge

> D +1 202 408 6443  |  US Internal 26443
> mark.hogge@dentons.com
> Bio  |  Website
>
> Dentons US LLP
>
> SNR Denton is proud to join Salans and FMC as a founding member of Dentons.
>
> Dentons is an international legal practice providing client services worldwide through its member firms
> and affiliates. This email may be confidential and protected by legal privilege. If you are not the
> intended recipient, disclosure, copying, distribution and use are prohibited; please notify us
> immediately and delete this copy from your system. Please see dentons.com for Legal Notices.

---

**From:** Norwood, Sharon M.
**Sent:** Wednesday, December 17, 2014 10:41 AM
**To:** Michael A. Nicolas (mnicolas@longfordcapital.com)
**Cc:** Darryl Costin (darryl@revolaze.com); darryl@technolines.com; wfarrell@longfordcapital.com;
Maheshwari, Shailendra K.; Hogge, Mark L.
**Subject:** RE: Motion to Compel

The attached is being sent at the request of Mark Hogge.

---

**From:** Michael A. Nicolas [mailto:mnicolas@longfordcapital.com]
**Sent:** Tuesday, December 16, 2014 9:55 PM
**To:** Hogge, Mark L.; Maheshwari, Shailendra K.
**Cc:** William P. Farrell, Jr.; Darryl Costin; Darryl J. Costin Jr.
**Subject:** Motion to Compel

Mark and Shalu:

We understand that one or more of the respondents in the ITC action have filed a motion to
compel the production of our funding agreement with Revolaze and other related documents.  We
have not received a copy of that motion, nor were previously advised of its filing.  We hope it
goes without saying that the requested documents, particularly the funding agreement, are highly
confidential.  Please provide us with a copy of the motion to compel as soon as possible, and
advise us of the deadline for Revolaze to respond to the motion.

**Michael A. Nicolas**

Exhibit 12

Managing Director

Longford Capital Management, LP

150 North Michigan Avenue

Suite 2800

Chicago, Illinois 60601

Phone: (312) 212-8240

E-mail: mnicolas@longfordcapital.com

Website: www.longfordcapital.com

13

PUBLIC VERSION

UNITED STATES INTERNATIONAL TRADE COMMISSION

Washington, D.C.

| | |
|---|---|
| In the Matter of<br><br>**CERTAIN LASER ABRADED DENIM GARMENTS** | Inv. No. 337-TA-930 |

**ORDER NO. 36:**   **GRANTING IN PART MOTION TO COMPEL RE-PRODUCTION OF DOCUMENTS**

(March 23, 2015)

On December 11, 2014, Respondents Abercrombie & Fitch Co., American Eagle Outfitters, Inc., The Buckle, Inc., Diesel S.p.A., The Gap, Inc., Guess?, Inc., H&M Hennes & Mauritz LP and H&M Hennes & Mauritz AB, Koos Manufacturing, Inc., Levi Strauss & Co.,[1] Lucky Brand Dungarees, Inc., Roberto Cavalli S.p.A., and VF Corp.[2] (collectively "Respondents") filed a motion seeking to compel Complainants to re-produce certain documents that had been clawed back as privileged: {            } materials, financial projections, and a domestic industry document. (Motion Docket No. 930-022.) Respondents say that Complainants' seven privilege logs do not support their claim of privilege with respect to these documents, and they allege that Complainants' clawbacks have been just as "piece-meal" as the logs.[3] (Mot. at 1-2; Mot. Mem. at 2.) According to Respondents, "Complainants have not met their burden of establishing that several of the documents clawed back and then logged on their November 3 and November 6 privilege logs are attorney-client privileged or subject to attorney work product protection." (Mot. Mem. at 4.) In addition, Respondents seek an order compelling

---

[1] Levi Strauss & Co. has since been terminated from the Investigation by initial determination. (*See* Order No. 22.) The Commission has not yet responded to the initial determination.

[2] VF Corporation has filed for termination.

[3] Respondents do not assert that a waiver has occurred, other than to say in a footnote that they reserve the right to "argue in subsequent briefing that Complainants waived any privilege or other protection with respect to documents. . . because reasonable steps were not taken to prevent disclosure of these documents." (Mot. Mem. at 2, n.1.)

1

Exhibit 13

**PUBLIC VERSION**

Complainants to produce documents they have exchanged with nonparty {

}. (Mot. at 2.)

On December 22, 2014, Complainants opposed. Complainants say the { · } agreement at issue is irrelevant to this Investigation, and even if this were not the case, it "enjoys work product protection." (Opp. at 1, 3, 14.) Complainants say that some of the documents Respondents seek cannot be produced in any case because Complainants have yet to locate or identify them. (*Id.* at 1, 6.) Complainants rely primarily on a district court case's findings with respect to the issue of whether { } documents are relevant and discoverable. (*Id.* at 3.) Complainants do not assert any privilege other than the work product doctrine with respect to the documents at issue. (*See, e.g., id.* at 19.)

No other responses were received.

Here, the parties' dispute centers around two main issues: whether the documents Respondents seek to compel are relevant to the Investigation and whether they are protected by the work product doctrine. No party is arguing that this situation implicates the Commission's Rules regarding waiver based on inadvertent disclosure in discovery.

Any party may obtain discovery regarding "any matter, not privileged," that is relevant to the "claim or defense of any other party[.]" Commission Rule 210.27(b). It is not grounds for objection that the information sought may be inadmissible at the hearing, if the information sought appears reasonably calculated to lead to the discovery of admissible evidence. (*Id.*)

In terms of determining what privileged matter may be excluded from discovery, the Federal Rules say that "[o]rdinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent)." F.R.C.P.

**PUBLIC VERSION**

Rule 26(b)(3).  Case law characterizes work product as documents and tangible things, such as memoranda, letters and emails, that provide an attorney's, or other representative's, thought processes and legal recommendations.  *In Re EchoStar Communics. Corp.*, 448 F.3d 1294, 1301 (Fed. Cir. 2006) (citations omitted).  "Essentially, the work-product doctrine encourages attorneys to write down their thoughts and opinions with the knowledge that their opponents will not rob them of the fruits of their labor." *Id.* (citing *Hickman v. Taylor*, 329 U.S. 495, 511 (1947)).

The Federal Rules permit discovery into certain types of factual work product upon a showing of substantial need, whereas the mental impressions, conclusions, and legal theories of an attorney or other representative are nearly always protected.  *Id.* (citing F.R.C.P Rule 26(b)(3)).  The party seeking work-product protection has the burden of proof to establish entitlement to it.  *In the Matter of Certain Flash Memory Chips and Products Containing Same*, Inv. No. 337-TA-735, Order No. 29 at *5 (U.S.I.T.C., 2011).

{             } **Materials.**

Respondents argue that the {             } materials at issue[4] are relevant to the Investigation because they concern interests in the asserted patents.  (Mot. Mem. at 1, 4-5, 9, 19; Mot., Ex. 12 at § 8.1.)  They say the {             } materials should be characterized as "business, diligence and financial information exchanged between parties negotiating at arms-length for a {                         }." (*Id.*)  Specifically, Respondents argue that Complainants have not established that Complainants' {             } agreement with {             } Agreement") "is entitled to attorney-client privilege, common interest privilege, or work product protection as Complainants claim." (*Id.* at 4, 10-11.)

---

[4] These include the {         } Agreement, "Diligence Material," "Matter Monitoring Material," "Draft {     } Agreement Materials," "Perfection Documents," and December 28, 2013 Letter Agreement.  (Mot. Mem. at 26.)

3

**PUBLIC VERSION**

Respondents say that the {       } Agreement shows that {   } was only provided with access to non-privileged materials, which they say reflects the fact that Complainants and {   } were working at arm's length and did not share a common legal interest.  (*Id.* at 6-7, 11; Mot., Ex. 12 at §§ 3.7, 3.8, 7.2(e).)  According to Respondents, Complainants and {   } only have a shared commercial interest, which is insufficient to create a common interest privilege between them.  (Mot. Mem. at 13-15.)

Complainants respond that the {       } materials are irrelevant and protected from discovery by the work product doctrine.  (Opp. at 6.)  According to Complainants, "discovery must be reasonably calculated to lead to the discovery of *admissible* evidence."  (*Id.* (emphasis in original).)  They argue that Respondents cannot show they lack standing, thus Complainants should not have to produce the documents.  (*Id.* at 9-13.)  In addition, Complainants say that the {      } Agreement is a document prepared in anticipation of litigation by a party or its representative.  (*Id.* at 15.)

Turning first to the issue of privilege, the undersigned finds that the {     } Agreement and all attached exhibits are not protected by the work product doctrine.  This is an arm's-length agreement that was prepared for a business purpose, and not prepared by a party or his representative in anticipation of litigation, *i.e.*, because of the prospect of litigation.  *SanDisk Corp. v. Round Rock Research LLC*, 2014 WL 691565 at *3 (N.D., Cal., Feb. 21, 2014) (explaining that a party whose business is litigation should not be permitted to withhold all documents as work product).  The undersigned makes the same finding with respect to the December 28, 2013 Letter Agreement: it is not work product.

Turning to the issue of relevance, the undersigned finds that the {   } Agreement and December 28, 2013 Letter Agreement are relevant, at a minimum, to the issue of standing and

4

**PUBLIC VERSION**

therefore are discoverable. *Certain Optical Disc Drives, Components Thereof, and Products Containing Same*, Inv. No. 337-TA-897, Opinion Remanding the Investigation, at 10 (U.S.I.T.C., January 7, 2015); Commission Rule 210.27(b).  Accordingly, this portion of Respondents' motion to compel is granted.  Respondents, however, have not adequately explained the relevance of any *drafts* of the {     } Agreement[5] and therefore this portion of Respondents' motion to compel is denied.

With respect to the remaining "{              } Documents" at issue, (*i.e.*, the Perfection Documents, the Matter Monitoring Documents, the Diligence Materials and the e-mails), for the reasons discussed below the undersigned finds that ruling on these is premature.  It should be noted, however, that work product protection is generally not waived when it is shared with a third party. *See* EDNA SELAN EPSTEIN, THE ATTORNEY-CLIENT PRIVILEGE AND THE WORK-PRODUCT DOCTRINE 1038 (5th ed. 2007) ("Parties who share only a business interest may nonetheless share work-product-protected documents without thereby losing the work-product protection.  The rationale is that such sharing does not make it more likely that an adversary will obtain the work-product-protected materials.  Bear in mind that the work-product protection is designed to maintain the integrity of the adversarial process by precluding one party from being able to poach upon the preparation of the other."). *See also SanDisk, supra.*

More specifically, with respect to e-mails among {     }, Complainants, and {          }, Respondents are correct that these have not been produced.  However, it appears that the parties agreed to delay e-mail discovery to a later point in time.  (Opp. at 24, n. 25.)  Therefore, it would be premature for the undersigned to rule on these documents at this time.

With respect to the Perfection Documents, they are defined in the {     } Agreement as "{

---

[5] (*See, e.g.*, Opp., Ex. A at §12.2.)

**PUBLIC VERSION**

}." (Mem. at 20, n. 9.)  The parties agree that these documents have not been produced. (Mem. at 20; Opp. at 23.)  However, Complainants allege they "have not yet located these documents and are not withholding them from production." Therefore, Complainants are directed to provide an update as to the status of these documents within 10 days of this order.

Both parties agree that the "Matter Monitoring Documents," including "Quarterly Monitoring Reports" have not been produced by Complainants.  (Mem. at 7-8, 10-12; Opp. at 23-24.)  However, Complainants allege they "have not yet located these documents and are not withholding them from production."  Therefore, Complainants are directed to provide an update as to the status of these documents within 10 days of this order.

Further, with respect to the "Diligence Materials," it is unclear as to whether Complainants are withholding any documents.  If additional "Diligence Materials" exist, Complainants shall address the status of these documents within 10 days of this order.

**Financial Projections.**

Respondents argue that the financial projections at issue[6] ("Projections") were prepared by Complainant RevoLaze, LLC's CEO and that Complainants cannot identify any attorney tied to the Projections that would make them attorney work product.  (Mot. Mem. at 1, 22-24.)

Complainants argue that the Projections contain the mental processes of CEO Darryl Costin, Sr., who is a representative of both RevoLaze and TechnoLines.  (Opp. at 20.)  They say that because Mr. Costin's financial analysis of "the potential recovery of Complainants' enforcement efforts" is a "core legal issue[,]" it is protected by the work product privilege.  (*Id.*)

A review of the Projections shows that they are relevant to the Investigation, as they concern, *inter alia*, projected royalty rates which are relevant to at least the issue of remedy and

---

[6] COM00000423.

6

**PUBLIC VERSION**

bonding.  (Opp., Ex. C.)  The undersigned finds, however, that the Projections are appropriately considered to be work product.  (*Id.*)  They appear to contain numbers that assume that Complainants have succeeded with this Investigation and other litigation.  (*Id.* at 1.)  Thus they are not projections made in the normal course of business, but instead appear to have been made by a party solely in anticipation of litigation.  F.R.C.P. Rule 26(b)(3).  The undersigned therefore finds that this portion of Respondents' motion is denied.

**Domestic Industry Document.**

Respondents argue that the domestic industry document at issue[7] (the "DI Document") was also prepared by Complainant RevoLaze, LLC's CEO and that, again, Complainants cannot identify any attorney tied to the DI Document that would make it attorney work product.  (Mot. Mem. at 1, 24-25.)

Complainants argue that the DI Document contains the mental processes of CEO Darryl Costin, Sr., who is a representative of both RevoLaze and TechnoLines.  (Opp. at 20.)  They say that because Mr. Costin memorialized "Complainants' analysis and evaluation of the Domestic Industry Requirement[,]"the DI Document is protected by the work product privilege.  (*Id.*)

The DI Document is pertinent to Complainants' assertion of a domestic industry with respect to the asserted patents.  (Opp., Ex. D.)  Thus there is no question that it is relevant to the Investigation.  Complainants labeled the DI Document "Privileged Attorney Client Work Product[,]" and it appears to have been prepared by a party for the benefit of counsel handling this Investigation.  (*Id.*)  For example, Mr. Costin provided electronic links in his report and instructions for the user to cut and paste them in a web browser.  (*Id.* at 2.)  The undersigned concludes that the DI Document is work product.  Therefore, this portion of Respondents' motion is also denied.  As with the Projections, the underlying factual information in the DI

---

[7]  COM00007151-7172.

7

Document is discoverable.  Complainants may provide a redacted version of the DI Document, or they will need to provide these facts in response to appropriate discovery requests.

Within seven (7) business days of the date of this document, each party shall submit to the Office of the Administrative Law Judges a statement as to whether or not[8] it seeks to have any confidential portion of this document deleted from the public version.  Any party seeking redactions to the public version must submit to this office two (2) copies of a proposed public version of this document pursuant to Ground Rule 1.11 with red brackets clearly indicating any portion asserted to contain confidential business information.

The parties' submissions may be made by facsimile and/or hard copy by the aforementioned date.  In addition, an electronic courtesy copy is required pursuant to Ground Rule 1.3.2.  The parties' submissions concerning the public version of this document need not be filed with the Commission Secretary.

**SO ORDERED.**

Charles E. Bullock
Chief Administrative Law Judge

---

[8] This means that parties that do not seek to have any portion redacted are still required to submit a statement to this effect.

**CERTAIN LASER ABRADED**                                    337-TA-930
**DENIM GARMENTS**

## PUBLIC CERTIFICATE OF SERVICE

I, Lisa R. Barton, hereby certify that the attached **ORDER** has been served by hand upon the
Commission Investigative Attorney, Peter J. Sawert, Esq., and upon the following parties as
indicated, on **April 8, 2015**.

Lisa R. Barton
Secretary to the Commission
U.S. International Trade Commission
500 E Street, SW, Room 112A
Washington, D.C. 20436

### ON BEHALF OF COMPLAINANTS REVOLAZE, LLC AND TECHNOLINES, LLC:

Mark L. Hogge, Esq.                      ☐ Via Hand Delivery
**DENTONS US LLP**                        ☐ Via Express Delivery
1301 K. Street, NW, 6th Fl.               ☒ Via First Class Mail
Washington, DC  20005                     ☐ Other: _____
(202) 408-6400

### ON BEHALF OF RESPONDENT ABERCROMBIE & FITCH CO.:

Andrew F. Pratt, Esq.                     ☐ Via Hand Delivery
**VENABLE LLP**                           ☐ Via Express Delivery
575 7th Street, NW                        ☒ Via First Class Mail
Washington, DC  20004-1604                ☐ Other: _____
(202) 344-4389

1

**CERTAIN LASER ABRADED**                                          337-TA-930
**DENIM GARMENTS**

## ON BEHALF OF RESPONDENT AMERICAN EAGLE OUTFITTERS INC.:

Stephen J. Rosenman, Esq.                     ☐ Via Hand Delivery
**ROPES & GRAY LLP**                          ☐ Via Express Delivery
One Metro Center                              ☒ Via First Class Mail
700 12th Street NW, Suite 900                 ☐ Other: _____
Washington, DC  20005
(202) 508-4773

## ON BEHALF OF RESPONDENTS THE BUCKLE, INC.; LUCKY BRAND DUNGAREES, INC.; AND DENIMATRIX S.A.:

D. Sean Trainor, Esq.                         ☐ Via Hand Delivery
**KIRKLAND & ELLIS LLP**                      ☐ Via Express Delivery
655  15th Street, NW                          ☒ Via First Class Mail
Washington, DC  20005                         ☐ Other: _____
(202) 879-5000

## ON BEHALF OF RESPONDENTS BUFFALO INTERNATIONAL ULC AND 1724982 ALBERTA ULC:

Gregory F. Ahrens, Esq.                       ☐ Via Hand Delivery
**WOOD, HERRON & EVANS, L.L.P**               ☐ Via Express Delivery
441 Vine Street                               ☒ Via First Class Mail
Cincinnati, OH 45202                          ☐ Other: _____
(513) 241-2324

## ON BEHALF OF RESPONDENTS DIESEL S.p.A. AND DENIM SERVICE S.p.A.:

Anthony W. Shaw, Esq.                         ☐ Via Hand Delivery
**ARENT FOX LLP**                             ☐ Via Express Delivery
1717 K Street, NW                             ☒ Via First Class Mail
Washington, DC 20006-5344                     ☐ Other: _____
(202) 857-6000

2

**CERTAIN LASER ABRADED**                           **337-TA-930**
**DENIM GARMENTS**

## ON BEHALF OF RESPONDENT THE GAP, INC.:

| | |
|---|---|
| Megan Whyman Olesek, Esq.<br>**KENYON & KENYON LLP**<br>1801 Page Mill Road, Suite 210<br>Palo Alto, CA 94304<br>(650) 384-4700 | ☐ Via Hand Delivery<br>☐ Via Express Delivery<br>☒ Via First Class Mail<br>☐ Other: _____ |

## ON BEHALF OF RESPONDENT GUESS?, INC.:

| | |
|---|---|
| Stephen R. Smith, Esq.<br>**COOLEY LLP**<br>1299 Pennsylvania Avenue, NW, Suite 700<br>Washington, DC  20004<br>(202) 842-7800 | ☐ Via Hand Delivery<br>☐ Via Express Delivery<br>☒ Via First Class Mail<br>☐ Other: _____ |

## ON BEHALF OF RESPONDENTS H&M HENNES & MAURITZ AB AND H&M HENNES & MAURITZ L.P.:

| | |
|---|---|
| Staci Jennifer Riordan, Esq.<br>**NIXON PEABODY LLP**<br>555 West 5th Street, 46th Fl.<br>Los Angeles, CA  90013-1010<br>(213) 629-6041 | ☐ Via Hand Delivery<br>☐ Via Express Delivery<br>☒ Via First Class Mail<br>☐ Other: _____ |

## ON BEHALF OF RESPONDENT ROBERTO CAVALLI S.p.A.:

| | |
|---|---|
| Adam R. Hess, Esq.<br>**VENABLE LLP**<br>575 7th Street, NW<br>Washington, DC  20004-1604<br>(202) 344-4481 | ☐ Via Hand Delivery<br>☐ Via Express Delivery<br>☒ Via First Class Mail<br>☐ Other: _____ |

3

**CERTAIN LASER ABRADED**         337-TA-930
**DENIM GARMENTS**

## ON BEHALF OF RESPONDENT KOOS MANUFACTURING, INC.:

| | |
|---|---|
| Brian K. Brookey, Esq.<br>**TUCKER ELLIS LLP**<br>515 South Flower Street, 42nd Fl.<br>Los Angeles, CA  90071-2223<br>(213) 430-3400 | ☐ Via Hand Delivery<br>☐ Via Express Delivery<br>☒ Via First Class Mail<br>☐ Other: _____ |

## ON BEHALF OF RESPONDENT CRYSTAL APPAREL, LTD.:

| | |
|---|---|
| R. Brian Burke, Esq.<br>**SANDLER, TRAVIS & ROSENBERG, P.A.**<br>55 W. 39th Street, Suite 600<br>New York, New York 10018 | ☐ Via Hand Delivery<br>☐ Via Express Delivery<br>☒ Via First Class Mail<br>☐ Other: _____ |

## RESPONDENT EROGLU GIYIM SAN TIC AS:

| | |
|---|---|
| Eroglu Giyin San Tic AS<br>Firuzxoy MAH Kain Karabekir CAD BO 2/1<br>343 25 Avcilar-Istanbul<br>Turkey | ☐ Via Hand Delivery<br>☐ Via Express Delivery<br>☒ Via First Class Mail<br>☐ Other: _____ |

## RESPONDENT MARTELLI LAVORAZIONI TESSILI S.p.A.:

| | |
|---|---|
| Martelli Lavorazioni Tessili S.p.A.<br>181, via Emilia Ponente<br>40060 Toscanella<br>Italy | ☐ Via Hand Delivery<br>☐ Via Express Delivery<br>☒ Via First Class Mail<br>☐ Other: _____ |

**CERTAIN LASER ABRADED**                        **337-TA-930**
**DENIM GARMENTS**

## ON BEHALF OF RESPONDENT MODELOS YASIRO (TEPEJI DEL RIO) SA DE CV:

Stephen R. Smith, Esq.                  ☐ Via Hand Delivery
COOLEY LLP                          ☐ Via Express Delivery
1299 Pennsylvania Avenue, NW     ☒ Via First Class Mail
Suite 700                             ☐ Other: _____
Washington, DC 20004
(202) 842-7800

## ON BEHALF OF RESPONDENTS ROPA SIETE LEGUAS, INC.; ROPA SIETE LEGUAS, S.A. DE C.V.; AND PRIVATE LABEL TEHUACAN S. DE R.L. DE C.V.:

Janine A. Carlan, Esq.                 ☐ Via Hand Delivery
**ARENT FOX LLP**                     ☐ Via Express Delivery
1717 K Street, NW                    ☒ Via First Class Mail
Washington, DC 20006-5344       ☐ Other: _____
(202) 857-6000

5

14



**From:** **Hogge, Mark L.** mark.hogge@dentons.com
**Subject:** FW: Conflict Issue raised by Gap
**Date:** February 5, 2015 at 8:20 AM
**To:** Darryl Costin (darryl@revolaze.com) darryl@revolaze.com
**Cc:** Maheshwari, Shailendra K. shailendra.maheshwari@dentons.com, Stein, Steven J. steven.stein@dentons.com

Fyi...see the nastygram from Gap's new counsel. I have our General Counsel dealing with this issue, as Gap was cleared through our GC. No matters for Gap are being handled by the U.S. firm. We have what is called a Verein structure, so we are a different firm than the Canadian and European firms. I will advise you how this goes. I usually have the GC take over communications and any ensuing motion practice that may occur.

**DENTONS** ▶ Mark L. Hogge

D +1 202 408 6443  |  US Internal 26443
mark.hogge@dentons.com
Bio  |  Website

Dentons US LLP

SNR Denton is proud to join Salans and FMC as a founding member of Dentons.

Dentons is an international legal practice providing client services worldwide through its member firms and affiliates. This email may be confidential and protected by legal privilege. If you are not the intended recipient, disclosure, copying, distribution and use are prohibited; please notify us immediately and delete this copy from your system. Please see dentons.com for Legal Notices.

---

**From:** Chris Holland [mailto:cholland@ksrh.com]
**Sent:** Wednesday, February 04, 2015 5:15 PM
**To:** Hogge, Mark L.
**Subject:** Conflict Issue

Mark:

Thanks for speaking with me again on Monday morning.

As promised, we are continuing to look into the Dentons conflict issue I mentioned during our call, and presumably you are doing the same, since as I stated, it is Dentons that bears the fiduciary and ethical responsibilities to avoid these types of situations.

In order to facilitate your prompt, voluntary recusal, I will share with you what we have uncovered thus far, which includes: (1) your partner Paul Lalonde in your Toronto office is presently working with Gap's U.S. taxation and transactional personnel on Canadian Border Serviced File Number C-2011-004709, which involves significant import/export issues; (2) Mr. Lalonde's representation of Gap is ongoing, and has been active for nearly the entire pendency of the two disputes for which you are lead adverse counsel to Gap, ITC Investigation No. 337-TA-930 and *Revolaze, LLC v. The Gap, Inc.*, Case No. 1:14-cv-01821-PAG (N.D. Ohio); (3) it appears at least your French and Russian offices also have handled recently and/or are still handling import/export related issues for my client; and (4) it appears that the representation of my client stretches back to as early as 1993, through Dentons and various predecessor firms it has

Exhibit 14

acquired.

We are still investigating other venues of prior and ongoing work for Gap by Dentons, but just based on what we have found to date, it seems very clear that Dentons' conflicts software is not functioning properly, since none of the above conflicts were brought to Gap's attention prior to your undertaking adverse representation. (Indeed, at one point shortly after the Ohio case was served, your partners in San Francisco attempted to solicit other litigation defense work from Gap.)

Regardless of how these conflicts arose within -- and were overlooked by -- your firm, certainly no signed waiver agreement was sought or obtained from Gap prior to Dentons initiating either the Ohio or the ITC cases against its client. As a result, those matters should never have been undertaken by Dentons, and there is no way for you and your firm to continue being adverse to Gap in any capacity, or even to have any substantive communications regarding those matters with anyone adverse to Gap.

We therefore look forward to your firm's immediate, voluntary withdrawal from both the above-referenced Ohio case, and the ITC investigation (at least as it pertains to Gap).

Please be advised that separate from the demand that you immediately withdraw, Gap reserves all of its other rights against Dentons, including, but not limited to, the right to seek reimbursement of the substantial legal fees Dentons has improperly caused its client to incur in connection with the Ohio and ITC matters.

Very truly yours,

CTH



Christopher T. Holland
Keller, Sloan, Roman & Holland LLP
555 Montgomery Street, 17th Floor
San Francisco, CA 94111
415-249-8330
415-249-8307 Direct
415-249-8333 Fax
cholland@ksrh.com
www.ksrh.com

15

**From:** **Hogge, Mark L.** mark.hogge@dentons.com
**Subject:** FW: Conflict Issue raised by Gap
**Date:** February 5, 2015 at 8:20 AM
**To:** Darryl Costin (darryl@revolaze.com) darryl@revolaze.com
**Cc:** Maheshwari, Shailendra K. shailendra.maheshwari@dentons.com, Stein, Steven J. steven.stein@dentons.com



Fyi...see the nastygram from Gap's new counsel. I have our General Counsel dealing with this issue, as Gap was cleared through our GC. No matters for Gap are being handled by the U.S. firm. We have what is called a Verein structure, so we are a different firm than the Canadian and European firms. I will advise you how this goes. I usually have the GC take over communications and any ensuing motion practice that may occur.

**DENTONS** ▸ Mark L. Hogge

D +1 202 408 6443   |   US Internal 26443
mark.hogge@dentons.com
Bio   |   Website

Dentons US LLP

SNR Denton is proud to join Salans and FMC as a founding member of Dentons.

Dentons is an international legal practice providing client services worldwide through its member firms and affiliates. This email may be confidential and protected by legal privilege. If you are not the intended recipient, disclosure, copying, distribution and use are prohibited; please notify us immediately and delete this copy from your system. Please see dentons.com for Legal Notices.

---

**From:** Chris Holland [mailto:cholland@ksrh.com]
**Sent:** Wednesday, February 04, 2015 5:15 PM
**To:** Hogge, Mark L.
**Subject:** Conflict Issue

Mark:

Thanks for speaking with me again on Monday morning.

As promised, we are continuing to look into the Dentons conflict issue I mentioned during our call, and presumably you are doing the same, since as I stated, it is Dentons that bears the fiduciary and ethical responsibilities to avoid these types of situations.

In order to facilitate your prompt, voluntary recusal, I will share with you what we have uncovered thus far, which includes:  (1) your partner Paul Lalonde in your Toronto office is presently working with Gap's U.S. taxation and transactional personnel on Canadian Border Serviced File Number C-2011-004709, which involves significant import/export issues; (2) Mr. Lalonde's representation of Gap is ongoing, and has been active for nearly the entire pendency of the two disputes for which you are lead adverse counsel to Gap, ITC Investigation No. 337-TA-930 and *Revolaze, LLC v. The Gap, Inc.*, Case No. 1:14-cv-01821-PAG (N.D. Ohio); (3) it appears at least your French and Russian offices also have handled recently and/or are still handling import/export related issues for my client; and (4) it appears that the representation of my client stretches back to as early as 1993, through Dentons and various predecessor firms it has

Exhibit 15

acquired.

We are still investigating other venues of prior and ongoing work for Gap by Dentons, but just based on what we have found to date, it seems very clear that Dentons' conflicts software is not functioning properly, since none of the above conflicts were brought to Gap's attention prior to your undertaking adverse representation.  (Indeed, at one point shortly after the Ohio case was served, your partners in San Francisco attempted to solicit other litigation defense work from Gap.)

Regardless of how these conflicts arose within -- and were overlooked by -- your firm, certainly no signed waiver agreement was sought or obtained from Gap prior to Dentons initiating either the Ohio or the ITC cases against its client.  As a result, those matters should never have been undertaken by Dentons, and there is no way for you and your firm to continue being adverse to Gap in any capacity, or even to have any substantive communications regarding those matters with anyone adverse to Gap.

We therefore look forward to your firm's immediate, voluntary withdrawal from both the above-referenced Ohio case, and the ITC investigation (at least as it pertains to Gap).

Please be advised that separate from the demand that you immediately withdraw, Gap reserves all of its other rights against Dentons, including, but not limited to, the right to seek reimbursement of the substantial legal fees Dentons has improperly caused its client to incur in connection with the Ohio and ITC matters.

Very truly yours,

CTH



Christopher T. Holland
Keller, Sloan, Roman & Holland LLP
555 Montgomery Street, 17th Floor
San Francisco, CA 94111
415-249-8330
415-249-8307 Direct
415-249-8333 Fax
cholland@ksrh.com
www.ksrh.com

16

**From:** "Hogge, Mark L." <mark.hogge@dentons.com>
**Subject: FW: RevoLaze Round up - Denimatrix , Buffalo, Diesel, Guess, Chrystal and more on the Gap DQ motion that will be coming.**
**Date:** February 20, 2015 at 11:42:48 AM EST
**To:** "Darryl Costin (darryl@revolaze.com)" <darryl@revolaze.com>
**Cc:** "Maheshwari, Shailendra K." <shailendra.maheshwari@dentons.com>, "Jackson, Nicholas H." <nicholas.jackson@dentons.com>

Darryl,

Denimatrix - (Robert Forman) fyi from Denimatrix below.  The reason that we brought them in is that they are a source, thus they have denim abrasion files, Laser model nos and manuals, and volume nos.  So we will need to get some discovery from them before we let them out.

Buffalo (Mike Hassan) - they do not want to pay 100k and would rather pay 45¢ per unit and 20k on past.  They have 54,199  units x .45 = $24,389.55

Diesel (Tony Shaw) - they offer 20¢ per unit.  Past U.S. sales (through 2014) is 34,143 and in Mexico / Turkey / China  is 5,239 = 39,382 .  For 2105 thus far in the U.S. actual is 5418 and in Mexico / Turkey / China actual is 2036 and forcasting to the end of 2015 in the U.S. is 24,512 and in Mexico / Turkey / China is 5455.  2016 on  they forecast growth at 10-15%.

Guess (Steve Smith)- they will not allow us to advise you of their nos except to say that their past nos are a few percentage points of the Guess product line. They are not going to use Lasers going forward, but want don't want to take a license or consent order.  They want to pay a lump sum and advise their suppliers don't laser.  I recommend a dollar a unit.

Chrystal - I spoke with Pete Su about their latest round.  They have stopped talking numbers and are reiterating their "poor me" line.  Pete recommends that we get on the phone with them to determine what they are thinking.

Gap - we expect them to file a motion to disqualify us, probably next week.  Our GC will handle a phone call on Monday with their counsel.  Our GC cleared conflicts.  Gap signed a retainer acknowledging that they only hired Dentons Canada and not Dentons U.S.  They are now denying that they tried to extort a low royalty with the threat of a conflict fight…I am not kidding. Gap attorney Chris Holland is spinning things now.  Mr. Holland has not made an appearance at the ITC, though he represented that he was lead counsel to me.

**DENTONS**  Mark L. Hogge

D +1 202 408 6343   |   US Internal 26443
mark.hogge@dentons.com
Bio   |   Website

Dentons US LLP

SNR Denton is proud to join Salans and FMC as a founding member of Dentons.

Dentons is an international legal practice providing client services worldwide through

Exhibit 16

its member firms and affiliates. This email may be confidential and protected by legal privilege. If you are not the intended recipient, disclosure, copying, distribution and use are prohibited; please notify us immediately and delete this copy from your system. Please see dentons.com for Legal Notices.

17

**From:** **Steven Stein**  sjstein2@gmail.com
**Subject:** At Global Law Firm Dentons, Strategy Is to Go Big - The Wall Street Journal.
**Date:** April 13, 2015 at 8:33 AM
**To:** Steven J. Stein  steven.stein@dentons.com

**At Global Law Firm Dentons, Strategy Is to Go Big**

http://www.wsj.com/articles/at-global-law-firm-dentons-strategy-is-to-go-big-1428877996

Download the Wall Street Journal app here: WSJ.

Sent from my iPad

Exhibit 17

# THE WALL STREET JOURNAL.

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers visit
http://www.djreprints.com.

http://www.wsj.com/articles/at-global-law-firm-dentons-strategy-is-to-go-big-1428877996

BUSINESS | LAW | LAW JOURNAL

# At Dentons, Strategy Is to Go Big

Law firm says it won't get hemmed in by conflicts as it bulks up to become a one-stop shop

By SARA RANDAZZO

April 12, 2015 6:33 p.m. ET

Through back-to-back mergers in China and the U.S., Dentons has transformed itself into the largest law firm in the world by head count, with more than 6,600 lawyers and professionals.

And it shows no sign of stopping. "There is no logical end," said Elliott Portnoy, Dentons's global chief executive officer, on how big the firm might become. "We're going to be driven by our strategy."

That strategy, which has drawn skepticism from industry analysts and rivals, involves modeling Dentons more after a "Big Four" accounting firm than after a typical law firm. In doing so, the firm hopes to become a one-stop shop for big corporations and small businesses alike.

Last week, Dentons said it agreed to merge with McKenna Long & Aldridge LLP, a firm with 430 lawyers and professionals known for government contracts and public-policy work. In January, it announced a combination with the largest law firm in mainland China, 4,000-lawyer Dacheng.

Dentons is itself the product of a three-way combination of Canada-based Fraser Milner Casgrain LLP, Salans LLP in Europe, and SNR Denton, which was formed in a 2010 cross-Atlantic merger.

Dentons's global chairman, Joseph Andrew, says the firm hopes to disprove a widespread belief that once a law firm gets past a certain size, conflicts of interest are inevitable, requiring it to forgo an assignment for one client that could cut against the interest of another. "What we're trying to do is take these myths that have

gathered up in the legal profession and simply say [they're] not true," he said.



Joseph Andrew, global chairman of Dentons, said he's trying to disprove the long-held belief that conflicts prevent law firms from growing past a certain size. *PHOTO: MATT ROTH FOR THE WALL STREET JOURNAL*

A way around the conflict issue, he said: simply chase a broader array of work in each city. He said that in each legal market, there's always going to be more work to capture that won't create conflicts.

The legal market is becoming increasingly segmented. While revenue at large, corporate law firms rose by close to 5% last year, a small group of elite law firms—many of which have benefited from the recent boom in mergers-and-acquisitions work—is outpacing the rest.

Unlike many of these elite firms, Dentons is positioning itself to do more routine, low-margin work for clients in addition to so-called bet-the-company matters, say Messrs. Portnoy and Andrew.

That includes representing individuals in areas like trust and estate work and entrepreneurs facing small-business issues. In January, it absorbed a six-lawyer New York firm focused on work for tech startups and venture-backed companies.

"It fit absolutely perfectly within an existing firm that also does multibillion deals," Mr. Portnoy said. Even some skeptics agree that Dentons's splashy acquisitions have improved its name recognition. But in a field that often prides itself on prestige over market penetration, some industry watchers question how such fast growth will aid the firm's partners or clients.

"Growth is not an end in itself," said legal-market analyst and

Case: 1:16-cv-01080-BYP  Doc #: 1-1  Filed: 05/04/16  212 of 282.  PageID #: 217

1/26/16, 4:26 PM

consultant Jordan Furlong. The question that Dentons needs to answer for clients, he said, is: "What end are you trying to achieve through the tactic of getting large?"

Among the firm's challenges is integrating far-flung partnerships, often with differing types of compensation systems. To make the firm's strategy work, clients need to be convinced that a Dentons lawyer in Dubai is as competent as one in Washington, industry watchers say.

"How many clients do they have who need these services in all these places?" said Aric Press, a partner at law firm consulting group Bernero & Press and former editor of the American Lawyer magazine. Dentons, for instance, will have 125 offices in more than 50 countries once its recent combinations are complete, everywhere from Belgium to South Africa.

Dentons said two of its clients are served by more than 20 offices and that 24 of its top 100 clients use lawyers in 10 to 20 of its offices. Last year, the firm said, it handled 3,150 cross-regional matters.

When Dentons advised manufacturing company Molex on its $7.2 billion acquisition by Koch Industries Inc. in 2013, it turned to lawyers in 17 cities in the U.S., Europe and Asia. The firm advised Chinese company China Minmetals Corp. on the $5 billion acquisition of a mining project, with lawyers in Beijing working with those in six other offices around the world.

Dentons took in $1.275 billion in revenue last year, the firm said, not including about $400 million brought in by Dacheng in 2014. McKenna Long hasn't reported its 2014 financial data.

Dentons isn't the first firm with a strong U.S. presence to have global ambitions. Baker & McKenzie, which has more than 4,200 lawyers in 47 countries, began expanding around the globe in the 1950s. Unlike Dentons, most of its growth has been slow and steady, rather than driven by big mergers.

DLA Piper, formed in 2005 from a three-way merger of two U.S. firms and a British firm, is up to around 4,200 lawyers in more than 30 countries.

In a statement, Baker & McKenzie said Dentons's latest mergers add to proof that the legal market "is becoming more truly global," adding: "Clients want their lawyers to have the capability to work across borders, as they do."

Dentons's growth could be a sign of things to come. "I think we're going to see a 10,000-lawyer law firm within five years," said legal

consultant Peter Zeughauser. "The rules are being rewritten."

**Write to** Sara Randazzo at sara.randazzo@wsj.com

Copyright 2014 Dow Jones & Company, Inc. All Rights Reserved

This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our Subscriber Agreement and by copyright law. For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit www.djreprints.com.

18

**PUBLIC VERSION**

## UNITED STATES INTERNATIONAL TRADE COMMISSION

### Washington, D.C.

| | |
|---|---|
| In the Matter of<br><br>CERTAIN LASER ABRADED DENIM GARMENTS | Inv. No. 337-TA-930 |

**ORDER NO. 43:**      **GRANTING MOTION TO DISQUALIFY COUNSEL**

(May 7, 2015)

On March 11, 2015, Respondent The Gap, Inc. ("Gap") filed a motion seeking to disqualify Dentons US LLP ("Dentons US") as counsel for Complainants.  (Motion Docket No. 930-034.)  Gap says that Dentons US cannot continue to pursue a complaint against Gap at the ITC because it is a "portal" of the Swiss verein Dentons ("Dentons"), which represents Gap on fourteen open matters elsewhere.  (Mot. at 1; Mot. Mem. at 1, 3, 5.)  According to Gap, for more than two decades, Dentons and its predecessor firm[1] have represented Gap in multiple matters around the world, including a recent engagement involving a Canadian Border Services Agency customs audit.  (Mot. Mem. at 1, 4-10.)  Gap explains that not only does Dentons US have an ethical conflict, but Dentons' relationship with Gap means that Dentons has had ongoing and unfettered access to Gap's confidential and privileged information relevant to the claims and defenses in this Investigation, including Gap's "U.S. importation, exportation, financial, and taxation structure, records, and information" and accused products.  (Mot. at 1; Mot. Mem. at 1-3, 5-6, 8-10, 18; Jedrzejek Decl.; Johnson Decl.)  Thus, Gap says, any continued representation of Complainants by a Dentons "portal" prejudices Gap's ability to defend against Complainants' claims and to negotiate a settlement.  (*Id.*)

---

[1] Salans LLP.  (Mot. Mem. at 3-4; Mertens Decl. at ¶ 3.)  Salans LLP and SNR Denton merged with a third firm into the Swiss verein "Dentons."  (*Id.*; Mot., Ex. H.)

Exhibit 18

**PUBLIC VERSION**

Gap further points out that Dentons did not inform Gap of the conflict prior to filing suit on behalf of Complainants in the Northern District of Ohio or at the ITC. (Mot. Mem. at 11.) Instead, it was Gap who discovered the conflict at the end of January, 2015. (*Id.*; Scarr Decl.; Jedrzejek Decl.) In addition, Gap says that Dentons never sought to obtain a conflict waiver from Gap. (*Id.*; Jedrzejek Decl.) Gap argues that under Dentons' contract with Gap, California law should be applied to this situation and that "California law mandates Dentons' automatic disqualification from this proceeding." (Mot. Mem. at 3, 7-8, 12-13, 16-19.) Even if California law does not apply, the Gap alternatively argues that the ABA Model Rules of Professional Conduct, which Gap says the ITC has adopted, still require disqualification. (*Id.*) Gap says that it engaged in several weeks of negotiation with Dentons in an unsuccessful attempt to get Dentons US to withdraw as counsel. (Mot. Mem. at 11.)

On March 17, 2015, Complainants filed a motion seeking an extension of time for them to respond to the motion. (Motion Docket No. 930-036.) The undersigned provided Complainants with an extension. (Order No. 35.) Responses by the remaining parties, if any, were due March 23. None were received.

On March 30, 2015, the Commission Investigative Staff ("Staff") filed a motion seeking leave to file its response out of time. (Motion Docket No. 930-044.) Said motion is granted.[2] Staff relies on Commission precedent and the ABA Model Rules to argue that Gap has demonstrated that Dentons' representation of Complainants presents "a serious risk of taint to this investigation." (Staff Mot. at 4.) Staff also argues that Dentons Canada and Dentons US are both part of the Dentons verein structure, which Staff says is an "association" within the meaning of the Model Rules. (*Id.* at 5.) Staff concludes that unless there effectively was a pre-existing

---

[2] The undersigned notes that Staff believes its prior request was overlooked in Order No. 35. (Staff Mtn. at 1.) Any material perceived deficiencies in an Order should be promptly brought to the attention of the undersigned, *i.e.*, prior to the pertinent deadline so that they may be timely addressed.

**PUBLIC VERSION**

ethical screen, "the potential prejudice to Gap outweighs the prejudice to Complainants in not

having their choice of counsel." (*Id.*)

On March 30, Complainants opposed the motion, arguing that Dentons US is separate

from Dentons Canada LLP ("Dentons Canada"). (Opp. at 2, 5, 16-17.) As evidence of this

separation, Complainants say that Dentons' US and Canada "Legal Practices"[3]

- do not have access to each other's client files;
- do not share client confidential information unless acting "as co-counsel";
- do not share profits and losses; and
- are financially and operationally separate.

(*Id.* at 2, 8, 17; Reich Decl.)  As a result, Complainants argue, Dentons US is not counsel for Gap

and does not have an ethical conflict.  (Opp. at 2, 15.)  Furthermore, Complainants say that all of

the Dentons US attorneys and paralegals who have worked for Complainants confirmed that they

have not "accessed any files, or received any documents or information from any lawyer, at

Dentons Canada LLP or Dentons Europe LLP relating to Gap." (*Id.* at 8; Reich Decl.)  Thus,

Complainants say that there is effectively an ethical screen in place between Dentons US and

Dentons Canada and that Gap cannot be prejudiced.  (*Id.* at 22-23.)  In contrast, Complainants

argue, they will be greatly prejudiced if Dentons is disqualified and the public interest will be

affected.  (*Id.* at 25-30.)

In addition to their separate entity arguments, Complainants argue that the Dentons

Canada retainer agreement that Gap signed contains a provision waiving potential future

conflicts.  (Opp. at 1, 15, 18.)  Thus, they reason, if there had been a conflict, Gap consented in

advance.  (*Id.* at 8-9, 18.)  Complainants also say that they would be prejudiced if they were

deprived of counsel mid-way through the Investigation.  (*Id.* at 2.)  According to Complainants,

Gap only identified the conflict after it was "unsuccessful in obtaining a settlement[,]" "unable to

---

[3] Hereinafter, the undersigned will refer to Dentons' "Legal Practices[,]" not portals.

3

meaningfully contradict [Complainants'] allegations of infringement," and had "acknowledged that it had failed to properly identify suppliers of the infringing accused products." (*Id.* at 4.) Complainants argue that under Commission precedent, the ABA Model Rules govern here and not the California Rules of Professional Conduct. (*Id.* at 10-12.)

On April 3, 2015, Gap filed a motion seeking leave, which is hereby granted, to file a supporting reply. (Motion Docket No. 930-040.) Gap disputes Complainants' account of the facts relating to the timing of Gap's motion and Gap's conduct both during discovery and in settlement talks. (Reply at 12, 16 n.1; Holland Decl.; Olesek Decl.) In addition, Gap raises further bases for disqualification which it said it could not raise prior to issuance of Order No. 36.

First, Gap says the Funding Agreement between Longford Capital Fund I, LP and RevoLaze and its attachments (collectively, the "Funding Agreement") demonstrate that Dentons US disclosed to Complainants (at least as of February 2014) that it has a current conflict with Gap, as well as with Respondents Guess and Diesel. (Reply at 1, 3-4, 7, 14; *id.*, Holland Decl., Ex. F at Schedule 1 (Dentons US engagement agreement with Complainant Revolaze LLC disclosing current conflict with Gap[4]).) Second, Gap says that Dentons has a partial contingency fee arrangement giving it a heightened interest in the outcome of the Investigation, which Gap says increases the need to disqualify Dentons because Dentons "stands to directly benefit from its own unethical conduct." (*Id.*, Holland Decl., Ex. F at §§ 4.2(c) (identifying Dentons' share of "Proceeds"), 6.1(d) (reduced fees for portion of "Proceeds").) In addition, Gap questions the probity of Complainants' opposition in light of the specific admission made by Dentons US in



[4] Gap

(Reply, Holland Decl., Ex. F at Schedule 1 (excerpt).)

**PUBLIC VERSION**

the Funding Agreement. (*Id.* at 4-6, 8.) Gap also questions why Dentons disclosed the conflict

to Complainants but not to Gap. (*See, e.g., id.* at 5, 8, 11-12.) With respect to Complainants'

arguments regarding the separation between Dentons US and Dentons Canada, Gap responds

that there are deficiencies and inconsistencies in the number and substance of the declarations

provided by Dentons. (*Id.* at 15-16.) Finally, Gap argues that Complainants' argument

regarding prejudice is belied by their awareness and waiver of the conflict prior to bringing their

Complaint to the ITC. (*Id.* at 5, 8-9.)

On April 8, 2015, Complainants sought an extension of time to respond to Gap's reply

motion. (Motion Docket No. 930-041.) The undersigned granted this request. (Order No. 38.)

On April 17, 2015, Complainants' opposed Gap's motion for leave to file a reply, arguing

that Gap did not raise new matters for consideration and that "Gap's motion for leave to file a

reply is nothing more than a strategic maneuver to get the last word in." (Reply Opp. at 3-4, 9-

10.) Complainants also say that "Gap's proposed reply identifies no specific prejudice, or even

any prejudice at all." (*Id.* at 5.) Complainants also dispute Gap's criticism of the declarations

their counsel submitted and dispute the issue regarding disclosure of suppliers. (*See, e.g., id.* at

7.) With respect to the disclosure of the conflict in the Funding Agreement, Complainants say

that counsel later "received confirmation that no legal conflict existed." (*Id.* at 9; Hogge[5] Decl.)

Based on a review of the motion papers and responses thereto, the undersigned finds as

follows.

The authority to disqualify counsel derives from presiding officers' inherent power to

control their proceedings. *Certain Network Interface Cards and Access Points for Use in Direct

Sequence Spread Spectrum Wireless Local Area Networks and Products Containing Same*, Inv.

No. 337-TA-455, Order No. 26 at 3 (U.S.I.T.C., August 2, 2001) (reviewed and aff'd) ("*Network*

---

[5] Mark L. Hogge is a partner at Dentons US.

**PUBLIC VERSION**

*Interface*") (citing 5 U.S.C. § 556(c)(5) and (7); 19 C.F.R. § 201.15(a)).  However, this authority

has rarely been exercised, as disqualification of counsel is drastic and disfavored.  *Id.*; *Certain*

*Baseband Processor Chips and Chipsets, Transmitter and Receiver (Radio) Chips, Power*

*Control Chips, and Products Containing Same, Including Cellular Telephone Handsets*, Inv. No.

337-TA-543, Order No. 29 at 19 (U.S.I.T.C., March 9, 2006) ("*Baseband*").

 The American Bar Association's Model Rules of Professional Conduct ("Model Rules")

provide guidance in resolving motions to disqualify counsel, as reflected in Commission

precedent.  *Network Interface*, Order No. 26 at 4; *Baseband*, at 20; *Certain Ground Fault Circuit*

*Interrupters and Products Containing Same*, Inv. No. 337-TA-615, Order No. 17 at 4

(U.S.I.T.C., February 29, 2008).  The current Model Rules, which "reflect a national

consensus,"[6] are instructive here:

> *Client-Lawyer Relationship, Rule 1.0 Terminology*
> (c)  "Firm" or "law firm" denotes a lawyer or lawyers in a law partnership,
> professional corporation, sole proprietorship or other association authorized to
> practice law; or lawyers employed in a legal services organization or the legal
> department of a corporation or other organization.
>
>    * * *
>
> (e)  "Informed consent" denotes the agreement by a person to a proposed course
> of conduct after the lawyer has communicated adequate information and
> explanation about the material risks of and reasonably available alternatives to the
> proposed course of conduct.
>
>    * * *

---

[6] *Network Interface*, Order No. 26 at n.1 (quoting *Certain Salinomycin Biomass and Preparations Containing Same*, Inv. No. 337-TA-370, Order No. 13 at 3-5 (U.S.I.T.C., May 25, 1995) ("*Biomass*")).  Gap's argument that the California choice of law clause in its agreement with Dentons should govern was rejected in *Biomass*:

>  The Commission . . . has nation-wide jurisdiction.  Choice of law principles have not figured prominently in prior decisions at the Commission concerning disqualification of counsel. Therefore, the Commission is not placed in the classic situation of having to choose between the rules of its own jurisdiction and the rules of another jurisdiction.
>
>  The Commission's reviewing court, the Court of Appeals for the Federal Circuit, also has nation-wide jurisdiction.  In this case, the disqualification question does not arise from Mr. Kelber's desire to represent his client in a particular jurisdiction or before a particular district court.  Rather it arises because of his representation before the Commission. . . .

*Biomass*, at n.4.

**PUBLIC VERSION**

> *Client-Lawyer Relationship, Rule 1.7 Conflict Of Interest: Current Clients*
> (a) Except as provided in paragraph (b), a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if:
>> (1) the representation of one client will be directly adverse to another client; []
>
> * * *
>
> (b) Notwithstanding the existence of a concurrent conflict of interest under paragraph (a), a lawyer may represent a client if:
>> (1) the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client;
>> (2) the representation is not prohibited by law;
>> (3) the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal[7]; and
>> (4) each affected client gives informed consent, confirmed in writing.

Model Rules 1.0(c), (e), 1.7 (2013).

In addition, there are other considerations, as "[a] violation of the ethical rules does not result in per se disqualification of the attorney involved. Rather, the crucial issue is whether continued representation will cause prejudice to or adversely impact the rights of another party in the matter and whether such prejudice outweighs the prejudice caused by disqualification of another party's choice of counsel. Thus to warrant the severe sanction of disqualification, there must be a showing that the unethical conduct has somehow 'tainted' the investigation." *Certain Unified Communications Systems, Products Used with Such Systems, and Components Thereof*, Inv. No. 337-TA-598, Order No. 14 at 9-10 (U.S.I.T.C., September 25, 2007) (quotations and citations omitted) ("*Unified Communics.*").

Factors considered in making such a determination include the nature of the ethical violation, the prejudice to the parties, the effectiveness of counsel in light of the violation, the public's perception of the profession, and whether a disqualification motion was used as a means

---

[7] A tribunal is defined to include an administrative agency or other body acting in an adjudicative capacity. Model Rule 1.0(m).

**PUBLIC VERSION**

of harassment. *See Certain Network Interface Cards and Access Points for Use in Direct*

*Sequence Spread Spectrum Wireless Local Area Networks and Products Containing Same*, Inv.

No. 337-TA-455, Order No. 26 at 11 (U.S.I.T.C., Aug. 2, 2001) ("*Network Interface Cards*").

The first issue presented here is whether the Swiss verein "Dentons" is a "firm" or "law

firm" as defined by the Model Rules. Staff argues that it is. (Staff Mot. at 4.) Complainants

argue that Dentons US is sufficiently separate from the other Dentons Legal Practices that its

representation of Complainants is tantamount to representation by a separately named law firm.

(Opp. at 2, 5, 16-17.) Gap argues that the Swiss verein Dentons is "an incorporated membership

association" that does not have an equivalent form in the United States, but should be treated as

an association. (Mot. Mem. at 4, 1 (quoting *In re Project Orange Associates, LLC*, 431 B.R.

363, 368 (Bankr. S.D.N.Y., 2010) ("*Project Orange*")).)

Gap also argues that in one of the few instances where a U.S. court has looked at the

issue of conflicts with respect to a Swiss verein law firm, the court found that it would not be

possible for a law firm that "holds itself out to the world as one firm" to represent, via its two

component entities, both a debtor and creditor "without violating ethical standards." (Mot. Mem.

at 15 (quoting *Project Orange*, 431 B.R. at 371, n.3)).) Gap says that like the law firm in *Project*

*Orange*, Dentons holds itself out as a single law firm with a "seamless delivery of services[.]"

(Mot. Mem. at 4 (quoting Dentons' website at Mot. Exs. I, J), 14-15.) Thus, Gap argues, all of

Dentons' worldwide Legal Practices owe it an undivided duty of loyalty. (Mot. Mem. at 4, 16,

19, n. 8; Reply at 19-20.) Gap says that Dentons has breached that duty by taking on

representation adverse to Gap, and that this is true "under the rules of professional conduct of

any jurisdiction." (*Id.* at 19-20 (emphasis in original).)

**PUBLIC VERSION**

The parties dispute the significance of the Dentons US retainer agreement attached to the Funding Agreement, which identifies Gap as a conflict. The undersigned cannot fully credit Mr. Hogge's representations that he only intended to identify Gap "as a potential business conflict" for two reasons. (Reply Opp., Hogge Decl.) First, Dentons US specifically identified the conflict with Gap in its retainer agreement with Complainant Revolaze as an "existing conflict." (*See* Holland Decl., Ex. F at Schedule 1.) It is textbook contract law that the words in the final written agreement trump Mr. Hogge's subjective intent. The identification of Gap as an existing conflict serves as an admission that Dentons US did not, at the time when it took on representation of Complainants and entered into the Funding Agreement, believe that it was sufficiently separate from the other Legal Practices to be able to represent Complainants against Gap. (*See id.*, Schedule I at 2 (discussing terms for handling conflicts).) Second, Complainants' opposition papers show a lack of understanding of the nuances of the ABA Model Rules between current and former clients and when ethical screens may be implemented. This unfamiliarity with the rules undermines the persuasiveness of Mr. Hogge's later determination that Dentons US could proceed without conflict.

The undersigned finds that the definitions of "firm" or "law firm" are broad enough to include a Swiss verein structure. Model Rule 1.0. Dentons holds itself out to the public as a single law firm, but says that it is divided into "Legal Practices." Either way, the verein is an "other association authorized to practice law" or is made up of lawyers "employed in a legal services organization or the legal department of a corporation or other organization." Model Rule 1.0(c); *id.*, Comment 2. The undersigned finds that the ABA guidance here is particularly instructive, as it says that a factual scenario involving a direct conflict may be weighed differently than lesser situations:

**PUBLIC VERSION**

[2]  Whether two or more lawyers constitute a firm within paragraph (c) can depend on the specific facts.  For example, two practitioners who share office space and occasionally consult or assist each other ordinarily would not be regarded as constituting a firm.  However, if they present themselves to the public in a way that suggests that they are a firm or conduct themselves as a firm, they should be regarded as a firm for purposes of the Rules.  The terms of any formal agreement between associated lawyers are relevant in determining whether they are a firm, as is the fact that they have mutual access to information concerning the clients they serve.  Furthermore, it is relevant in doubtful cases to consider the underlying purpose of the Rule that is involved.  A group of lawyers could be regarded as a firm for purposes of the Rule that the same lawyer should not represent opposing parties in litigation, while it might not be so regarded for purposes of the Rule that information acquired by one lawyer is attributed to another.

(*Id.*)  Thus, in the event of a direct conflict such as the one presented here, the ABA would rather regard a group of lawyers as a firm—even if the case is "doubtful."  (*Id.*)  The undersigned concludes that the Swiss verein Dentons is a "firm" or "law firm" within the meaning of Model Rule 1.0(c).

Because this definition is met, the two Model Rules regarding conflicts with a current client and imputed conflicts among members of a firm apply here, since no party denies that, at a minimum, Dentons Canada has been representing Gap while Dentons US has been concurrently representing Complainants.  *See* Model Rules 1.7, 1.10.  Dentons Canada's representation of Gap is imputed to Dentons US.  Model Rule 1.10.  Dentons US is therefore banned under the Model Rules from helping Complainants bring claims against Gap in this Investigation.  Although the Model Rules permit such representation if the law firm obtains informed consent from both clients, Dentons US did not do so here.  Indeed, Dentons US asserts that it does not rely on an advance waiver for establishing that a conflict does not exist.  (Opp. at 21.)  Thus, it is the undersigned's determination that Dentons US has committed an ethical violation in the form of a concurrent conflict of interest.

10

**PUBLIC VERSION**

The second issue presented here is whether ethical violation discussed above has tainted the Investigation. *Unified Communics.*, at 9-10. The undersigned has considered the factors set forth in *Network Interface Cards* and concludes, for the reasons discussed below, that disqualification is warranted. The first factor – the nature of the ethical violation – weighs in favor of disqualification. Dentons owes Gap a duty of loyalty, yet it stands to benefit both in terms of legal fees and a share in certain proceeds by representing other clients who are seeking to bar Gap's imports into the U.S. Additionally, although Dentons apparently realized that there was a conflict, it did not attempt to obtain Gap's informed consent. This inaction shows disregard for the rules of professional conduct.

The undersigned must also consider potential remedies in assessing whether the nature of the conflict weighs in favor of disqualification. Complainants cite cases in which the Commission denied motions for disqualification and instead recommended that an ethical screen be put in place to safeguard against improper disclosure of client information. (Opp. at 23.) Notably, these cases all involved prior representations of clients – not current ones. Ethical walls, pre-existing or otherwise, are not considered by the ABA to be a viable remedy in this situation. The Model Rules do not provide for the implementation of an ethical wall unless the situation involves a prohibition based on a disqualified lawyer's association with a prior firm. Model Rule 1.10(2). Thus, even if the undersigned were to recommend that an ethical screen be put in place, Dentons would still be in violation of its ethical rules. Moreover, the ABA commentary repeatedly states that a law firm should withdraw from representation in the event of a direct conflict. *See, e.g.*, Model Rule 1.7, Comment 4.

Next, the undersigned must consider prejudice to both Complainants and Gap. In its briefing, Gap submits that its confidential and attorney-client information are at risk and that

11

**PUBLIC VERSION**

Dentons is violating the most basic duties it owes to Gap. (Mem. at 20.)  Dentons has submitted that its attorneys in this Investigation have not had access to any of Gap's confidential or privileged information.  Because there has not been a disclosure of information, the undersigned finds that the prejudice to Gap weighs against disqualification.

The undersigned further finds that the prejudice to Complainants also weighs against disqualification.  It is important that parties be able to choose and maintain counsel.  Additionally, as Complainants note, they have been working with Dentons US for more than 15 months. (Opp. at 26.)  During this time, Dentons US "has acquired knowledge about [Complainants'] business, intellectual property, and [litigation] strategies" and has "developed expertise regarding the factual and legal issues present in the current investigation." (*Id.*)  Complainants also assert that retaining new counsel would impose "significant and unnecessary costs." (*Id.* at 27.)  Accordingly, the prejudice to Dentons at this point in the Investigation would be severe.  This prejudice, however, is somewhat mitigated by the fact that the ethical conflict was disclosed to Complainant Revolaze, who nevertheless proceeded against Gap as a named Respondent.

The next factor, the public's perception of the profession is also significant.  Dentons holds itself out to the public as a unified global law firm in order to attract business (Mot., Exs. H, I, J), and Dentons' continued representation in the face of a direct conflict would both contradict this public image and impact negatively on the law profession as a whole.  With respect to the last factor, the undersigned finds that the consideration of whether a disqualification motion was used as a means of harassment weighs in favor of Complainants but does not overcome the other factors.  There is an undeniable tactical advantage to a respondent in disqualifying lead counsel.  However, as with the issue of prejudice, Complainants were fully

informed of and assumed this risk when they named Gap as a respondent. Although the undersigned concludes that several of the factors weigh against disqualification, this drastic remedy is appropriate in this case. The undersigned cannot condone the continued violation of an ethical rule and therefore disqualification is necessary. The undersigned concludes, under the circumstances presented here, that Dentons US may not continue to represent Complainants while Gap is a respondent in this Investigation.

Accordingly, Gap's motion to disqualify Dentons as counsel for Complainants (Motion Docket No. 930-034) is granted.

Within seven (7) business days of the date of this document, each party shall submit to the Office of the Administrative Law Judges a statement as to whether or not[8] it seeks to have any confidential portion of this document deleted from the public version. Any party seeking redactions to the public version must submit to this office two (2) copies of a proposed public version of this document pursuant to Ground Rule 1.11 with red brackets clearly indicating any portion asserted to contain confidential business information.

The parties' submissions may be made by facsimile and/or hard copy by the aforementioned date. In addition, an electronic courtesy copy is required pursuant to Ground Rule 1.3.2. The parties' submissions concerning the public version of this document need not be filed with the Commission Secretary.

**SO ORDERED.**

Charles E. Bullock
Chief Administrative Law Judge

---

[8] This means that parties that do not seek to have any portion redacted are still required to submit a statement to this effect.

13

CERTAIN LASER ABRADED
DENIM GARMENTS

337-TA-930

## PUBLIC CERTIFICATE OF SERVICE

I, Lisa R. Barton, hereby certify that the attached **ORDER** has been served by hand upon the Commission Investigative Attorney, Peter J. Sawert, Esq., and upon the following parties as indicated, on **June 30, 2015**.

Lisa R. Barton
Secretary to the Commission
U.S. International Trade Commission
500 E Street, SW, Room 112A
Washington, D.C. 20436

## ON BEHALF OF COMPLAINANTS REVOLAZE, LLC AND TECHNOLINES, LLC:

Steven F. Molo, Esq.
**MOLOLAMKEN LLP**
540 Madison Ave.
New York, NY 10022
(212) 607-8170

☐ Via Hand Delivery
☐ Via Express Delivery
☒ Via First Class Mail
☐ Other: _____

## ON BEHALF OF RESPONDENT ABERCROMBIE & FITCH CO.:

Andrew F. Pratt, Esq.
**VENABLE LLP**
575 7th Street, NW
Washington, DC 20004-1604
(202) 344-4389

☐ Via Hand Delivery
☐ Via Express Delivery
☒ Via First Class Mail
☐ Other: _____

1

**CERTAIN LASER ABRADED**                                     **337-TA-930**
**DENIM GARMENTS**

## ON BEHALF OF RESPONDENT AMERICAN EAGLE OUTFITTERS INC.:

Stephen J. Rosenman, Esq.                  ☐ Via Hand Delivery
**ROPES & GRAY LLP**                       ☐ Via Express Delivery
One Metro Center                           ☒ Via First Class Mail
700 12th Street NW, Suite 900              ☐ Other: _____
Washington, DC  20005
(202) 508-4773

## ON BEHALF OF RESPONDENTS THE BUCKLE, INC.; LUCKY BRAND DUNGAREES, INC.; AND DENIMATRIX S.A.:

D. Sean Trainor, Esq.                      ☐ Via Hand Delivery
**KIRKLAND & ELLIS LLP**                   ☐ Via Express Delivery
655  15th Street, NW                       ☒ Via First Class Mail
Washington, DC  20005                      ☐ Other: _____
(202) 879-5000

## ON BEHALF OF RESPONDENTS BUFFALO INTERNATIONAL ULC AND 1724982 ALBERTA ULC:

Gregory F. Ahrens, Esq.                    ☐ Via Hand Delivery
**WOOD, HERRON & EVANS, L.L.P**            ☐ Via Express Delivery
441 Vine Street                            ☒ Via First Class Mail
Cincinnati, OH 45202                       ☐ Other: _____
(513) 241-2324

## ON BEHALF OF RESPONDENTS DIESEL S.p.A. AND DENIM SERVICE S.p.A.:

Anthony W. Shaw, Esq.                      ☐ Via Hand Delivery
**ARENT FOX LLP**                          ☐ Via Express Delivery
1717 K Street, NW                          ☒ Via First Class Mail
Washington, DC 20006-5344                  ☐ Other: _____
(202) 857-6000

**CERTAIN LASER ABRADED**                              **337-TA-930**
**DENIM GARMENTS**


## ON BEHALF OF RESPONDENT THE GAP, INC.:

Megan Whyman Olesek, Esq.                    ☐ Via Hand Delivery
**KENYON & KENYON LLP**                       ☐ Via Express Delivery
1801 Page Mill Road, Suite 210                ☒ Via First Class Mail
Palo Alto, CA 94304                           ☐ Other: _____
(650) 384-4700


## ON BEHALF OF RESPONDENT GUESS?, INC.:

Stephen R. Smith, Esq.                        ☐ Via Hand Delivery
**COOLEY LLP**                                ☐ Via Express Delivery
1299 Pennsylvania Avenue, NW, Suite 700       ☒ Via First Class Mail
Washington, DC 20004                          ☐ Other: _____
(202) 842-7800


## ON BEHALF OF RESPONDENTS H&M HENNES & MAURITZ AB AND H&M HENNES & MAURITZ L.P.:

Staci Jennifer Riordan, Esq.                  ☐ Via Hand Delivery
**NIXON PEABODY LLP**                         ☐ Via Express Delivery
555 West 5th Street, 46th Fl.                 ☒ Via First Class Mail
Los Angeles, CA 90013-1010                    ☐ Other: _____
(213) 629-6041


## ON BEHALF OF RESPONDENT ROBERTO CAVALLI S.p.A.:

Adam R. Hess, Esq.                            ☐ Via Hand Delivery
**VENABLE LLP**                               ☐ Via Express Delivery
575 7th Street, NW                            ☒ Via First Class Mail
Washington, DC 20004-1604                     ☐ Other: _____
(202) 344-4481


3

**CERTAIN LASER ABRADED**                                    **337-TA-930**
**DENIM GARMENTS**

## ON BEHALF OF RESPONDENT KOOS MANUFACTURING, INC.:

Brian K. Brookey, Esq.                          ☐ Via Hand Delivery
**TUCKER ELLIS LLP**                            ☐ Via Express Delivery
515 South Flower Street, 42nd Fl.               ☒ Via First Class Mail
Los Angeles, CA  90071-2223                     ☐ Other: _____
(213) 430-3400

## RESPONDENT MARTELLI LAVORAZIONI TESSILI S.p.A.:

Martelli Lavorazioni Tessili S.p.A.            ☐ Via Hand Delivery
181, via Emilia Ponente                         ☐ Via Express Delivery
40060 Toscanella                                ☒ Via First Class Mail
Italy                                           ☐ Other: _____

## ON BEHALF OF RESPONDENTS ROPA SIETE LEGUAS, INC.; ROPA SIETE LEGUAS, S.A. DE C.V.; PRIVATE LABEL TEHUACAN S. DE R.L. DE C.V.; AND EROGLU GIYIM SANAYI TICARET A.S.:

Janine A. Carlan, Esq.                          ☐ Via Hand Delivery
**ARENT FOX LLP**                               ☐ Via Express Delivery
1717 K Street, NW                               ☒ Via First Class Mail
Washington, DC 20006-5344                       ☐ Other: _____
(202) 857-6000

4

19

**From: Darryl Costin** darryl@revolaze.com
**Subject:** Re: We are Disqualified
**Date:** May 8, 2015 at 9:00 AM
**To:** Mark Hogge L. mark.hogge@dentons.com



YOU GOT TO BE KIDDING ME!!!

Darryl Costin, Ph.D
CEO, RevoLaze, LLC
29007 Clemens Rd.
Westlake, OH 44145
440-617-0502
www.revolaze.com

Confidentiality Notice: This transmission and any accompanying documents or attachments contain confidential information from RevoLaze, LLC  which is legally privileged, confidential and exempt from disclosure under applicable law and executed confidentiality agreement(s). If you ar for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution, forwarding, or copying of this communication is strictly prohibited.  If you have received this communication in error, please notify the sender immediately by e-mail, or by tele immediately. Thank you.

On May 8, 2015, at 8:33 AM, Hogge, Mark L. <mark.hogge@dentons.com> wrote:

> We do not have the opinion yet, but that is the entry in the ITC record.  We should have the opinion shortly to see what this means.

<image001.png>

Mark L. Hogge

D +1 202 408 6443  |  US Internal 26443
mark.hogge@dentons.com
Bio  |  Website

Dentons US LLP

SNR Denton is proud to join Salans and FMC as a founding member of Dentons.

Dentons is an international legal practice providing client services worldwide through its member firms and affiliates. This email may be confidential and protected by legal privilege. If you are not the intended recipient, dis prohibited; please notify us immediately and delete this copy from your system. Please see dentons.com for Legal Notices.

Exhibit 19

20

**From: Darryl Costin** darryl@revolaze.com
**Subject:** Need Dentons Corporation
**Date:** May 11, 2015 at 3:38 PM
**To:** Mark Hogge L. mark.hogge@dentons.com
**Cc:** Maheshwari Shailendra K. shailendra.maheshwari@dentons.com, Jackson, Nicholas H. nicholas.jackson@dentons.com



Mark,

I tried to call you by phone Saturday and have not heard back but I am in a big jam.  I do not want to settle with the GAP under these circumstances.  I can agree to an appeal but am extremely concerned about the timing.

Therefore I have secured counsel to take over the ITC portion of the case (Dentons will still be my counsel for the original District Court action).

We are now facing severe deadlines, and I need for you guys to meet with our new group to pass on your knowledge of the case to get them up to speed as quickly as possible.  Can you meet with MoloLamken LLP, Graham Gerst and Cindy Ahn Thursday at your officers to start this process?  It is absolutely critical.

Please call or respond by email asap.

Darryl


Darryl Costin, Ph.D
CEO, RevoLaze, LLC
29307 Clemens Rd.
Westlake, OH 44145
440-617-0502
www.revolaze.com

Confidentiality Notice: This transmission and any accompanying documents or attachments contain confidential information from RevoLaze, LLC  which is legally privileged, confidential and exempt from disclosure under applicable law and executed confidentiality agreement(s). If you are not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution, forwarding, or copying of this communication is strictly prohibited.  If you have received this communication in error, please notify the sender immediately by e-mail, or by telephone at (440)617-0502, and delete the original message immediately. Thank you.

Exhibit 20

21

**From:** **Stein, Steven J.**  steven.stein@dentons.com
**Subject:**
**Date:** May 11, 2015 at 4:33 PM
**To:** Darryl Costin (darryl@revolaze.com)  darryl@revolaze.com
**Cc:** Hogge, Mark L.  mark.hogge@dentons.com, Maheshwari, Shailendra K.  shailendra.maheshwari@dentons.com, wfarrell@longfordcapital.com



Darryl:

Mark has forwarded your request that we meet with your new counsel and asked that I reply to make arrangements so we can do so.  As you are aware, the firm is owed for fees and expenses that are unpaid and I have asked our accounting department to calculate the balance including adding back to the discounted rates agreed as we may no longer have the opportunity to earn the success fee into which capture of the discount (plus possible premium) was built.

The current balance due is, in round numbers, just under $ 1 Mio based on time spent on your matter for which we have not been paid.  The "additional add back" will of course increase the amount due. We expect to have a final invoice not later than Thursday of this week.

We appreciate your confidence in us as counsel for the district court which, as a practical matter, involves little to do at this time.  We will consider the appropriateness of this assignment in view of the holding of the ALJ on disqualification.  We also appreciate your willingness to cooperate in an appeal of the ruling and your approval of our choice of Williams & Connelly.

Please advise MoloLamken LLP, Graham Gerst and Cindy Ahn that we will revert to them when the foregoing has been satisfactorily resolved.  (A copy of this letter is being provided to Longford Capital.)

Sincerely,
Steven J. Stein

**DENTONS** ▶  Steven J. Stein

D +1 212 398 4879  |  US Internal 14879
steven.stein@dentons.com
Bio  |  Website

Dentons US LLP

SNR Denton is proud to join Salans and FMC as a founding member of Dentons.

Dentons is an international legal practice providing client services worldwide through its member firms and affiliates. This email may be confidential and protected by legal privilege. If you are not the intended recipient, disclosure, copying, distribution and use are prohibited; please notify us immediately and delete this copy from your system. Please see dentons.com for Legal Notices.

Exhibit 21

ALL-STATE® LEGAL 800-222-0510 EO11-1C RECYCLED

22



**From: Graham Gerst** ggerst@giplg.com
**Subject:** Transfer of documents
**Date:** May 11, 2015 at 10:24 PM
**To:** Mark Hogge L.  mark.hogge@dentons.com
**Cc:** Darryl Costin  darryl@revolaze.com

Dear Mark:

We need to get access to all the documents in the case, including:

-all confidential pleadings
-all written discovery (requests and responses)
-all production documents (including attorney coding/review information)
-all deposition transcripts and exhibits
-expert retention agreements
-expert declarations
-case-related correspondence
-any other case-related materials

Please provide these materials consistent with your professional obligations.

Because time is of the essence, please confirm that you will be able to provide these materials for delivery at our office by Wednesday morning (either by electronic mail, a secure website, or a Fed Exed storage media.  If Sharon would like to discuss file protocols, I can put her in contact with our paralegal.

Best regards,

Graham Gerst

C. Graham Gerst
GLOBAL IP LAW GROUP, LLC
233 South Wacker Drive
92d Floor
Chicago, Illinois 60606
Direct:     312.241.1504
Cell:        312.593.3629
Fax:         312.241.1524
ggerst@giplg.com

The contents of this message, including any attachment(s), may be subject to, among others, the attorney-client and work product privileges.  If this message has been received in error, please destroy.  Your receipt of this message is not intended to waive any applicable privilege.  This message should not be forwarded without permission of the author.  Any tax advice contained in this email was not intended to be used, and cannot be used, by you (or any other taxpayer) to avoid penalties under the Internal Revenue Code of 1986, as amended.

Exhibit 22

23

**From:** **Hogge, Mark L.** mark.hogge@dentons.com  📎
**Subject:** RE: Transfer of documents
**Date:** May 12, 2015 at 8:25 AM
**To:** Graham Gerst ggerst@giplg.com
**Cc:** Darryl Costin darryl@revolaze.com



Dear Graham,

You have all case related correspondence on your e-mail server under Cindy's name.  She has the case related correspondence since her move.  As far as any other case related materials go, that will be in the discovery, pleadings, and case correspondence.

**DENTONS**▶  Mark L. Hogge

    D +1 202 408 6443  |  US Internal 26443
    mark.hogge@dentons.com
    Bio  |  Website

    Dentons US LLP

    SNR Denton is proud to join Salans and FMC as a founding member of Dentons.

    Dentons is an international legal practice providing client services worldwide through its member firms and affiliates. This email may be confidential and protected by legal privilege. If you are not the intended recipient, disclosure, copying, distribution and use are prohibited; please notify us immediately and delete this copy from your system. Please see dentons.com for Legal Notices.

---

**From:** Graham Gerst [mailto:ggerst@giplg.com]
**Sent:** Monday, May 11, 2015 10:24 PM
**To:** Hogge, Mark L.
**Cc:** Darryl Costin
**Subject:** Transfer of documents

Dear Mark:

We need to get access to all the documents in the case, including:

-all confidential pleadings
-all written discovery (requests and responses)
-all production documents (including attorney coding/review information)
-all deposition transcripts and exhibits
-expert retention agreements
-expert declarations
-case-related correspondence
-any other case-related materials

Please provide these materials consistent with your professional obligations.

Because time is of the essence, please confirm that you will be able to provide these materials for delivery at our office by Wednesday morning (either by electronic mail, a secure website, or a Fed

Exhibit 23

Exed storage media.  If Sharon would like to discuss file protocols, I can put her in contact with our paralegal.

Best regards,

Graham Gerst

C. Graham Gerst
GLOBAL IP LAW GROUP, LLC
233 South Wacker Drive
92d Floor
Chicago, Illinois 60606
Direct:   312.241.1504
Cell:     312.593.3629
Fax:                 312.241.1524
ggerst@giplg.com

The contents of this message, including any attachment(s), may be subject to, among others, the attorney-client and work product privileges.  If this message has been received in error, please destroy.  Your receipt of this message is not intended to waive any applicable privilege.  This message should not be forwarded without permission of the author.  Any tax advice contained in this email was not intended to be used, and cannot be used, by you (or any other taxpayer) to avoid penalties under the Internal Revenue Code of 1986, as amended.

24

PRIVILEGED - ATTORNEY WORK PRODUCT

# ESTIMATED ITC BUDGET - REVOLASE

| Timeline by Month | Tasks | Estimated Legal Fees | Estimated Expenses | Proposed Team |
|---|---|---|---|---|
| Pre-suit Investigation + post filing (2 months pre-suit and 1 month post filing)<br><br>(Phase 1) | Identify and analyze patents to assert;<br>Identify importation evidence;<br>Obtain certified patent copies, file histories and assignments;<br>Draft declarations for domestic industry and infringement;<br>Draft ITC complaint;<br>Meet with OUII attorney to review complaint and revise accordingly;<br>File ITC complaint and await institution;<br>Collect documents and prepare first round of discovery to serve on respondents;<br>Draft public interest statement;<br>Liaise with client. | 300,000 | 50,000 | Hogge<br>Maheshwari<br>Bruton<br>Noronha<br>Norwood (Paralegal)<br><br>-------------<br>Stein |
| Month 1 (Phase 1) | Institution of ITC Action;<br>Serve first round of discovery;<br>Rrespond to first round of discovery;<br>Negotiate procedural schedule for items not set by ALJ;<br>Review and study ground rules;<br>Attend preliminary status conference and hearing;<br>Begin negotiating settlements and exclusion orders;<br>Negotiate procedural schedules for items not set by ALJ;<br>Review and study ground rules;<br>Liaise with client | 150,000 | 15,000 | Hogge<br>Maheshwari<br>Bruton<br>Noronha<br>Associate TBD<br>Norwood (Paralegal)<br><br>-------------<br>Stein (as needed) |
| Month 2 (Phase 1 and 2) | Continue responses to discovery;<br>Review respondents responses and draft additional discovery requests as needed;<br>Set claim construction positions and claim construction exchanges (some ITC cases will have claim construction hearings);<br>Review early prior art identified by respondents;<br>Participate in first settlement conference;<br>Continue negotiating settlements and exclusion orders;<br>Liaise with client | 250,000 | 15,000 | Hogge<br>Maheshwari<br>Bruton<br>Noronha<br>Associate TBD<br>Norwood (Paralegal)<br><br>-------------<br>Stein (as needed) |
| Month 3 (Phase 2) | Continue fact discovery;<br>Begin preparation for depositions;<br>Interactions with experts for infringement and domestic industry;<br>Contemplate factory inspections and if required notice inspections;<br>Continue negotiating settlements and exclusion orders;<br>Liaise with client | 200,000 | 75,000 | Hogge<br>Maheshwari<br>Bruton<br>Noronha<br>Associate TBD<br>Norwood (Paralegal)<br><br>-------------<br>Stein (as needed) |

Exhibit 24

### PRIVILEGED - ATTORNEY WORK PRODUCT

| Timeline by Month | Tasks | Estimated Legal Fees | Estimated Expenses | Proposed Team |
|---|---|---|---|---|
| Month 4 (Phase 2) | Begin fact depositions and continue service of and responses to discovery including 3rd party subpoenas; Participate in 2nd settlement conference; Continue negotiating settlements and exclusion orders; Continue interaction with experts; Liaise with client | 200,000 | 75,000 | Hogge Maheshwari Bruton Noronha Associate TBD Norwood (Paralegal) ------------- Stein (as needed) |
| Month 5 (Phase 2) | Continue fact depositions and continue discovery including taking of 3rd party depositions - including domestic industry discovery; Resolve discovery disputes via motion practice and argue before ALJ as required; Continue interaction with experts; Continue negotiating settlements and exclusion orders; Liaise with client | 200,000 | 100,000 | Hogge Maheshwari Bruton Noronha Associate TBD Norwood (Paralegal) ------------- Stein (as needed) |
| Month 6 (Phase 2) | Motions to compel and any additional discovery needed including final depositions; Claim construction hearing (possible); Continue interactions with experts including early work on reports; Continue negotiating settlements and exclusion orders; Liaise with client | 100,000 | 100,000 | Hogge Maheshwari Bruton Noronha Associate TBD Norwood (Paralegal) ------------- Stein (as needed) |
| Month 7 (Phase 3) | Prepare expert reports - initial; Study opposing parties reports and begin preparing rebuttal, including infringement and invalidity; Participate in 3rd settlement conference and prepare report; Continue settlement negotiations with parties; Liaise with client | 300,000 | 100,000 | Hogge Maheshwari Bruton Noronha Associate TBD Norwood (Paralegal) ------------- Stein (as needed) |
| Month 8 (Phase 3) | Prepare expert reports - rebuttal; Depositions - experts; Last written discovery as discovery closes as does expert discovery; Technology tutorial for Court; Draft any remaining motions to compel; Review all deposition transcripts and begin cataloging statements for oppositions to or use in summary determination motions; Continue settlement negotiations with parties; Liaise with client | 200,000 | 75,000 | Hogge Maheshwari Bruton Noronha Associate TBD Norwood (Paralegal) ------------- Stein (as needed) |
| Month 9 | Prepare Joint Stipulation of contested | 300,000 | 50,000 | Hogge |

**PRIVILEGED - ATTORNEY WORK PRODUCT**

| Timeline by Month | Tasks | Estimated Legal Fees | Estimated Expenses | Proposed Team |
|---|---|---|---|---|
| (Phase 3) | issues;<br>**** Draft summary determination motions (Summary Judgment) including domestic industry, infringement and validity;<br>Court Ordered Settlement Conference and report;<br>Exchange of exhibit and exhibit lists;<br>Begin hearing/trial preparations;<br>Continue settlement negotiations with parties;<br>Liaise with client | | | Maheshwari<br>Bruton<br>Noronha<br>Associate TBD<br>Norwood (Paralegal)<br><br>--------------<br>Stein (as needed) |
| Month 10<br>(Phase 4) | Direct exhibit submission;<br>Prepare objections to direct exhibits and responses to objections;<br>Rebuttal exhibit submission, responses and objections;<br>***Draft Pre-Trial statements and briefs;<br>Draft motions *in limine;*<br>Begin preparation of witnesses for hearing, including experts;<br>Negotiate final settlements and licenses;<br>Liaise with client | 250,000 | 75,000 | Hogge<br>Maheshwari<br>Bruton<br>Noronha<br>Associate TBD<br>Norwood (Paralegal)<br><br>--------------<br>Stein (as needed) |
| Month 11<br>(Phase 4) | Prepare responses to motions *in limine;*<br>Prepare Joint Witness List;<br>Draft responses to high priority witness list;<br>Attend Pre-trial conference;<br>Final witness preparations;<br>Conduct Trial/Hearing;<br>Begin preliminary efforts of post-hearing briefs;<br>Liaise with client | 500,000 | 150,000 | Hogge<br>Maheshwari<br>Bruton<br>Noronha<br>Associate TBD<br>Norwood (Paralegal)<br><br>--------------<br>Stein (as needed) |
| Month 12<br>(Phase 4) | Prepare post-hearing briefs and final exhibit lists;<br>Draft reply briefs | 150,000 | 50,000 | Hogge<br>Maheshwari<br>Bruton<br>Noronha<br>Associate TBD<br>Norwood (Paralegal)<br><br>--------------<br>Stein (as needed) |
| Month 13 | Await Decision;<br>Liaise with client | | | |
| Month 14 | Await Decision;<br>Liaise with client | | | |
| Month 15<br>(Phase 4) | Review Initial Determination and drafting of appeal to briefs to commission;<br>Liaise with client | 75,000 | 15,000 | Hogge<br>Maheshwari<br>Bruton<br>Noronha |

## PRIVILEGED - ATTORNEY WORK PRODUCT

| Timeline by Month | Tasks | Estimated Legal Fees | Estimated Expenses | Proposed Team |
|---|---|---|---|---|
| | | | | Associate TBD Norwood (Paralegal)<br>-------------<br>Stein (as needed) |
| Month 16 | Await Confirmation; Liaise with client | | | |
| Month 17 (Phase 4) | Target Date for Completion; General Exclusion Order issues and follow-up enforcement of same; Liaise with client | 25,000 | 5,000 | Hogge Maheshwari Norwood (Paralegal)<br>-------------<br>Stein (as needed) |
| | Phase 1 | 575,000 | 80,000 | |
| | Phase 2 | 825,000 | 350,000 | |
| | Phase 3 | 800,000 | 175,000 | |
| | Phase 4 | 1,000,000 | 295,000 | |
| | TOTAL OF ALL PHASES | 3,200,000 | 950,000 | |

## CONCURRENT DISTRICT COURT LITIGATION

| Timeline by Month | Tasks | Estimated Legal Fees | Estimated Expenses | Proposed Team |
|---|---|---|---|---|
| Filing of District Court Actions<br><br>Month 1<br><br>(Phase 1) | Utilize ITC efforts and draft notice pleadings in district courts for patent infringement; Await stay motions | 50,000 | 10-25,000 (depends on need for local counsel and filing fees of each action) | Hogge Maheshwari Noronha Norwood (Paralegal)<br>-------------<br>Stein |
| Month 2 | Await Stay Motions | | | |
| TBD | If case is reopened it will be for litigation of damages assuming no globalized settlement - we will have to revisit a budget for that at an appropriate time | | | |
| | TOTAL | 50,000 | 10-25,000 | |

** The above are estimated fees for the case.  However we endeavor to run every case in as streamlined and efficient manner as possible thereby attempting to reduce the spend as much as possible.  Expenses include items, including, but not limited to the following: experts, vendors for depositions and court reporting, travel expenses, creation of exhibits, reproduction services, electronic data collection and hosting, trial support including graphics, couriers, FedEx, etc. However, this case is unique in that expenses here may potentially overlap and be shared with the district court cases contemplated thus reducing the overall allocation to expenses.

25



**From:** Hogge, Mark L. mark.hogge@dentons.com
**Subject:** FW: Revolaze ITC budget
**Date:** September 4, 2014 at 5:29 PM
**To:** William P. Farrell, Jr. (wfarrell@longfordcapital.com) wfarrell@longfordcapital.com, Darryl Costin (darryl@revolaze.com) darryl@revolaze.com

Bill and Darryl, attached is my working budget.  In forecasting going forward, I reduced estimated fees to arrive at a sum of 3,289,584.80.  To agree with the original 3.2M I then reduced 90k in expenses.  But the expense column is now 192,152.30 over the estimated 950k and I think I found an addition error in phase 3.  I am thinking of stripping out the estimated expenses and keeping track of them in gross. Remaining expenses for the ITC case are 620,347.67.  From here on out the expenses are basically some travel, an expert (100k), court reporter for depositions (we will probably take 18 deps if all go forward), graphic artists for Markman tutorial and Direct testimony at trial, and technician for the hearing.   The 620k should handle that.

I factored in the latest invoice which you don't have yet, and am asking management to write off 100k on that invoice, for the cause as it were.  The last page has the actual nos for the concurrent District Court cases.  I did an allocation off of the latest invoice to get the District Court nos. So far the parties are requesting 30 day extensions.

Please review and lets discuss.

**DENTONS** ▶  Mark L. Hogge

D +1 202 408 6443   |   US Internal 26443
mark.hogge@dentons.com
Bio  |  Website

Dentons US LLP

SNR Denton is proud to join Salans and FMC as a founding member of Dentons.

Dentons is an international legal practice providing client services worldwide through its member firms and affiliates. This email may be confidential and protected by legal privilege. If you are not the intended recipient, disclosure, copying, distribution and use are prohibited; please notify us immediately and delete this copy from your system. Please see dentons.com for Legal Notices.

**From:** Jenkins, Sabra D.
**Sent:** Thursday, September 04, 2014 4:48 PM
**To:** Hogge, Mark L.
**Subject:**



Revolaze ITC Budget 9-
4-14.doc

Exhibit 25

**From:** Darryl Costin <darryl@revolaze.com>
**Date:** November 6, 2014 at 12:31:22 PM EST
**To:** "Nicholas H. Jackson" <nicholas.jackson@dentons.com>, "Maheshwari, Shailendra K."
<shailendra.maheshwari@dentons.com>, "Hogge, Mark L." <mark.hogge@dentons.com>
**Cc:** "Costin Jr. Darryl" <darryljr@revolaze.com>
**Subject: Fwd: Summary of Notes from Troy Moore's First Set of Document I Sent You**

As per my email below, I would subpoena Jennifer Park and James Hwang of Koos Manufacturing. And should we subpoena our friend, Bill Dinauer from Lasx Industries regarding the Koos meeting at Lasx. And we maybe we could subpoena LST and Jeanologia as well regarding lasers at Koos. Also, Koos bought out the interest of Adriano Goldschmied when he formed the AG brand and Adriano was a proponent of laser technology so maybe we can subpoena Adriano on his business dealings with Yul Ku.

Call me to discuss if you want.

Darryl


Darryl Costin, Ph.D
CEO, RevoLaze, LLC
29300 Clemens Rd.
Westlake, OH 44145
440-617-0502
www.revolaze.com

Confidentiality Notice: This transmission and any accompanying documents or attachments contain confidential information from RevoLaze, LLC  which is legally privileged, confidential and exempt from disclosure under applicable law and executed confidentiality agreement(s). If you are not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution, forwarding, or copying of this communication is strictly prohibited.  If you have received this communication in error, please notify the sender immediately by e-mail, or by telephone at (440)617-0502, and delete the original message immediately. Thank you.

Begin forwarded message:


**From:** Darryl Costin <darryl@revolaze.com>
**Subject: Summary of Notes from Troy Moore's First Set of Document I Sent You**
**Date:** October 30, 2014 at 2:31:26 PM EDT
**To:** "Jackson, Nicholas H." <nicholas.jackson@dentons.com>
**Cc:** "Maheshwari, Shailendra K." <shailendra.maheshwari@dentons.com>, "Mark Hogge L."
<mark.hogge@dentons.com>, Darryl Costin <darryljr@revolaze.com>

Nick,

I just wanted to note some of the dates from Troy's documents relating to communications with Koos and Gap.

They may be privileged attorney client confidential information but here are some highlights:

12/28/15, 4:17 PM

Exhibit 26

Koos:

May 2000 - Costin makes proposal to Yul Ku to commercialize our technology for whisker production at Koos and Ku accepts proposal with some modifications.

June 2000 - Jennifer Park from Koos sends sample garments for whiskers to Lasx and asks for meeting date at Lasx and covers James Hwang, VP Production at Koos.

July 28, 2000 - Yul Koo meets us at Lasx.

Date Uncertain - I also remember that Troy and I met Yul Ku in Los Angeles airport and he took us to his factory for a tour.

Gap:

August 1996 - Eric Goldstein sends us samples of waistband graphic to laze.

August 1996 - Troy sends Julie Kanberg (Gap attorney) confidentiality agreement which Eric Goldstein signs.

October 18, 1996 - Costin sends Eric Goldstein samples of laser etched logos on denim.

(GAP Business Cards in Troy's documents):  Julie Kanberg, Senior Attorney; Chris Choy, Merchandise Manager; Meg Harris. VP Women's Denim; Amy Hennisch, VP Product Development; Eric Goldstein, Director, Product Development.

May 28, 1997 - Julie Kanberg sends Troy draft of memo fo understaning (individual patent applications and serial numbers in exhibits).

Aug 14, 1997 - July Kanberg fax to Troy with Draft Letter of Intent to laser scribe fit name and size to inside waistband.

August 21, 1997 - Julie Kanberg fax to Troy re Worldwide exclusive license.

August 27, 1997 - Letter of Intent for Gap License

August 11 and 12, 1997 - meetings in New York between Gap and TechnoLines (Costin and Troy)

December 5, 1997 - Troy Letter to Julie Kanberg referencing the above meeting.

June 16, 1998 - Julie Kanberg sends Troy draft license agreement

September 16, 1998 - Troy sends Julie serial numbers of patent applications.

2008 - Also add the email  information I sent you earlier re the CEO of GAP's evaluation of denim jean samples Masonite handed him in San Francisco.

Darryl

Darryl Costin, Ph.D
CEO, RevoLaze, LLC
29300 Clemens Rd.
Westlake, OH 44145
440-617-0502
www.revolaze.com

Confidentiality Notice: This transmission and any accompanying documents or attachments
contain confidential information from RevoLaze, LLC  which is legally privileged, confidential
and exempt from disclosure under applicable law and executed confidentiality agreement(s).
If you are not the intended recipient, or the employee or agent responsible for delivering the
message to the intended recipient, you are hereby notified that any
dissemination, distribution, forwarding, or copying of this communication is strictly prohibited.
 If you have received this communication in error, please notify the sender immediately by
e-mail, or by telephone at (440)617-0502, and delete the original message immediately.
Thank you.

**From:** **Hogge, Mark L.** mark.hogge@dentons.com
**Subject:** Gap Settlement Discussions
**Date:** April 13, 2015 at 5:58 PM
**To:** Darryl Costin darryl@revolaze.com
**Cc:** Maheshwari, Shailendra K. shailendra.maheshwari@dentons.com,  Jackson, Nicholas H. nicholas.jackson@dentons.com



Gap has promised units this week.  Can you have Graham tell Gap counsel, the frame work of

50 cents a unit on the past, 25 - 20 - 15 , locked in by MFNs, etc.   We would like to accelerate the discussions and try and stop the expensive high stakes desparate motion practice of Gap.  It is a drag on OUII and the other respondents.

Exhibit 27

28

**From:** **Hogge, Mark L.** mark.hogge@dentons.com
**Subject:** GAP DQ
**Date:** May 8, 2015 at 1:53 PM
**To:** Darryl Costin (darryl@revolaze.com) darryl@revolaze.com,  William P. Farrell, Jr. (wfarrell@longfordcapital.com) wfarrell@longfordcapital.com
**Cc:** Maheshwari, Shailendra K.  shailendra.maheshwari@dentons.com

Darryl and Bill:

I can be reached over the weekend at 703 444 3805 if there is anything I can do to help.  If you want Dentons to stay in the ITC case, GAP needs to be out this weekend.

The situation is simple from Judge Bullock's point of view.  Gap has to be out of the case for us to continue with the ITC matter.  The message is to Gap as well.  This is the one time that GAP has to capitalize on its strategy.  Gap does not have big numbers with Crystal out of the picture.

If that is not going to happen this weekend, Monday at the latest, we need to transition the work, Monday or Tuesday.  Once we transition the work, the message to GAP will be that their window of opportunity is gone.

If they want out, then they need to withdraw their claim of conflict, and agree to complete redaction of Order 43.

**DENTONS** ▶ Mark L. Hogge

D +1 202 408 6443   |   US Internal 26443
mark.hogge@dentons.com
Bio   |   Website

Dentons US LLP

SNR Denton is proud to join Salans and FMC as a founding member of Dentons.

Dentons is an international legal practice providing client services worldwide through its member firms and affiliates. This email may be confidential and protected by legal privilege. If you are not the intended recipient, disclosure, copying, distribution and use are prohibited; please notify us immediately and delete this copy from your system. Please see dentons.com for Legal Notices.

Exhibit 28

29

RevoLaze, LLC Confidential Information

# USITC Investigation 337-TA-930
# In Re: Laser Abraded Denim

Settlement Negotiation Meetings

November 2014

Confidential  -  Fed. R. Civ. P. 408 Communication

Exhibit 29

# RevoLaze Objectives

- Advance the use of lasers in the denim jeans industry

- Offer manufacturing processes for the production of denim garments that are: 1) healthy and safe for workers; 2) environmentally friendly; 3) respectful of our finite natural resources; and 4) efficient and cost effective

- Support the effort of the denim jeans industry at all stages of the supply chain

- Achieve an acceptable outcome of the ITC and district court actions

RevoLaze, LLC Confidential Information

# RevoLaze Invented Laser Abrasion of Denim

Only a handful of patents in the world disclose the method to abrade denim with a laser to create the worn look to replace the sandblast and hand-sanding processes

**And RevoLaze owns every single one of them**

RevoLaze, LLC Confidential Information

# Settlement Discussion

It's comprised of:

1. Past Damages over 6 years
2. Future Royalties for the next 7 years

RevoLaze, LLC Confidential Information

RevoLaze, LLC Confidential Information

# Past Damages

**Table 1.  Past Damages Analysis Regarding Imported Laser Abraded Denim (For the Entire U.S. Imported Denim Garment Market)**

| Years | 2009-2014 |
|---|---|
| Jeans Imported into U.S. - 2009 - 2014 (000)[1] | 2,946,000 |
| Abraded Jeans Imported into U.S - 2009-2014 (000)[2] | 1,973,820 |
| Laser Share of Abraded Market (%)[3] | 5% |
| Laser Abraded Jeans Imported into the U.S. (000) | 98,691 |
| Average Price of Jeans Sold in U.S. [4] | $37.41 |
| Past Royalty Owed at 3% of Sales Price (000)[5] | $110,761 |

[1] Estimated from "SJ Sourcing Journal", September 2013, Judith Russell.

[2] Estimated from "Biowash Novozymes Market Insight Study on Trends  in the Laundry Industry", Novoz

[3] Jeanologia reports that it  sold some 4,500 lasers during that period

[4] Average price of jeans sold in US was $37.41 according to US Denim Market Report.

[5] Does not include economic relief from treble and punitive damages.

RevoLaze, LLC Confidential Information

# Future Royalties

**Table II. Future Royalty Analysis Regarding Imported Laser Abraded Denim (For the Entire U.S. Imported Denim Garment Market)**

| Year | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 |
|---|---|---|---|---|---|---|---|
| Jeans Imported into U.S. (000)[1] | 491,000 | 491,000 | 491,000 | 491,000 | 491,000 | 491,000 | 491,000 |
| Abraded Jeans Imported into U.S. (000)[2] | 328,970 | 328,970 | 328,970 | 328,970 | 328,970 | 328,970 | 328,970 |
| Laser Share of Abraded Market (%)[3] | 15 | 20 | 25 | 30 | 35 | 40 | 40 |
| Laser Abraded Jeans Imported into U.S. (000) | 49,346 | 65,794 | 82,243 | 98,691 | 115,140 | 131,588 | 131,588 |
| Average Price of Jeans Sold in U.S. (000) | $37.41 | $37.41 | $37.41 | $37.41 | $37.41 | $37.41 | $37.41 |
| Royalty at 3% of Sales Price ($000)[4] | $55,380 | $73,841 | $92,301 | $110,761 | $129,221 | $147,681 | $147,681 |

[1] Estimaged from "SJ Sourcing Journal, September 2013, Judith Russell

[2] Estimated from "Biowash Novozymes Market Insight Study on Trends in the Laundry Industry", Novozymes.

[3] Anticipated growth as a result of increasing popularity in use of laser abrasion, due, in part, to health, environmental, and ecological risks associated with hand-sanding and chemical treatments. Jeanologia alone sold 4,500 lasers with over 600 million unit annual capacity and with continuing sales of 70 lasers/month.

[4] Average price of jeans sold in US was $37.41 according to US Denim Market Report. Ignores anticipated increases in price over

# Individual Company Analysis

*** RevoLaze, LLC Confidential Information ***

**Table III. Individual Settlement Based On Market Share**

| Royalty Period | Past 6 Years 2009 - 2014 | Next 7 Years 2015 - 2021 | Total |
|---|---|---|---|
| Years |  |  |  |
| Royalty at 3% of Sales Price | $110,761 | $756,866 | $867,627 |
| | | | |
| **Examples:** | | | |
| Company with 12% Share of Laser Abraded Market | $13,291 | $90,824 | $104,115 |
| Company with 5% Share of Laser Abraded Market | $5,538 | $37,843 | $43,381 |
| Company with 1% Share of Laser Abraded Market | $1,108 | $7,569 | $8,676 |
| | | | |
| **Possible Pay Out Schedules** | | | |
| | | | |
| Company with 12% Share of Laser Abraded Market | | | |
| Due at Closing: | | | |
| Past Six Years Royalty ($) | $13,291 | | |
| Net Present Value of Next 7 Years Royalty ($)[1] | $69,925 | | |
| **Total Settlement** | **$83,217** | | |
| | | | |
| Company with 5% Share of Laser Abraded Market | | | |
| Due at Closing: | | | |
| Past Six Years Royalty ($) | $5,538 | | |
| Net Present Value of Next 7 Years Royalty ($)[1] | $29,136 | | |
| **Total Settlement** | **$34,674** | | |
| | | | |
| Company with 1% Share of Laser Abraded Market | | | |
| Due at Closing: | | | |
| Past Six Years Royalty ($) | $1,108 | | |
| Net Present Value of Next 7 Years Royalty ($)[1] | $5,827 | | |
| **Total Settlement** | **$6,935** | | |

# Negotiated Variables

1. Volume of laser abraded jeans during the past 6 years and estimated for the next 7 years.

2. Royalty per jean.

RevoLaze, LLC Confidential Information

# Settlement Structures

1. Lump sum payment for past, present and future.

2. Upfront payment for past damages and license agreement for future.

RevoLaze, LLC Confidential Information

30

**From: William P. Farrell, Jr.** wfarrell@longfordcapital.com
**Subject:** RE: Revolaze Budget
**Date:** September 3, 2014 at 4:27 PM
**To:** Hogge, Mark L. mark.hogge@dentons.com, Michael A. Nicolas mnicolas@longfordcapital.com,
Darryl Costin (darryl@revolaze.com) darryl@revolaze.com



Thanks, Mark.

**William P. Farrell, Jr.**
Managing Director
Longford Capital Management, LP
150 North Michigan Avenue
Suite 2800
Chicago, Illinois 60601
Phone: (312) 212-8240
E-mail: wfarrell@longfordcapital.com
Website: www.longfordcapital.com

---

**From:** Hogge, Mark L. [mark.hogge@dentons.com]
**Sent:** Wednesday, September 03, 2014 3:04 PM
**To:** William P. Farrell, Jr.; Michael A. Nicolas; Darryl Costin (darryl@revolaze.com)
**Subject:** Revolaze Budget

All, I have done an analysis and reworked the numbers.  I expect to get the budget back to you all tomorrow with additional columns suggested by Bill, i.e., actual and forecast.

The major reasons for exceeding the budget have to do with the original infringer list changing as things developed, the number of claims determined to be infringed, and the actual mapping of infringement.

I've attached some notes on the original infringer list, which shows a fair amount of drift in the ensuing investigation and infringement mapping.  The order of magnitude remained essentially the same:  we sued 17 vs. the original list of 24.

We determined that some 70 patent claims (including both dependent and independent claims) were infringed by these 17 companies, with the proof including scanning electron micrographs for each.  There are about 1400 infringement charts and we filed them all at the ITC.  Though we were only required to map and file charts for just the independent claims we were asserting.

The good news is that we appear to be on budget for the District Court filings.

More to come.

**DENTONS** Mark L. Hogge

D +1 202 408 6443   |   US Internal 26443
mark.hogge@dentons.com
Bio   |   Website

Dentons US LLP

Exhibit 30

SNR Denton is proud to join Salans and FMC as a founding member of Dentons.

Dentons is an international legal practice providing client services worldwide through its member firms and affiliates. This email may be confidential and protected by legal privilege. If you are not the intended recipient, disclosure, copying, distribution and use are prohibited; please notify us immediately and delete this copy from your system. Please see dentons.com for Legal Notices.

31

**From:** **William P. Farrell, Jr.** wfarrell@longfordcapital.com  📎  
**Subject:** Revolaze - Dentons Invoices
**Date:** October 23, 2014 at 9:27 AM
**To:** Steven J. Stein (steven.stein@dentons.com) steven.stein@dentons.com
**Cc:** darryl@revolaze.com, mark.hogge@dentons.com, Michael A. Nicolas  mnicolas@longfordcapital.com, Jason E. Searfoss jsearfoss@longfordcapital.com

Exhibit 31

Steve,

We are looking forward to speaking with you at the top of the hour.

Attached please find a schedule of invoices and payments for the pre-suit investigation and post-filing phase of the Dentons budget.  This schedule is current as of the Dentons invoice delivered yesterday.  As you will see, the overage currently stands at more than $1 million and 300% over budget.

Bill

**William P. Farrell, Jr.**
Managing Director
Longford Capital Management, LP
150 North Michigan Avenue
Suite 2800
Chicago, Illinois 60601
Phone: (312) 212-8240
E-mail: wfarrell@longfordcapital.com
Website: www.longfordcapital.com



**LONGFORD CAPITAL**
LITIGATION FINANCE

| | Funding Agreement dated as of February 7, 2014 | | | | |
|---|---|---|---|---|---|
| Pre-suit investigation + post filing (2 months pre-suit and 1 month post filing) | | | | | |
| Budgeted Legal Fees | $300,000.00 | | | | |
| Budgeted Expenses | $50,000.00 | | | | |

| | Legal Fees | | Expenses | | |
|---|---|---|---|---|---|
| | Amount | Budget Remaining | Amount | Budget Remaining | Comments |
| Invoice No. 1548653 | $87,831.91 | $212,168.09 | $12,355.91 | $37,644.09 | Paid by wire 4/11/14 |
| Invoice No. 1551863 | $147,353.56 | $64,814.53 | $62,862.66 | ($25,194.57) | Paid by wire 5/14/14 |
| Invoice No. 1559772 | $102,438.47 | ($37,623.94) | $40,635.03 | ($65,831.16) | Paid by wire 5/30/14 |
| Invoice No. 1567031 | $180,031.22 | ($217,645.16) | $63,647.19 | ($135,478.30) | Paid by wire 8/14/14 |
| Invoice No. 1576129 | $158,540.36 | ($376,185.52) | $65,747.41 | ($223,428.19) | Received 7/23/14; Expense portion paid by wire 10/7/14 |
| Invoice No. 1582181 | $155,541.14 | ($571,726.66) | $14,618.90 | ($238,047.09) | Received 8/15/14; Expense portion paid by wire 10/7/14 |
| Invoice No. 1590092 | $64,516.37 | ($636,243.03) | $10,537.26 | ($248,584.35) | Received 10/1/14 |
| Invoice No. 0023 (Summit Global Services, LLC) | $26,000.00 | ($662,243.03) | $0.00 | ($248,584.35) | Paid by wire 10/14/14 |
| Invoice No. 1599085 | $127,461.95 | ($790,105.98) | $35,529.95 | ($284,114.30) | Received 10/12/14 |

32

**From:  William P. Farrell, Jr.** wfarrell@longfordcapital.com
**Subject:** Revolaze
**Date:** November 10, 2014 at 5:05 PM
**To:** Stein, Steven J. steven.stein@dentons.com, Michael A. Nicolas mnicolas@longfordcapital.com
**Cc:** Hogge, Mark L. mark.hogge@dentons.com, darryl@revolaze.com



Steve,

I just left a message with your secretary.

Please call me to discuss.  Suffice it to say, we do not agree with your email.

Bill

**William P. Farrell, Jr.**
Managing Director
Longford Capital Management, LP
150 North Michigan Avenue
Suite 2800
Chicago, Illinois 60601
Phone: (312) 212-8240
E-mail: wfarrell@longfordcapital.com
Website: www.longfordcapital.com

---

**From:** Stein, Steven J. [steven.stein@dentons.com]
**Sent:** Monday, November 10, 2014 8:15 AM
**To:** William P. Farrell, Jr.; Michael A. Nicolas
**Cc:** Hogge, Mark L.
**Subject:**

Bill:

We are operating under a heavily negotiated funding agreement which is working as intended.  There are, as you know from our continuing updates, respondents that have or shortly will accept licensing arrangements and this group will increase as the proceedings at the ITC intensify in late winter-early spring.  In any case there is ongoing discovery as provided under the rules.
A major disappointment for us is LCF's delay in making prompt payments which we hope can be restored in light of our assurances to you that the firm is 100% aligned with LCF (as it is with Revolaze, of course) to completing the ITC phase of the case, indeed all phases as the proceedings prove necessary.  You need not be concerned about payments to conflict counsel as there is no intention on Daryl's part to pursue the few potential "Dentons conflicted" respondents at this time.  Should this change we can discuss handling.

With this assurance, we see no reasonable basis on which to make revisions to the funding agreement.  We ask that LCF catch up immediately by paying the outstanding balance.  We will issue the invoice for October services later today as to assure prompt receipt of the large balance that has built up .

With personal regards,
Steve

Steven J. Stein

Exhibit 32

**DENTONS** Steven J. Stein

D +1 212 398 4879  |  US Internal 14879
steven.stein@dentons.com
Bio   |   Website

Dentons US LLP

SNR Denton is proud to join Salans and FMC as a founding member of Dentons.

Dentons is an international legal practice providing client services worldwide through its member firms and affiliates. This email may be confidential and protected by legal privilege. If you are not the intended recipient, disclosure, copying, distribution and use are prohibited; please notify us immediately and delete this copy from your system. Please see dentons.com for Legal Notices.

33

**From: Jim Schnorf** jschnorf@wsscapital.com
**Subject:** RE: LCF
**Date:** November 21, 2014 at 2:43 PM
**To:** Stein, Steven J.  steven.stein@dentons.com,  Darryl Costin Sr  darryl@revolaze.com

Steve,

Left you a voice mail, I would strongly encourage a fair resolution on this
and under no circumstances taking action that stops work or goes down the
path of filing some type of complaint.  As discussed I think both sides have
had some disconnects on the proper interpretation and assessment of the
situation.

Jim Schnorf, President
Wall Street Strategic Capital, Inc.
www.wsscapital.com
407-788-5123


-----Original Message-----
From: Stein, Steven J. [mailto:steven.stein@dentons.com]
Sent: Friday, November 21, 2014 2:29 PM
To: Darryl Costin Sr; Jim Schnorf
Subject: LCF

Waiting for my management to instruct response to Bill's offer.

Sent from my iPhone

Exhibit 33

# CUYAHOGA COUNTY, OHIO

### DESIGNATION FORM TO BE USED TO INDICATE THE CLASSIFICATION OF THE CAUSE

RevoLaze, LLC
_____
*Plaintiff*

vs.

Dentons US LLP, et al.
_____
*Defendant*

Judge: DAVID T MATIA

CV 16 861410
_____

| | | |
|---|---|---|
| Has this case been previously filed & dismissed? Yes ☐ No ☑ | | |
| Case #: _____ Judge: _____ | | |
| Is this case related to any cases now pending or previously filed Yes ☐ No ☑ | | |
| Case #: _____ Judge: _____ | | |

## CIVIL CLASSIFICATIONS: *Place an (X) in ONE Classification Only.*

### Professional Torts:
- ☐ 1311 Medical Malpractice
- ☐ 1315 Dental Malpractice
- ☐ 1316 Optometric Malpractice
- ☐ 1317 Chiropractic Malpractice
- ☑ 1312 Legal Malpractice
- ☐ 1313 Other Malpractice

### Product Liability:
- ☐ 1330 Product Liability

### Other Torts:
- ☐ 1310 Motor Vehicle Accident
- ☐ 1314 Consumer Action
- ☐ 1350 Misc Tort

### Workers Compensation:
- ☐ 1550 Workers Compensation
- ☐ 1531 Workers Comp. Asbestos

### Foreclosures:
Utilize Separate Foreclosure
Designation Form

### Commercial Docket
- ☐ 1390 Cognovit

### Administrative Appeals:
- ☐ 1540 Employment Services
- ☐ 1551 Other

### Other Civil:
- ☐ 1500 Replevin/Attachment
- ☐ 1382 Business Contract
- ☐ 1384 Real Estate Contract
- ☐ 1388 Consumer Debt
- ☐ 1391 Other Contract
- ☐ 1490 Foreign Judgment
- ☐ 1491 Stalking Civil Protection Order
- ☐ 1501 Misc Other
- ☐ 1502 Petition to contest Adam Walsh Act
- ☐ 1503 Certificate of Qualification for Employment

| Amount of Controversy: | |
|---|---|
| ☐ None Stated | |
| ☐ Less than $25,000 | |
| ☑ Prayer Amount $52 million | |

| Parties have previously attempted one of the following prior to filing: | |
|---|---|
| ☐ Arbitration | |
| ☐ Early Neutral Evaluation | |
| ☐ Mediation | |
| ☑ None | |

*I certify that to the best of my knowledge the within case is not related to any now pending or previously filed, except as noted above.*

Ballenger & Moore Co., L.P.A.
_____
*Firm name (Print or type)*

405 Madison Avenue, 20th Floor
_____
*Address*

Toledo, Ohio 43604
_____
*Address*

(419) 243-1040
_____
*Phone*

Troy L. Moore
_____
*Attorney of Record (Print or type)*

_____
*Signature*

tlmoore@ballengermoore.com
_____
*Email Address*

0030047
_____
*Supreme Court #*

Print Form

**SUMMONS IN A CIVIL ACTION** **COURT OF COMMON PLEAS, CUYAHOGA COUNTY JUSTICE CENTER**
CLEVELAND, OHIO 44113

| CASE NO. | | | SUMMONS NO. |
|---|---|---|---|
| CV16861410 | D1 FX | | 28788238 |

Rule 4 (B) Ohio

Rules of Civil
Procedure

REVOLAZE, LLC | PLAINTIFF
VS
DENTONS US, LLP, ET AL | DEFENDANT

## SUMMONS

DENTONS US LLP
C/O RL& F SERVICE CORP.
920 N. KING STREET, 2ND FLOOR
WILMINGTON DE 19801-0000

You have been named defendant in a complaint (copy attached hereto) filed in Cuyahoga County Court of Common Pleas, Cuyahoga County Justice Center, Cleveland, Ohio 44113, by the plaintiff named herein.

You are hereby summoned and required to answer the complaint within 28 days after service of this summons upon you, exclusive of the day of service.

Said answer is required to be served on:



Said answer is required to be served on Plaintiff's Attorney (Address denoted by arrow at left.)

**Plaintiff's Attorney**

TROY L. MOORE
BALLENGER & MOORE CO.

405 MADISON AVE., 20TH FLOOR
TOLEDO, OH 43604-0000

Your answer must also be filed with the court within 3 days after service of said answer on plaintiff's attorney.

If you fail to do so, judgment by default will be rendered against you for the relief demanded in the complaint.

Case has been assigned to Judge:

DAVID T MATIA
Do not contact judge. Judge's name is given for attorney's reference only.

**NAILAH K. BYRD**
Clerk of the Court of Common Pleas

| DATE |
|---|
| Apr 5, 2016 |

By _____ Deputy

COMPLAINT FILED 04/04/2016

SUMMONS IN A CIVIL ACTION    COURT OF COMMON PLEAS, CUYAHOGA COUNTY JUSTICE CENTER
CLEVELAND, OHIO 44113

| CASE NO.<br>CV16861410 | D2 FX | SUMMONS NO.<br>28788239 |
|---|---|---|

Rule 4 (B) Ohio

Rules of Civil Procedure

|  | |
|---|---|
| REVOLAZE, LLC<br>VS<br>DENTONS US, LLP, ET AL | **PLAINTIFF**<br><br>**DEFENDANT** |

**SUMMONS**

MARK L. HOGGE
C/O DENTONS US LLP
1301 K STREET, NW
SUITE 600, EAST TOWER

WASHINGTON DC 20005-0000



Said answer is required to be served on:

Plaintiff's Attorney

TROY L. MOORE
BALLENGER & MOORE CO.

405 MADISON AVE., 20TH FLOOR
TOLEDO, OH 43604-0000

You have been named defendant in a complaint (copy attached hereto) filed in Cuyahoga County Court of Common Pleas, Cuyahoga County Justice Center, Cleveland, Ohio 44113, by the plaintiff named herein.

You are hereby summoned and required to answer the complaint within 28 days after service of this summons upon you, exclusive of the day of service.

Said answer is required to be served on Plaintiff's Attorney (Address denoted by arrow at left.)

Your answer must also be filed with the court within 3 days after service of said answer on plaintiff's attorney.

If you fail to do so, judgment by default will be rendered against you for the relief demanded in the complaint.

Case has been assigned to Judge:

DAVID T MATIA
Do not contact judge. Judge's name is given for attorney's reference only.



NAILAH K. BYRD
Clerk of the Court of Common Pleas

| DATE<br>Apr 5, 2016 | By _____<br>Deputy |
|---|---|



COMPLAINT FILED    04/04/2016

CMSN130

**SUMMONS IN A CIVIL ACTION**   **COURT OF COMMON PLEAS, CUYAHOGA COUNTY JUSTICE CENTER**
CLEVELAND, OHIO 44113

| CASE NO. | | SUMMONS NO. |
|---|---|---|
| CV16861410 | D3 FX | 28788240 |

Rule 4 (B) Ohio

Rules of Civil
Procedure

REVOLAZE; LLC **PLAINTIFF**
VS
DENTONS US, LLP, ET AL **DEFENDANT**

## SUMMONS

STEVEN J STEIN
C/O DENTONS US LLP
1221 AVENUE OF THE AMERICAS
NEW YORK NY 10020-0000



**Said answer is required to be served on:**



Plaintiff's Attorney

TROY L. MOORE
BALLENGER & MOORE CO.

405 MADISON AVE., 20TH FLOOR
TOLEDO, OH 43604-0000

You have been named defendant in a complaint (copy attached hereto) filed in Cuyahoga County Court of Common Pleas, Cuyahoga County Justice Center, Cleveland, Ohio 44113, by the plaintiff named herein.

You are hereby summoned and required to answer the complaint within 28 days after service of this summons upon you, exclusive of the day of service.

Said answer is required to be served on Plaintiff's Attorney (Address denoted by arrow at left.)

Your answer must also be filed with the court within 3 days after service of said answer on plaintiff's attorney.

If you fail to do so, judgment by default will be rendered against you for the relief demanded in the complaint.

**Case has been assigned to Judge:**

DAVID T MATIA
Do not contact judge. Judge's name is given for attorney's reference only.



NAILAH K. BYRD
Clerk of the Court of Common Pleas

| DATE |
|---|
| Apr 5, 2016 |

By_____
Deputy



COMPLAINT FILED    04/04/2016

CMSN130